UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| THERSIA J. KNAPIK | |
| PLAINTIFF | CASE NO. 2:12-cv-175 |
| v. | |
| MARY HITCHCOCK MEMORIAL HOSPITAL | |
| DEFENDANT | |

### *AMENDED VERIFIED COMPLAINT AND JURY DEMAND*

PLAINTIFF brings this action against defendant, asserts the facts and claims and seeks the remedies delineated herein, as follows:

### Jurisdiction

1. Plaintiff is a resident of White River Junction in Windsor County, Vermont, as she was during her residency.

2. Mary Hitchcock Memorial Hospital ("MHMH") is located in Lebanon, New Hampshire.

3. Jurisdiction is proper in this Court by virtue of diversity of citizenship. 28 U.S.C.A. §1332.

### Defendant

4. MHMH operates its residency programs under the auspices of the Accreditation Council for Graduate Medical Education ("ACGME").

5. The ACGME is an independent accrediting organization that review and accredits graduate medical programs for specialties and sub-specialties based no its published

standards and those of its member organizations including the American Medical Association ("AMA").

6. As the accrediting organization for medical residency programs in this country, the ACGME establishes educational standards for medical graduate programs and compares individual programs with the standards. This process results in accreditation decisions for defendant's residency programs.

7. ACGME establishes "core competencies" that residents must fulfill in order to graduate with a specialty medical degree in preparation for acquiring a license for specialty practice.

8. The ACGME "core competencies" require residents to demonstrate medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism and systems-based practice.

9. AGCME also establishes clinical course requirements that residents must undertake and pass with satisfactory ratings.

10. Defendant's educational programs must comply with ACGME standards in order to be accredited by that organization.

11. ACGME standards include those adopted by several accreditation organizations, including the AMA.

12. The AMA issued formal opinions concerning physicians' conduct and ethical obligations.

13. The AMA issued a formal opinion specifically regarding physicians' ethical obligation to report a colleague's unethical conduct or incompetence.

14. The AMA Opinion mandates that unethical behavior that threatens patient care or

Watts Law Firm PC, PO Box 270, Woodstock, VT 05091
Tel: (802) 457-1020 Fax: (802) 432-1074 Email: wattslawfirmpc@gmail.com

Page 2 of 12

welfare be reported to the appropriate authorities.

15. The AMA Opinion also stresses that, when a physician's inappropriate conduct continues despite initial reports, the reporting physician should report the matter to a higher or additional authority.

**Plaintiff**

16. During 2007 - 2012, defendant employed plaintiff first as an intern (2007-2008) then as a resident physician (2008-2012) in its surgery department residency program.

17. Plaintiff was a New Hampshire physician, licensed for training purposes.

18. Plaintiff's academic performance in defendant's surgical residency program was excellent.

19. Plaintiff's clinical performance in defendant's surgical residency program was excellent.

20. Plaintiff's training performance in defendant's surgical residency program was excellent.

21. Plaintiff received numerous letters of recommendation from defendant's faculty and clinical supervisors.

22. By June 2012, plaintiff successfully completed the requirements of her residency program and was eligible for graduation.

## COUNT ONE:
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

23. Plaintiff incorporates paragraphs 1-22 into this count.

Watts Law Firm PC, PO Box 270, Woodstock, VT 05091
Tel: (802) 457-1020 Fax: (802) 432-1074 Email: wattslawfirmpc@gmail.com

Page 3 of 12

24. During plaintiff's fourth residency training year, another surgical resident gave plaintiff a letter that detailed the basis for the other resident's probation while in the surgery training program.

25. The other resident's program director and "vice chair for academic affairs and faculty development" castigated the other resident for serious breaches of the ACGME "core competencies."

26. The program director expressed serious concerns, the faculty's and his own, about the other resident's patient care, including "attention to detail," medical knowledge, including not being aware of "the steps of the operations you are performing," as well as deficient practice-based learning and improvement, professionalism and interpersonal and communication skills.

27. The program director effectively placed the other resident on probation, delaying advancement to the final year of training until the resident demonstrated clear improvement in the identified categories.

28. Defendant's faculty severely questioned the other resident's competence.

29. Resident physicians who seek additional post-graduate training may apply for fellowships at medical training institutions.

30. Plaintiff and the other resident applied for and were accepted for fellowships in their field of surgical sub-specialty.

31. In applying for fellowships and the related state medical license, residents are required to state under oath whether they were subject to disciplinary action, specifically including probation at any time during their training.

32. Plaintiff urged the other resident to be honest with full disclosure and comply with

Watts Law Firm PC, PO Box 270, Woodstock, VT 05091
Tel: (802) 457-1020 Fax: (802) 432-1074 Email: wattslawfirmpc@gmail.com

Page 4 of 12

the relevant professional ethical standards by admitting the other resident's probationary status and providing the probation letter on the other resident's applications for fellowship programs and state licensing authorities.

33. Plaintiff reasoned that it was important for physicians to create and maintain a trusting and honest relationship with their training institution.

34. Plaintiff drew a parallel between an illness she contracted during training – that she disclosed to defendant – and the other resident's disciplinary record.

35. After considerable debate between the two residents, the other resident declined to admit the other resident's probation or to send the probation letter to the fellowship program or the state licensing authority.

36. On information and belief, the other resident effectively submitted false documentation to the institution and the state.

37. Plaintiff was aware of her ethical obligation, as a physician, to report unethical behavior or incompetence "that threatens patient care or welfare" to appropriate authorities.

38. Plaintiff was aware of the AMA Opinion stressing that, when she is aware of a physician's inappropriate conduct, she must "report the matter to a higher or additional authority."

39. Plaintiff was extremely troubled that a physician would lie or mislead authorities on the fellowship and licensing applications, concluding that, a physician who would lie under oath to authorities about the probation during medical training, lacked the required physician's ethical commitment.

40. Plaintiff reasoned that a lie under oath in the fellowship and licensing process may

well lead to other misconduct as a practicing physician – a surgeon.

41. The probation letter identified several areas that relate to the other resident's propensity for cutting corners – even in surgical procedures!

42. Acting on her reasonable conclusion that the other resident's refusal and/or failure to inform the fellowship program and the licensing state about the other resident's probation was, in effect, perjury, plaintiff sent the probation letter to the fellowship program and the state licensing authority.

43. Plaintiff was also troubled that if she failed to report the false information she would be complicit in the other resident's unethical conduct.

44. Upon learning that plaintiff sent the other resident's probation letter to the fellowship and state authorities, defendant suspended and then fired plaintiff.

45. Defendant's rationale for dismissing plaintiff was that she engaged in "behavior incompatible with the role of a physician and counter to the Dartmouth-Hitchcock Code of Ethical Conduct" and other policies.

46. The policies that defendant cited as justification for its dismissal of plaintiff are vague and, even under a loose interpretation, do not support plaintiff's dismissal on ethical grounds.

47. Defendant claimed that the other resident's probation letter – which the other resident gave to plaintiff – was an internal "quality assurance document" that plaintiff provided to others without authority from the other resident nor the probation letter's author.

48. Defendant claimed that plaintiff violated ACGME "core competency of professionals" – without specifics or elaboration.

Watts Law Firm PC, PO Box 270, Woodstock, VT 05091
Tel: (802) 457-1020 Fax: (802) 432-1074 Email: wattslawfirmpc@gmail.com

Page 6 of 12

49. Plaintiff violated none of the ACGME "core competency of professionals."

50. And, defendant castigated plaintiff for failure to demonstrate "remorse" for her actions – without reference to its policies.

51. Actually, public policy commands that physicians' professional ethical standards and obligations control over institutional policies.

52. Plaintiff was aware that physicians' professional ethical standards and obligations control over institutional policies and determined to adhere to the former by sending the other resident's probation letter to the fellowship institution and the licensing state.

53. Plaintiff, thus, was adhering to professional ethical obligations rather than the vague and subjective definition of a "quality assurance document;" under the circumstances, plaintiff was not required to secure the probation letter author's – or the other resident's – permission to transmit it.

54. Defendant's actions were unjustified and amounted to wrongful termination from employment in violation of public policy as established by the professional AMA standards identified above.

55. The New Hampshire Board of Medicine enforces the AMA ethical standards. R.S.A. 329:17.

56. As plaintiff's employer, defendant was not entitled or permitted to terminate her for reasons that are contrary to public policy.

57. Defendant's actions constituted wrongful termination in violation of public policy.

58. As a result of defendant's illegal action in dismissing her from the residency program for institutional reasons and ignoring professional ethical standards that compelled

plaintiff's actions, plaintiff's training was halted, her fellowship canceled and her career ruined.

59. After nine years of training, graduation from medical school and successfully completing defendant's residency program, plaintiff does not even possess a medical license to practice medicine.

60. Plaintiff has, thus, suffered significant personal, professional and career losses.

61. Plaintiff requests judgment against defendant for wrongful termination in violation of public policy.

62. Plaintiff also requests an award of monetary damages to compensate her for lost earnings and other compensation as well as punitive damages, court costs and other relief, as warranted, that the jury may determine.

## COUNT TWO:
## BREACH OF IMPLIED CONTRACT OF EMPLOYMENT

63. Plaintiff incorporates paragraphs 1-62 into this count.

64. Defendant's residency and personnel policies establish that resident physicians are provided post-medical school graduate educational and clinical training.

65. A residents' tenure in the program is secure so long as the resident maintains acceptable academic and clinical progress and does not violate ethical standards.

66. Defendant's policies constitute an implied contract of employment between it and the plaintiff.

67. When defendant fired plaintiff, it accused her of violating its policies.

68. Defendant's policies define "just cause" for termination from employment.

69. The policies establish an implied contract of employment to the effect that defendant

Watts Law Firm PC, PO Box 270, Woodstock, VT 05091
Tel: (802) 457-1020 Fax: (802) 432-1074 Email: wattslawfirmpc@gmail.com

Page 8 of 12

may not dismiss a resident absent "just cause."

70. Defendant's reasons for terminating plaintiff, described above, constituted alleged "just cause" for her dismissal.

71. Under the just cause doctrine, an employer's discharge of an employee must be reasonable; that is, it must be reasonable to dismiss an employee because of the misconduct alleged and the employee must have received fair notice that the conduct would be ground for termination.

72. Although defendant's reasons for dismissing plaintiff were tantamount to "just cause" reasons, they were false.

73. Defendant's reasons for dismissing plaintiff were vague and unreasonable, particularly in the context of the nationally-implemented professional ethical standards and obligations.

74. Plaintiff's understanding that the professional standards and obligations prevail over institutional policies is correct; hence, plaintiff did not have fair notice that she would be dismissed for complaining about the other resident's unethical conduct.

75. Actually, the opposite is true - plaintiff's highest obligations are the professional standards that the AMA established and New Hampshire enforces.

76. Defendant ignored the professional standards that plaintiff is required to comply with and uphold as a physician.

77. As there was no just cause for defendant's actions in dismissing plaintiff from the program, defendant breached the implied contract of employment between the parties.

78. Defendant's breach of the implied contract caused plaintiff to suffer personal, professional and career losses.

79. Plaintiff requests judgment against defendant for its breach of the implied contract of employment.

80. Plaintiff also requests an award of monetary damages to compensate for her earnings and career losses and other injuries, as may be warranted and the jury determines.

## COUNT THREE:
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

81. Plaintiff incorporates paragraphs 1-80 into this count.

82. The covenant of good faith and fair dealing is implicit in every contract.

83. The covenant requires parties to a contract to act in good faith according to the implied-in-law promise not to act in any way to undermine or destroy the parties' rights to receive the benefit of the parties' agreement, including plaintiff's employment rights.

84. In addition to its actions described above, defendant announced its decision to fire plaintiff by appearing at plaintiff's residence virtually minutes before the graduation ceremonies.

85. Defendant asserted that plaintiff was suspended because she allegedly invaded its confidential communications network, breached its confidentiality, attempting to damage the other resident's career and that the other resident's falsifying documentation was not plaintiff's or defendant's responsibility.

86. The announcement was made during a celebratory gathering of plaintiff's associates, relatives and friends at her residence.

87. Defendant's conduct humiliated plaintiff in the presence of the guests at her residence.

88. Defendant claimed that the other resident's conduct was "in the past" and it permitted her to graduate.
89. Defendant, thus, was complicit in the other resident's unethical conduct.
90. After plaintiff explained that the other resident gave her the probation letter, defendant changed the rationale for her suspension to unethical conduct in transmitting an internal document without authorization.
91. In essence, defendant accused plaintiff of unethical conduct – for reporting unethical conduct!
92. Two weeks later, defendant again changed its rationale for disciplinary action against plaintiff – this time dismissing her from the program.
93. As described above, defendant's rationale was now more elaborate but equally vague as its initial portrayal of alleged unethical conduct.
94. Defendant's rationale was, nevertheless, false.
95. Defendant's actions prevented plaintiff from graduating and acquiring a certificate to advance into the fellowship program where she had been accepted.
96. Plaintiff was prevented from pursuing her fellowship and her career is ruined.
97. Defendant's conduct demonstrated malice, or, at minimum, reckless disregard for plaintiff's rights.
98. Defendant's actions, described here and elsewhere, constituted bad faith conduct and a breach of the covenant of good faith and fair dealing.
99. For defendant's bad faith conduct, in breach of the covenant, as described above, as well as other acts, plaintiff requests judgment against defendant.
100. Plaintiff also requests an award of monetary damages as the law permits, including punitive damages, attorney's fees and court costs, plus other remedies as the jury

determines to be appropriate.

**PLEASE NOTE: PLAINTIFF DEMANDS TRIAL BY JURY**

DATED: 8/3/12 .                                    /s/Norman E. Watts
                                                         Norman E. Watts, Esq.
                                                         Watts Law Firm PC
                                                         Attorney for Plaintiff

### *Verification*

I, Thersia J. Knapik, MD, state that I have read the foregoing Verified Complaint and Jury Demand and that the information stated therein as factual is true and those factual matters which are stated upon information and belief are believed to be true.

Dated:_____.

                                                         _____
                                                         Thersia J. Knapik, MD

**State of** _____
**County of** _____

    **Subscribed and sworn before me this** _____ **day of** _____, **2012.**

                                                        _____
                                                        **Notary Public**

                      **My Commission Expires**_____

## Verification

I, Thersia J. Knapik, MD, state that I have read the foregoing Verified Complaint and Jury Demand and that the information stated therein as factual is true and those factual matters which are stated upon information and belief are believed to be true.

Dated: 7/26/12

*Thersia J. Knapik, MD*

State of North Carolina
County of Orange

Subscribed and sworn before me this 26 day of July, 2012.

*Rachel E. Evans*
Notary Public

My Commission Expires June 11, 2017

>   RACHEL E EVANS
>   Notary Public
>   Orange Co., North Carolina
>   My Commission Expires June 11, 2017