## UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF VERMONT

| |
|---|---|
| **THERSIA J. KNAPIK** | |
| | |
| **PLAINTIFF** | **CASE NO. 5:12-cv-175** |
| | |
| **v.** | |
| | |
| **MARY HITCHCOCK MEMORIAL HOSPITAL** | |
| | |
| **DEFENDANT** | |
| | |

### *DR. KNAPIK'S MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT*

<u>Introduction</u>

Mary Hitchcock Memorial Hospital ("MHMH") dismissed Thersia J. Knapik, MD at the end of her five year surgical residency because she anonymously forwarded a letter, provided to her by another resident ("Dr. Doe"), to Dr. Doe's medical licensing authority and fellowship program in Kentucky. (Plaintiff's Statement of Disputed Material Facts ("SDMF") ¶146). The letter showed that MHMH placed Dr. Doe on probation during her fourth year of residency for several serious deficiencies, including lying on a patient-care related issue. (SDMF ¶ 147). Dr. Doe had previously emailed the letter to Dr. Knapik. (SDMF ¶ 148).

Dr. Knapik sent the letter after trying, in vain, to convince Dr. Doe to truthfully answer questions on her license application that inquired if she had been on probation or subject to disciplinary action during her residency. (SDMF ¶ 149). Dr. Knapik realized that AMA ethical standards required her to disclose Dr. Doe's lie to the relevant licensing

authority and clinical service.   The AMA permitted such reports to be submitted anonymously where there was fear of retaliation.  (SDMF ¶ 150).

When the Kentucky fellowship program received the letter, it confronted MHMH. Kentucky was unaware of the probation letter.   The disclosure embarrassed MHMH. (SDMF ¶ 151).

MHMH spoke with Dr. Doe who accused Dr. Knapik of electronically stealing the letter and sending it out of malice toward Dr. Doe.  (SDMF ¶ 153).

MHMH accepted Dr. Doe's false and uncorroborated allegations, made no genuine investigation of the allegations, did not speak to Dr. Knapik until it had already decided to dismiss her, never informed her that they were considering dismissing her, terminated her and advised her fellowship program of her termination on the same day.  (SDMF ¶ 154).

The Program Director ("PD"), Dr. Kispert, advised plaintiff that the termination decision was irrevocable. (SDMF ¶ ).

MHMH asserts that Dr. Knapik's motivation was malicious but the program director who dismissed her never asked her about her motivation.  The program director who sent the letter to Dr. Doe testified that if Dr. Knapik misunderstood the nature of the letter and mistakenly believed it was a "probation" letter, then sending the letter to Kentucky authorities did not constitute "unprofessional conduct."  (SDMF ¶ 156).

In dismissing Dr. Knapik without any warning and without any opportunity for a fair hearing before her termination became effective, MHMH violated its contractual due process requirements. (SDMF ¶ 157). MHMH communicated to Dr. Knapik's dismissal to her fellowship program and to the American Board of Surgery and New Hampshire licensing authorities.  (SDMF ¶ 158).

MHMH's actions substantially damaged Dr. Knapik's career and personal life. (SDMF ¶ 159). Since Dr. Knapik filed suit to reverse MHMH's actions and for compensation for her substantial professional and personal injuries, MHMH has compounded the damage by expressing false and insupportable allegations about her in an effort to portray her as evil and ill-intentioned. (SDMF ¶ 160).

The personal attacks upon Dr. Knapik are, for the most part, unrelated to the issues MHMH raises in its motion and memorandum for summary judgment. Accordingly, Dr. Knapik presents an analysis of the legal claims first, and returns to address the personal innuendos at the conclusion of this memorandum, beginning at page 20.

SUMMARY DISMISSAL OF DR. KNAPIK'S CLAIMS IS UNWARRANTED

Plaintiff asserts three claims against defendant:

1) Wrongful dismissal from employment in violation of public policy;

2) Breach of implied employment contract for lack of "just cause" and other transgressions of the contract relationship; and,

3) Breach of the covenant of good faith and fair dealing.

Defendant seeks summary dismissal of plaintiff claims. Before making its legal arguments, defendant engages in a lengthy monologue of condemnation, against plaintiff, containing numerous "facts" that are false and/or completely unrelated to the reasons defendant advances for summary dismissal. These are addressed at pp. *infra*.

Defendant seeks summary dismissal by arguing that:

1) the Resident's Agreement, and related institutional policies and New Hampshire law require plaintiff to exhaust administrative remedies;

2) she cannot bring both a claim for wrongful termination, a tort, and a contract claim because she was a contracted employee who may only sue on contract;

3) that, as an academic/educational institution, the Court should defer to its judgment in making employment decisions for physician residents.

Defendant's arguments are baseless.  Defendant failed to meet its burden to prove that it provided Dr. Knapik with the opportunity for an administrative remedy because it dismissed her without prior notice or opportunity for a hearing. Defendant's argument that wrongful termination and violation of contract are mutually exclusive remedies relies on case and legal theories that have since been repudiated by the New Hampshire Supreme Court.  Defendant's claim that it is entitled to special deference when making a decision to dismiss a resident for academic reasons is inapplicable here because defendant has specifically admitted that Dr. Knapik's dismissal was for non-academic reasons.    And, finally, all of defendant's arguments depend upon facts that are either indisputably wrong or fully rebutted by reliable and admissible contrary evidence and thus cannot be resolved by summary judgment.

## A.    MHMH Is Not Entitled to Summary Judgment on Exhaustion Grounds Because it Has Not Met Its Burdens on that Affirmative Defense

MHMH contends that Dr. Knapik "may not maintain [her] action"—and that it is entitled to summary judgment because she "decided to forego the evidentiary hearing [it] offered to her concerning her dismissal from the residency program." (MHMH Memo [Doc. 141] at 14).  MHMH is wrong.

As delineated below, there are three reasons demonstrating that defendant cannot prevail on its affirmative[1]/ exhaustion of remedies defense:

---

[1]/ As a preliminary matter, exhaustion is an affirmative defense, as MHMH concedes, Answer at 9, and as the Supreme Court has recognized. *Jones v. Bock*, 549 U.S. 199, 216 (2007). As with all such defenses,

(1) MHMH has not met its burden of proving the parties agreed that the Grievance Procedure ("DHMC-GP") MHMH drafted as part of its boilerplate Resident Agreement, would be their exclusive remedy and that Dr. Knapik agreed that exhaustion was a precondition for a lawsuit;

(2) MHMH has not met its burden of showing the DHMC-GP applied under the circumstances of this case or, assuming the DHMC-GP does apply here, that MHMH met its obligations to provide Dr. Knapik with the "Fair Hearing and Due Process," because it did not provide her with adequate notice and an opportunity to be heard <u>before</u> it dismissed her as the DHMC-GP requires; and

(3) MHMH has not met its burden of demonstrating that it would not have been futile for Dr. Knapik to seek to prove that she should not be dismissed before the same group of officials that already concluded that she should be dismissed and, actually, had effectuated her dismissal.

## 1.     MHMH Has Not Met Its Burden of Proving the Parties Agreed the DHMC-GP Was The Exclusive Remedy or that Exhaustion Was a Condition for Suit

First, MHMH has the burden of demonstrating that the DHMC-GP was to serve as the parties' exclusive remedy for any breach of the Resident Agreement, by either party, and that the parties agreed that exhaustion was a precondition for a lawsuit by either party.

But defendant has not established that the parties agreed, through the DHMC-GP or otherwise.  Yet, as the U. S. Supreme Court explained long ago, it is hornbook law that if a private entity provides an internal "grievance ... procedure ... in the contract, but the

---

the defendant "bears the burden of proving that it applies in a given case." *Lamprey v. Britton Constr.*, 37 A.3d 359, 364 (N.H. 2012).

parties do not intend it to be an exclusive remedy, then a suit for breach of contract will normally be heard even though such procedures have not been exhausted." *Vaca v. Sipes*, 386 U.S. 171, 184 n.9 (1967) (citing 6A CORBIN, CONTRACTS §1436 (1962)).

The contract principle is especially important in the employment context.[2] MHMH has not asserted, and there is no reason to presume, that the parties intended and agreed the DHMC-GP would be their exclusive remedy for a breach.

MHMH drafted the PPM and the DHMC-GP and those documents should be construed against it.

## 2.   MHMH Has Not Met Its Burden of Proving the DHMC-GP Applied to this Case or, Presuming It Did, that MHMH Met Its Obligations Under It.

The following facts are not in dispute. MHMH drafted and proposed, and Dr. Knapik accepted, a boilerplate contract, the Resident Agreement ("the Contract") that governed most aspects of their employment relationship. The Contract incorporated the MHMH Policies and Procedures Manual ("PPM"), which includes the DHMC-GP. (Defendant's Statement of Facts, [Doc 138] ("SOF"), ¶¶ 67-68; Plaintiff's Statement of Disputed Material Facts for Trial ("SDMF"), ¶ 175)  The PPM— "including [its] policies regarding '[g]rievance procedures and due process'"— "'is considered to be an integral part'" of the "Resident Agreement ... between Dr. Knapik and MHMH." (SOF ¶ 68; SDMF ¶ 178). The PPM promised Dr. Knapik a "Fair Hearing and Due Process" before MHMH could dismiss her. The PPM promised that she would receive the minimal due process requirements of timely, pre-dismissal "notice and opportunity to be heard"—by providing

---

[2] *See Ramirez-Lebron v. Int'l Shipping Agency, Inc*., 593 F.3d 124, 132 (1st Cir. 2010); *Rutherford v. Judge & Dolph, Ltd*., 707 F.3d 710, 714-15 (7th Cir. 2013); *Waldron v. Boeing Co.*, 388 F.3d 591, 593 n.2 (8th Cir. 2004); *Turner v. AFT*, 138 F.3d 878, 882 (11th Cir. 1998).

her a "written notice" of particulars on the charges against her <u>before</u> scheduling and holding a pre-dismissal hearing on those charges.  (SDMF ¶ 161).

But MHMH did not provide Dr. Knapik with "written notice" <u>before</u> it dismissed her. MHMH did not provide Dr. Knapik with a hearing <u>before</u> it dismissed her.  Defendant violated the PPM by offering her a hearing after the final dismissal.  No appeal was available. (SDMF ¶¶ 162-167).

The DHMC-GP is clear that the particular procedures it prescribes are available solely in one situation: <u>before</u> dismissal occurs -- <u>not afterwards</u>. Thus, the DHMC-GP explains "[t]he purpose of this policy is to delineate <u>Fair Hearing</u> procedures which assure <u>due process</u> to Residents who … are <u>recommended</u> for non-renewal or dismissal from a program due to academic deficiency, non-academic deficiency or behavior incompatible with the role of the physician." (SDMF ¶ 170).

To remove any doubt as to when the DHMC-GP does—and does not—apply, DHMC-GP's text repeats the "recommended"-only condition five more times. The subsequent references are contained in the PPM sections on "Behavior Incompatible with the Role of the Physician," "Procedure for Notification of … Dismissal …," "Hearing Procedure," and "Post-Hearing Procedure."  (SDMF ¶ 172).

These DHMC-GP provisions convincingly establish that a "recommendation" may prompt a "hearing" and a "hearing" may result in a "dismissal." But nothing in these provisions or any other part of the DHMC-GP, the PPM, or the Contract specifies -- or even contemplates -- that a Resident may request a hearing <u>after</u> dismissal.

A hearing is a post-"recommendation"/pre-"dismissal" vehicle -- nothing less and nothing more. This concept is critically important because, as summarized above (pp. 2, 6-7) and as delineated in MHMH's SOF ¶¶ 135-137, Dr. Knapik never received written

notice that dismissal was being "recommend[ed]" or even being considered.  Nor did defendant give her the opportunity to request or participate in the only hearing procedure specified in the DHMC-GP before MHMH dismissed her.

Instead of offering Dr. Knapik a pre-dismissal hearing as the DHMC-GP required—when it might have been worthwhile and productive—MHMH offered her an undefined and unprecedented "evidentiary hearing" but only after it had decided to dismiss her and after, by its own actions, it had actually dismissed her. At that point, defendant had already notified plaintiff's surgery fellowship program that it would not permit her to graduate, that she had been dismissed and that defendant would not certify her to sit for the surgical boards. As a result, the fellowship cancelled her acceptance, substantially damaging her surgical and medical careers. (SDMF ¶ 166-169).

Moreover, even if the post-dismissal evidentiary hearing MHMH "offered" were to be regarded as a legitimate part of the DHMC-GP, MHMH failed to comply with its own duties under the DHMC-GP.  Not only did MHMH reach the decision to dismiss Dr. Knapik before any hearing occurred – it did so after a completely inappropriate and deficient "investigation" into the facts and circumstances that were the basis for its dismissal decision.  (Please refer to p. 2 concerning the "investigation" and SDMF ¶ ).

Importantly, the U.S. District Court for the District of New Hampshire, like many courts around the country, has noted that an institution's "'failure to comply with its own [grievance] process … may excuse a failure to exhaust.'" *Gebo v. Thyng*, 2012 U.S. Dist. LEXIS 38124, *13-14 (D.N.H. 2012) (citations omitted).[3]/   MHMH's manifest failures excuse Dr. Knapik's own putative obligation to exhaust, even if such obligation existed.

---

[3]/ See *Garvin v. AT&T Co.*, 174 F.3d 1087, 1093 (10th Cir. 1999) ("Exhaustion is excused when … the employer through its conduct has repudiated the grievance procedure itself."). See also *Powe v. Ennis*, 177

**3.      Dr. Knapik Was Excused from Exhaustion Because of "Futility"**

Even if MHMH can surmount its first two hurdles discussed above, MHMH must establish that exhaustion would not be wasteful, profitless, and futile.  MHMH cannot meet this obligation either.  Actually, it has not even tried to do so.

The New Hampshire Supreme Court recently reiterated what it has long recognized - that "the exhaustion of administrative remedies doctrine is flexible" and "exhaustion is not required 'when further administrative action would be useless.'" *Dembiec v. Town of Holderness*, 2014 N.H. LEXIS 138, *4-5 (N.H. Nov. 13, 2014) (citations omitted).

Other state supreme courts agree, especially "where further administrative review 'would result in a decision on the same issue by the same body." *City of Suwanee v. Settles Bridge Farm, LLC*, 738 S.E.2d 597, 600 (Ga. 2013). See *Steinhart v. Cnty of Los Angeles*, 223 P.3d 57, 68 (Cal. 2010); *Lehigh Portland Cement Co. v. Dep't of Envtl. Conserv.*, 661 N.E.2d 961, 963 (N.Y. 1995).

The Supreme Court's own "precedents" similarly "<u>weigh heavily against requiring administrative exhaustion ... where the administrative body is shown to be biased or has otherwise predetermined the issue before it.</u>" *McCarthy v. Madigan*, 503 U.S. 140, 146-48 (1992) (citing *Gibson v. Berryhill*, 411 U.S. 464 n.14 (1973), and *Houghton v. Shafer*, 392 U.S. 639, 640 (1968)). (emphasis added).

---

F.3d 393, 394 (5th Cir. 1999); *Boyd v. Corrections Corp.*, 380 F.3d 989 (6th Cir. 2004); *Jamie S. v. Milwaukee Pub. Schs*, 668 F.3d 481, 494 (7th Cir. 2012); *Mercy Hosp. of Laredo v. Heckler*, 777 F.2d 1028, 1033-34 (5th Cir. 1985).

Scrupulous compliance is especially warranted in student cases as "effectively impos[es] the death penalty." *Tun v. Fort Wayne Cmty. Sch.*, 326 F. Supp. 2d 932, 947 (N.D. Ind. 2004);  See *Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 248 (E.D. Pa. 2012) (same).

In *Houghton*, a prisoner was excused from exhausting administrative remedies before challenging a rule because the ultimate decision maker, had already made his position clear. *Houghton,* 392 U.S. at 640. [4/]

Based on New Hampshire state court decisions, there is no requirement, absent a statute or contractual obligation, to exhaust administrative remedies prior to bringing a civil claim.  MHMH fails to cite a single New Hampshire case mandating exhaustion except when expressly required by statute or by contract.  Nor, has plaintiff's research revealed any.  This is remarkable given that New Hampshire courts have recognized the exhaustion doctrine for nearly two centuries.  See, e.g. *Tappan v. Evans*, 11 N.H. 311, 326 (1840); *Hub Constr. Co. v. New Eng. Breeders' Club*, 67 A. 574, 576 (N.H. 1907).  The three New Hampshire cases MHMH cites in support of its exhaustion argument prove this point and are not exceptions to it. [5/]

Thus, MHMH's reliance on *Huard v. Town of Pelham*, 986 A.2 460, 465 (N.H. 2009), is misplaced because dismissal in that case was upheld because the plaintiff had failed to exhaust the administrative remedies required by a statutory zoning ordinance before filing suit.

MHMH's reliance on *Silva v. Warden, N.H. State Prison*, 839 A.2d 4 (N.H. 2003), is similarly misplaced because the federal Prison Litigation Reform Act required pre-suit exhaustion by state inmates.  *Id.* @ 6-8.

Finally, MHMH's reliance on *Reardon v. Lemoyne*, 454 A.2d 428 (N.H. 1982), is misplaced because *Reardon* involved a contract dispute between private parties.

---

[4/]  See *Phu Chan Hoang v. Comfort*, 282 F.3d 1247, 1254 (10th Cir. 2002)(decision-maker had made up its mind); See also *Cinderella Career & Fin. Schools, Inc. v. FTC*, 425 F.2d 583, 590-91 (D.C. Cir. 1970)(*Athlone Indus. v. CPSC*, 707 F.2d 1485, 1489 (D.C. Cir. 1983); *Frontier Air, Inc. v. CAB*, 621 F.2d 369, 371 (10th Cir. 1980). Notably, anyone who rendered the earlier decision cannot be trusted "to decide the issue of [its] own prejudgment himself" because it is "well-recognized ... that a man may not be a judge in his own cause." *Rose v. Giamatti*, 1989 Ohio App. LEXIS 2542, *12-13 (Ohio App. 1989). See *Brooks v. Dretke*, 444 F.3d 328, 329 (5th Cir. 2006)(citing *Dr. Bonham's Case*, 77 Eng. Rep. 646, 652 (C.P. 1610) (Coke, J.)).

[5] / MHMH previously cited [Doc. 103] *Appeal of Lynn*, 145 N.H. 350 (2000) and *Rochester School Board v. Public Employee Labor,* 149 N.H. 45 (1979).  In *Lynn*, the state whistleblower statute required exhaustion of administrative remedies, while in *Rochester*, exhaustion was required by a union collective bargaining agreement.

Absent a statute or contract mandating exhaustion, there is no requirement. The Residency Agreement does not contain such a mandate. Nor is there a N.H. statute mandating exhaustion.

Accordingly, summary dismissal of plaintiff's claims for failure to exhaust administrative remedies is unwarranted.

## B.   MHMH's Outdated View of New Hampshire Law Provides No Basis to Dismiss Dr. Knapik's Wrongful Termination Claim

Citing a 21 year-old decision, defendant argues that Dr. Knapik is barred from bringing a wrongful termination claim and a contract claim in the same suit. Defendant argues that she must elect between two (supposedly mutually exclusive)—alternatives: suing in contract or tort. Indeed, MHMH asserts that one of those options, a tort claim for wrongful termination, is foreclosed because the parties' contract was for a fixed term of years. (MHMH Memo [Doc. 141] at 18).

Even if MHMH's argument had been viable two decades ago under *Censullo v. Brenka Video, Inc*., 989 F.2d 40, 42 (1st Cir. 1993), MHMH's reliance on *Censullo* is misplaced because the past twenty years has seen New Hampshire law change in pivotal ways, particularly with the emergence of separate tort and contract claims in employment law.

A decade ago, ten years after *Censullo*, the New Hampshire Supreme Court explained: "wrongful termination is a cause of action in tort," and if "the facts constituting the breach of the contract also constitute a breach of a duty owed by the defendant to the plaintiff independent of the contract, a separate claim for tort [also] will lie.'" *Porter v. City of Manchester*, 849 A.2d 103, 114 (N.H. 2004) (citation omitted). Simply put, contract employees like Dr. Knapik can concurrently sue under contract theories (including claims for breach of implied covenants) and tort theories (for wrongful discharge).

The *Censullo* court noted, under New Hampshire law, "employees fall into two classes: contract employees and at-will employees." 989 F.2d at 42 (citation omitted). For centuries, at-will employees had no enforceable rights under any theory. "At-will" effectively meant "at-mercy." That attitude began to transition sixty-five years ago, as common law courts began to craft new remedies to vindicate both the personal interests of individual at-will employees and the broad interests of the public at large. *Monge v. Beebe Rubber Co*., 316 A.2d 549, 551 (N.H. 1974) (noting rapid change in the law).

The New Hampshire Supreme Court joined the trend in the 1970s, creating a cause of action for wrongful termination by reading "an implied covenant of good faith and fair dealing" into at-will relationships. *Harper v. Healthsource N.H*., 674 A.2d 962, 965 (N.H. 1996). Thus, like most courts, New Hampshire's courts carved out exceptions to the common law employment-at-will doctrine, noting that in some cases "the employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two." *Id*. @ 964-65 (citation omitted).

Unfortunately, however, New Hampshire courts, confusingly classified wrongful termination claims as a sub-species of contract claims. Thus, forty years ago the New Hampshire Supreme Court held "that a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system or the public good and <u>constitutes a breach of the employment contract</u>." *Monge, supra* (emphasis added).

Ironically, although the *Monge's* "holding" (and the pre- and post-*Monge* developments in New Hampshire law that *Porter* summarized), opened doors for at-will employees for redress, *Monge's* categorization of wrongful termination claims as a

variation of a contract cause of action limited the ability of contract employees to take advantage of the law's growing sense that <u>all</u> employers needed to comply with the covenants implied by law into every contract. *Porter, supra,* 113-114.  As *Porter* candidly acknowledged in 2004, "we have 'neither spoken consistently nor clearly on the nature of the wrongful claim.'" *Id,* 114. (citation omitted).

    *Porter* aimed to rectify earlier mistakes, to clarify "the nature of the wrongful claim" and, thus, to bring New Hampshire into "line with a majority of States that have considered this issue ...." *Id.*  To that end, *Porter* explained "'[t]he fundamental difference between tort and contract actions lies in the nature of interests protected. Tort actions protect the interest in freedom from various kinds of harm. Contract actions protect the interest in having promises performed.'" *Id.*  Furthermore, "a wrongful termination action is not designed to protect the employee's interest in having promises performed. Rather, it is designed to protect the employee from the harms that result from a wrongful discharge." *Id.*  Finally, "'a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation'"—such "retaliation" for a whistleblower's disclosure of unethical conduct by a person charged with protecting the public's health and safety—" 'is not in the best interest of the economic system or the public good and [therefore] constitutes a breach of the employment contract.'" *Id.* at 113 (citation omitted).

    Naturally, "the public good" cannot be adequately served if at-will employees are the only persons allowed to pursue wrongful termination claims to vindicate the public good.  To remove this anomaly, *Porter* then "conclude[d] that <u>wrongful termination is a cause of action in tort</u>." *Id.*, at 114 (emphasis added).

Most important, the fact that termination claims sound in tort, and not contract, means that such claims no longer are limited to "at-will" employees, but also are available for contract employees. For exactly these reasons, *Porter* unequivocally held that "'[i]f ... the facts constituting the breach of the contract also constitute a breach of a duty owed by the defendant to the plaintiff independent of the contract, a separate claim for tort will lie.'" *Id.* (emphasis added; citation omitted).

A "separate claim for tort" means just that: "separate" from—and in addition to—whatever breach-of-contract claims a contract employee, i.e., a non-at-will employee, may bring. Hence, as *Porter* made clear, the two claims are <u>not</u> mutually exclusive alternatives, but rather distinctly different, independent and "separate" ones.

In a nutshell, although at-will employees can only sue for the tort of wrongful termination, contract employees can sue in contract for breach and concurrently sue for wrongful termination in tort. This explains why, *before Porter*, New Hampshire courts routinely held that a "claim for breach of contract is subsumed in the wrongful termination claim," *Estate of Sweeney v. Allard Nazarian Group, Inc.*, 2003 N.H. Super. LEXIS 18 (N.H. Super. 2003).  But why <u>after</u> *Porter*, New Hampshire courts are quite willing to permit a plaintiff to simultaneously sue the same defendant for breach of contract and for wrongful termination.  *O'Keefe v. Keene Senior Ctr., Inc.*, 2009 N.H. Super. LEXIS 150, *4-10, 14-16 (N.H. Super. 2009).

Thus, here summary dismissal of plaintiff's tort and contract claims is unwarranted.

## C.   MHMH's Admissions That It Dismissed Dr. Knapik for "Non-Academic Deficiencies" Voids Its "Academic Deference" Argument

MHMH asserts that the Court should summarily dismiss Dr. Knapik's breach claims for four interrelated reasons:

(1) it dismissed Dr. Knapik for "academic" reasons;

(2) many courts have held that medical schools deserve deference whenever they dismiss hospital residents for "academic" reasons;

(3) courts grant deference because they lack the specialized knowledge and experience to question physicians' "professional judgment" regarding a resident's medical skills; and

(4) MHMH is an "academic" institution and the physicians who decided it should dismiss Dr. Knapik were exercising their "professional judgment." Q.E.D.

MHMH's syllogism is fatally flawed because its factual premise is completely false. MHMH's contention that it dismissed Dr. Knapik solely for "academic" reasons is the summary judgment equivalent of a convenient, deathbed conversion.

Indeed, what MHMH is now expressing to the Court differs diametrically from its statement to Dr. Knapik on the day it dismissed her.

For example, the first paragraph of MHMH's June 13, 2012 dismissal letter to Dr. Knapik expressly admitted: "This letter is to inform you of your dismissal .... <u>Non-academic deficiencies have resulted in your dismissal</u>." (SDMF ¶ 170).

Similarly, MHMH's Memorandum [Doc. 141] completely contradicts what defendant advised the very same day by telephone, confirmed the next day in writing. The first paragraph of MHMH's June 14, 2012 letter to Dr. Thaller stated that Dr. Knapik's dismissal "was <u>not the result of academic or clinical deficiencies</u>." (SDMF ¶ 176).  Now, MHMH seeks to recant these binding admissions, *sub silentio,* and thereby attempts to avoid their legal consequences.

Like a guilty child whistling past the graveyard, MHMH refuses even to mention much less acknowledge these admissions. Instead, MHMH cites three cases where hospitals made no admissions of any kind, and cases in which courts found the proven misconduct to be sufficient grounds for adverse personnel actions. (MHMH Memo [Doc. 141] at 20 (quoting *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 784 (2d Cir.), *cert. denied*, 502 U.S. 1013 (1991)), and citing *Fenje v. Feld*, 398 F.3d 620 (7th Cir. 2005), and *Fuller v. Schoolcraft College*, 909 F. Supp. 2d 862 (E.D. Mich. 2012)).

Each case decision is distinguishable from the facts of this proceeding.

As an initial matter, *Ezekwo* was not a "dismissal" case at all; it was a "promotion" case or, more precisely, a "refusal to promote" case. The plaintiff was a hospital resident who had lost a competitive contest to become the defendant's Chief Resident in Ophthalmology. *Ezekwo, supra,* 776-77. The District Court found that the defendant denied plaintiff the promotion she sought because she had been found lacking in essential medical knowledge and not just in interpersonal skills, let alone solely in interpersonal skills. [6]/

The reasoning is important because medical schools "have the widest range of discretion in making judgments as to the <u>academic performance</u> of students and their entitlement to promotion or graduation." *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96, n. 6 (1978) (Powell, J., concurring; emphasis added).

---

[6]/ "The determination not to appoint [Ezekwo] as Chief Resident ... was based on deficiencies in her performance in the residency, particularly in the area of interpersonal relationships, and on her lower [Ophthalmic Knowledge Assessment Program] scores. <u>The determination was **not** the result of any charge of **misconduct** against</u> her. Accordingly, the determination was <u>academic</u> and not disciplinary in nature ...." *Ezekwo,* 1990 U.S. Dist. LEXIS 15166 at *6 (emphasis added). The Court of Appeals reversed and remanded for other reasons. 940 F.2d 775 (CIR 2) 1991

The other two cases MHMH relies on, *Fenje v. Feld,* 398 F.3d 620 (7th Cir. 2005) and *Fuller v. Schoolcraft College,* 909 F.supp.2d 862 (E.D. Mich. 2012), also are inapposite. Neither involved dismissals for "non-academic deficiencies" of fifth-year surgical residents.

Instead, the plaintiffs in those cases had been provisionally accepted for admission to, or provisionally granted promotions within, medical and nursing schools, respectively, but never assumed those new positions. The institutions rescinded the provisional admissions/promotions immediately after discovering that the plaintiffs had committed academic fraud by lying on their written submissions for admission/advancement and during their accompanying interviews.

In short, they had lied to enable themselves to achieve an advantage in winning competitive slots.  In other words, they cheated their way into the schools.  *Fenje*, *supra,* 620-22; *Fuller*, *supra,* at 866-67.

Unlike "non-academic deficiencies," lying during pre-acceptance interviews and cheating on admission applications for competitive academic slots are classic "academic" violations. "Lying" and "[c]heating on exams is clearly an academic matter…" *Corso v. Creighton Univ.*, 731 F.2d 529, 532 (8th Cir. 1984).  And, a "decision to grant or deny admission" is likewise "a quintessential matter of academic judgment." *Mangla v. Brown Univ.*, 135 F.3d 80, 84 (1st Cir. 1998). *A fortiori*, lying and cheating on admission exams— or misrepresenting the results of those exams and related matters in pre-admission letters or interviews are "academic" matters *par excellence*. On the other hand, as *Fenje* explained (quoting the Supreme Court):

> "[d]isciplinary dismissals, by contrast, are those involving 'the violation by a student of valid rules of [ethical] conduct' or 'disruptive and insubordinate behavior.' Disciplinary dismissals, being more objective in nature and not

dependent upon the analytical expertise of professional academicians, will bear a 'resemblance to traditional judicial and administrative factfinding[.]'"

*Fenje,* 398 F.3d at 625 (quoting *Horowitz,* 435 U.S. at 86, 90, & 88-89).

Significantly,

"[s]ince the issue first arose 50 years ago, state and lower federal courts have recognized that there are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons .... 'Misconduct is a very different matter from failure to attain a standard of excellence in studies.'"

*Horowitz,* 435 U.S. at 87 (emphasis added; citation omitted).

Here, MHMH's written admissions to Dr. Knapik and Dr. Thaller deserve considerable weight and not merely because MHMH now shrinks from them.  For example, just two months ago, another District Court concluded that university employees' written "characterization of [a nursing student's] termination" as "non-academic"—"immediately following her dismissal"—"supports a finding that her dismissal was disciplinary in nature." *Borrell v. Bloomsburg Univ.*, 2014 U.S. Dist. LEXIS 149753, *66-67 (M.D. Pa. Oct. 21, 2014).

In *Borrell,* as here, various physicians informed both the plaintiff student and outside institutions that "her termination ... was 'non-academic,'" that "'[t]his situation is a non-academic issue,'" and that the student's "particular case involved a 'non-academic issue.'" Id. at *67. See *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 892 (1st Cir. 1988) (viewing dismissal of surgical resident as disciplinary and not academic in nature because supervising physician advised plaintiff resident "the reasons for this dismissal are purely disciplinary. Your academic performance has been consistently good.").

In the final analysis, here, as in *Lipsett* and *Borrell,* "[d]efendants' own admissions indicate that [the student] was not dismissed ... for academic reasons." *Borrell,* 2014 U.S. Dist. LEXIS 149753 at *67-68 (emphasis added).

Additionally, courts often hold that allegations that medical students or residents had transgressed "ethical and professional standards," in "violat[ion of] HIIPA and ASHA's ethical codes, which are rules of conduct," required the court to treat the student's "dismissal [] as a disciplinary dismissal." *Guse v. Univ. of South Dakota*, 2011 U.S. Dist. LEXIS 34621, *22-23 (D.S.D. Mar. 30, 2011). Thus, allegations that a dental resident had "forged a patient treatment record and presented multiple patient encounter forms that she knew to be false in order to obtain the [practice] credits that she needed to graduate" meant that resident's "expulsion, based on charges of 'inappropriate professional behavior,' under Code of Ethics, was undeniably disciplinary in nature." *Matter of Kickertz v. New York Univ.*, 952 N.Y.S.2nd 147, 149-50 (N.Y.App. div. 2012). See, *Siblerud v. Colorado State Bd. Of Agric.*, 896 F. Supp. 1506, 1513 (D. Colo. 1995) (dismissal of student from Ph.D. who misrepresented his qualifications in published articles was disciplinary, not academic); *Univ. of Tex. Medical Sch. V. Than*, 901 S.W.2d 926, 931 (Tex. 1995) (med student's "dismissal for academic dishonesty," cheating on an exam, "unquestionably is a disciplinary action for misconduct.").

Finally, whether Dr. Knapik's alleged violation of defendant's Code of Ethical Conduct was "disciplinary" or "academic" is a question properly left to the jury.

Therefore, this Court should deny MHMH's motion for summary dismissal based on its own admissions, the clear decisional authorities and the material facts in dispute.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if the record demonstrates that 1) there is no genuine dispute, 2) as to any material fact, and 3) the moving party is entitled to judgment. *Beard v. Banks*, 548 U. S. 521, 529 (2006).

A genuine dispute exists, and dismissal is improper, when a rational fact-finder, considering the evidence in the record could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U. S. 557, 586 (2009). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 254 (1986). Summary judgment is appropriate only where the non-moving party fails to make an adequate showing on an essential element of its case, as to which it has the burden of proof. *Cleveland v. Policy Management Systems Corp.,* 526 U. S. 795, 804 (19886).

In the summary process, the non-moving party's evidence will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party and all reasonable inferences will be drawn in the non-moving party's favor. *Crawford v. Metropolitan Gov't of Nashville & Davidson County*, 555 U. S. 271, 274 n.1. (2006).

Here, it is clear there are genuine factual disputes concerning the essential elements of her claims. Defendant's motion for summary judgment should be denied.

## **MHMH'S EXTRANEOUS AND FALSE ALLEGATIONS**

Although plaintiff has established that there are factual disputes concerning the essential elements of her claims concerning defendant's violation of public policy, breach of implied employment contract and the covenant of good faith and fair dealing, she wishes to address the extraneous matters that defendant raised. She provides a brief summary of the pertinent additional facts below. [7]

## **DR. KNAPIK WAS A WELL-RESPECTED RESIDENT**

---

[7]       Local Rule 7 prescribes a 25 page limit on opposition memorandum absent prior permission from the Court. If plaintiff's memorandum addressed each of the extraneous facts defendant includes in its Statement of Facts [Doc. 138], it would exceed the page limit. Therefore, plaintiff includes a more detailed accounting of the summarized facts in her separate Statement of Disputed Material Facts for Trial, ¶¶ 146-255.

Dr. Knapik was well respected by the surgery residency program.  Dr. Axelrod, Section Chief, Solid Organ Transplant Surgery at MHMH recommended plaintiff without hesitation and lauded her "welcome blend of maturity, leadership, and work ethic." (SDMF ¶ 179).  Dr. Axelrod described plaintiff as "an excellent physician, a gifted surgeon, and an asset to [a] training program."  (SDMF ¶ 180).     Another attending noted that plaintiff was "Very honest.  Reliable.  Integrity one of her strongest assets."  (SDMF ¶ 181).

In 2011, her peers elected Dr. Knapik as the upper level representative during ACGME accreditation site visit.  Dr. Freeman invited her to be part of a faculty panel to address medical student complaints and lauded her for her efforts in addressing LCME concerns.  (SDMF ¶ 190).

Plaintiff also took an active role in collecting resident feedback/recommendations concerning appointment of a new program director once Dr. Finlayson announced his departure and was instrumental in starting a women in surgery group. (SDMF ¶ 191).

Two months before summarily dismissing her, Dr. Kispert described plaintiff as "an honest and reliable resident" and an "individual with high standard to which she holds herself and those around her."  (SDMF ¶ 192).

### DR. KNAPIK DID NOT "HACK" ANY EMAIL ACCOUNT

MHMH has a robust and comprehensive IT program. (SDMF ¶ 210).  Defendant has failed to produce any documents showing that anyone other than Dr. Doe or Dr. Isak Goodwin themselves forwarded emails from their own accounts to Dr. Knapik.  There is also no reliable evidence that Dr. Knapik was capable of such sophisticated computer skills that she could "hack into" others' email accounts, nor that she had a motive to do so.  When the alleged hacking occurred (March and May 2011) the accounts were

protected by two passwords and other security protocols mandated by HIPAA.  (SDMF ¶ 212-213).

Dr. Doe's deposition testimony confirms that she lied about Dr. Knapik stealing the Finlayson letter from her e-mail account.  Dr. Doe testified that in May 2011, at a dinner at Dr. Doe's house, Dr. Doe's mother and Dr. Knapik had a detailed conversation concerning the letter and whether Dr. Doe had an obligation to report her status when applying for fellowships. Yet, Dr. Doe told MHMH that she did not know Dr. Knapik had the letter until May 2012.  (SDMF ¶ 204).   Dr. Doe also testified she never told anyone she had received a letter, never told them it was sent by email and never discussed its contents. (SDMF ¶ 205).    MHMH is unable to explain how Dr. Knapik would have been able to hack into Dr. Doe's email account to steal a letter she did not know existed, in an email she did not know was sent and on a date of which she was unaware.

**MHMH KNEW OF DR. DOE'S HISTORY OF LYING AND INCOMPETENCE**

In the Spring of 2011, Dr. Doe sought a letter of recommendation for her fellowship application from the vascular surgeons at MHMH, but she failed to inform them that her promotion to PGY5 might be delayed. Dr. Cronenwett testified he was unaware of the letter when he recommended Dr. Doe and only found out about it when contacted by the Kentucky fellowship program.  (SDMF ¶ 224).

Dr. Doe's application for a medical license in Kentucky asked her, inter alia, "Have you ever been disciplined by any licensed hospital (including postgraduate training) or the medical staff of any licensed hospital, including removal, suspension, probation, limitation of hospital privileges or *any other disciplinary* action if the action was based upon what the hospital or medical staff found to be unprofessional conduct, professional incompetence, malpractice or a violation of a provision(s) of a Medical Practice Act?"  Dr.

Doe responded "No". (SDMF ¶ 227).   Dr. Kispert signed that application on behalf of

MHMH attesting to the lack of competency problems but at the time he signed it he was,

or should have been, aware of the following facts:

- Two attendings (Dr. Strong and Dr. Tansky) at an outside rotation (Concord) wrote independently to the PD that Dr. Doe was performing inadequately and should be counseled to seek a different career altogether outside of surgery.

- Dr. Henriques documented to the PD in early 2011 that Dr. Doe had lied in reporting findings on a CT scan that she had not viewed, as cited in the Finlayson letter.

- Dr. Finlayson's 2/11/11 letter documented deficiencies in 5 of 6 core competencies, and notified Dr. Doe that unless she improved by fall 2011 she would either have to repeat her PGY-4 year or would be dropped from residency.

- Shortly after the Finlayson letter, Dr. Gupta (another trauma attending) documented that Doe had lied on rounds about lab values on a patient.  He was so outraged he terminated rounds to file a written complaint with the PD.

- Dr. Doe's promotion to PGY5 status was delayed due to the issues raised in the Finlayson letter and she was retroactively promoted in the fall of 2011.

- After serving as the PD for approximately three months and observing Dr. Doe, Dr. Kispert sent Dr. Freeman an email in January 2012 stating that Dr. Doe lacked the skills to safely practice independently and should not graduate in June 2012.

- An episode where Dr.Doe falsely reported that she had reviewed a patient's radiology prior to an amputation surgery, but when the attending attempted to amputate patient's leg a metal plate was discovered on the bone.   The plate was clearly visible on the radiology.  (SDMF ¶ 228).

During its investigation of Dr. Knapik, MHMH was also aware of inconsistencies

and unexplained anomalies in Dr. Doe's statement.

- Initially Dr. Doe insisted that the Finlayson letter must have been stolen from MHMH files and when that was shown to be wrong and evidence showed it had been forwarded from her email account she changed her story to say it was stolen from her email account.  However, she had already told MHMH that no one knew about the letter and she had never discussed it with anyone.  MHMH should have investigated how someone could have stolen a letter they did not know existed.

- When asked about her whereabouts on the day the email was forwarded from her account, Dr. Doe provided an ambiguous answer that she was "surely on trauma

rounds, etc."  There is no evidence MHMH tried to verify the claim or that Dr. Doe was unavailable to send the email.  (SDMF ¶ 229).

## DR. KNAPIK BELIEVED SHE WAS ETHICALLY OBLIGATED SEND THE LETTER TO KENTUCKY AUTHORITIES

In 2012 Dr. Knapik was completing her own state medical licensing application for a Florida license.   She inquired of Dr. Doe whether the Kentucky application included a similar question and if Dr. Doe had revealed the stipulations of the Finlayson letter in response.  Dr. Doe confirmed her application included the question but asserted that she was not going to disclose the existence of any issues arising during her residency.  (SDMF ¶ 231).

At that point Dr. Knapik became concerned about her own ethical duty to report Dr. Doe as a colleague who was lying on a medical license application.  Dr. Knapik had documentary proof of the lie and after many attempts to convince Dr. Doe to tell the truth, Dr. Knapik quit trying to help Dr. Doe and focused on her own ethical obligations. (SDMF ¶ 232).

Once Dr. Knapik realized she was potentially culpable in Doe's apparent decision to lie on a medical license application, she reviewed the Dartmouth Code of Ethics, ACS and the AMA Physician Ethical Obligations as well as the ACGME guidelines.  The AMA obligations were the most specific and declared that physicians have an ethical obligation to report unethical conduct.  "Unethical conduct that threatens patient care or welfare should be reported to the *appropriate authority for a particular clinical service*. Unethical conduct that violates state licensing provisions should be reported to the *state licensing board*." AMA Code of Medical Ethics, Opinion 9.031(emphasis added). Anonymous reporting was acceptable.  (SDMF ¶ 233).  *Id.*

Dr. Knapik believed she could be found complicit in Dr. Doe's lying.   She did not

believe she could report internally, to the same officials who had already decided Dr. Doe would be permitted to graduate despite the PD's belief that Dr. Doe could not safely practice independently.  (SDMF ¶ 235).

Dr. Knapik discussed her moral and ethical responsibilities with her therapist in late March 2012.  After considerable research and thought, Dr. Knapik complied with the AMA Code of Medical Ethics and mailed the Finlayson letter to the "state licensing board," which was the State of Kentucky Board of Medicine and to the "appropriate authority for a particular clinical service," the University of Kentucky where Dr. Doe was to continue her training. Dr. Knapik did not believe she was qualified to tell either the University of Kentucky or the Kentucky licensing authority what she believed were the implications of the Finlayson letter, thus she sent the letter with the minimum comment.  (SDMF ¶ 230).

Dr. Knapik was not motivated by anger, animosity or with the intent to harm Dr. Doe.   Her only motive was her ethical duty.   (SDMF ¶ 237).

**THE AMERICAN BOARD OF SURGERY FOUND DR. KNAPIK BOARD ELIGIBLE**

Despite defendant's actions, Dr. Knapik has been granted full and unrestricted licenses to practice medicine in New Hampshire and North Carolina. The American Board of Surgery rejected MHMH's position and declared her board eligible on July 18, 2014. She will take the surgical boards on in August of 2015. (SDMF ¶ 255).

Dated:_____12/15/14_____.                    /s/Norman E. Watts_____
                                             Norman E. Watts, Esq.
                                             Anthony Z. Roisman, Esq.
                                             Watts Law Firm PC
                                             PO Box 270
                                             Woodstock, VT 05091
                                             (802) 457-1020
                                             wattslawfirmpc@gmail.com

**<ins>Certificate of Service</ins>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 15, 2014.

Dated:<ins>       12/15/14       </ins>.

/s/Norman E. Watts<ins>            </ins>
Norman E. Watts, Esq.
Anthony Z. Roisman, Esq.
Watts Law Firm PC
PO Box 270
Woodstock, VT 05091
(802) 457-1020
wattslawfirmpc@gmail.com