## UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF VERMONT

| |
THERSIA J. KNAPIK | |
| |
PLAINTIFF | CASE NO. 5:12-cv-175
| |
v. | |
| |
MARY HITCHCOCK MEMORIAL | |
HOSPITAL | |
| |
DEFENDANT | |
| |

### _DR. KNAPIK'S STATEMENT OF GENUINE DISPUTED ISSUES OF MATERIAL FACT FOR TRIAL_

Mary Hitchcock Memorial Hospital's ("MHMH") extended statement of allegedly material facts not in dispute is compelling evidence that summary judgment is not appropriate. As noted below the most critical, relevant and material facts are contested with substantial, admissible contrary evidence. Many of the facts alleged are not relevant to the issues raised in the summary judgment motion. For example, MHMH seeks to besmirch Dr. Knapik's academic record. But, when Dr. Knapik was terminated, defendant stressed that she was not dismissed for either academic or clinical deficiencies.

"Dr. Knapik was dismissed because of how she acted on her purported ethical concerns." (MHMH Memo [Doc. 141], pp. 21-22). MHMH did not fire her for academic deficiencies.

Dr. Knapik first responds to Defendant Mary Hitchcock Memorial Hospital's Statement of Undisputed Facts in Support of its Motion for Summary Judgment in sequential order, then provides Dr. Knapik's genuine issues of material fact for trial.

1.     The characterization is denied.      Admit MHMH is located in Lebanon, New Hampshire and that MHMH sponsors medical residencies, but it also includes other programs including surgical residencies.  (Exhibit 1, Policies and Procedures Manual, ("PPM"), p. 2 (Bates MHMH 525).  In addition, the citation to a non-controlling foreign Court decision is a legal conclusion and therefore denied.

2.     Denied.  The paragraph includes legal conclusions and citations to a non-controlling foreign Court decision.  Graduate Medical Education ("GME") also includes fellowship programs, research and both medical and surgical residencies.  (*Id.*).

3.     Admitted.

4.     Denied.  The paragraph includes legal conclusions and citations to a non-controlling foreign Court decision.   Denied the descriptions provided by Dr. Doe are reliable support for the statements.  For example, post graduate year 3 ("PGY3") residents doing Concord, New Hampshire and Veteran's Administration ("VA") pediatric rotations are considered chief residents for those services.   In many rotations, including vascular, transplant and thoracic rotations, PGY4 residents are considered chief residents.

5.     Denied.  The sole direct support for the paragraph is a non-binding foreign Court decision that does not purport to address the terms or conditions of the financial arrangements between Dr. Knapik and MHMH.  In addition, nothing on the cited page from MHMH's policies and procedures directly addresses why a stipend is paid or whether the amount is negotiable or non-negotiable.  [1]/

---

[1] /   The citation to PPM (MHMH 53) at 13 appears to be a typographical error.  It appears the correct Bates citation is MHMH 536.

6.     Admitted that the medical residency training contains academic portions as well as other performance and disciplinary segments including those emphasized in the ACGME Common Program Requirements and defendant's policies and procedures. Admitted defendant's policies and procedures manual indicates "performance evaluations" are "considered confidential" but denied all evaluations are consistently treated as confidential.   Please refer to Dr. Knapik's Supplemental Statement of Genuine Disputed Issues of Material Fact for Trial ("SDMF"), ¶¶ 195, 182 and FN 3 below.

7.     Admitted plaintiff received a letter dated March 20, 2007 signed by Dr. Daniel Walsh  [2]/ and the document speaks for itself.

8.     Admitted the paragraph accurately reflects the deposition testimony cited; denied the source is reliable.

9.     Admitted.

10.     Denied.   Please refer to ¶ 178 below.

11.     Admitted.

12.     Admitted, based upon plaintiff's personal knowledge, not the unreliable testimony of Dr. Doe.

13.     The characterization is denied.   The paragraph cites an email criticism, although it incorrectly identifies the author. [3]/ It further cites one evaluation.   The cited documents speak for themselves and should be read with proper context.   Please refer to ¶ 182 below.

---

[2] / Defendant incorrectly identifies the author of the March 20, 2007 letter as  Dr. Donald Walsh.

[3] / Defendant attributes authorship of the email to Dr. Walsh.   The email appears to have originated from a personal email account of BZwolak (BZwolak2@aol.com) addressed to Dr. Knapik on 9/21/07.  Dr. Walsh was copied on the email and the email was then later forwarded from Dr. Walsh's account to Dawn

14.     Denied plaintiff "had particular trouble" with the ABSITE examinations.  Please refer to ¶¶ 187-188 below.

15.     Admitted.

16.     Denied as the only source provided to support this assertion is the testimony of Dr. Doe who is not a reliable witness, hence there is no reliable evidence of such a meeting. Please refer to ¶ 195 below.

17.     Admitted the paragraph accurately quotes an email although the editorial comment concerning the characterization of plaintiff's relationship with Ron Suciu[4]/ is denied.

18.     Admitted.

19.     Denied that the 2/11/11 letter was "confidential and privileged" with regard to the plaintiff.  The characterization of the content of the letter is also denied.  The letter speaks for itself.  The description of the alleged conversation between Dr. Doe and Dr. Finlayson is also denied as Dr. Finlayson did not confirm the conversation or the alleged advice and Dr. Doe is not a reliable witness.  Please refer to ¶ 195 below.

20.     Denied.   The residency did not approve Dr. Doe's advancement to PGY5 until several months after PGY5 began.  Such decisions were made in October 2011.  Please refer to ¶¶ 195 and 228 below.

_____

E. Robinson.   (Exhibit 2, Including Pertinent Documents produced by Plaintiff, 9/21/07 Zwolak Email, P72).

[4] /Although Dr. Knapik and Ron Suciu were involved in a romantic relationship at one time, Mr. Suciu was not Dr. Knapik's boyfriend at the time referenced in the paragraph.  They were, and continue to remain, platonic friends.  (Suciu Transcript 9:18-10-8).

21.     Denied.  There is no evidence of this nature.  MHMH relies solely on the testimony of Dr. Doe who is not a reliable witness.

22.     Admitted the paragraph accurately reflects the deposition testimony.  But, please refer to ¶¶ 197-198 below.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted, but please refer to ¶¶ 195-198, 205-205 and 214-217 below.

27.     Admitted that Dr. Doe testified Dr. Finlayson did not use the word "probation." Denied that her testimony supports the statement "nor anyone else connected with the residency program ever told Dr. Doe that she was on probation."   Deny Dr. Doe is a reliable witness, particularly given that Dr. Doe described her probation status to Dr. Knapik and Dr. Prock numerous times.  Admit the rest of the paragraph accurately quotes excerpts of the emails cited, but the entirety of the emails, defendant's policies and ACGME policies and procedures speak for themselves.    Please refer to ¶¶ 195, 214-217 and 231 below.

28.     Admitted.

29.     Denied.  Please refer to ¶¶ 218, 222 below.

30.     The characterization is denied.  Please refer to ¶¶ 218-221 below.

31.     The characterization is denied.  Please refer to ¶ 223 below.

32.     Admitted.

33.      Denied.  Please refer to ¶¶ 197-198 below.

34.     As Dr. Doe is not a reliable witness, the allegation is denied.

35.     Denied.  Please refer to ¶¶ 197-198 below.

36.     The characterization of the password is denied.   Please refer to ¶ 213 below.  Furthermore, Dr. Doe is not a reliable witness.

37.     Admit the scores were emailed on February 23, 2011.  The document speaks for itself.

38.     Admit the paragraph accurately quotes an excerpt from the email.  The document speaks for itself.

39.     Admitted.

40.     Denied Dr. Doe's testimony is reliable and that the statement is true.   Please refer to ¶ 202 below.

41.     Admitted.

42.     Denied.  Please refer to ¶ 200 below.

43.     Admitted that Dr. Doe so testified but note that she is not a reliable witness.

44.     Admitted.

45.     Dr. Doe so testified but the statement is false.    Please refer to ¶ 198  below.

46.      Admitted the paragraph accurately reflects a portion of the witness' testimony, but ignores other portions of her testimony that make this assertion not credible.  The witness is not reliable.  The editorial comment is denied.  Please refer to ¶¶ 198, 200 below.

47.     Denied.  The statement is absolutely false and Dr. Doe is not a reliable witness.  Please refer to ¶ 207 below.

48.      Admitted.

49.      Admitted the paragraph accurately quotes the deposition testimony.  Please refer to ¶¶ 208-212 below.

50.      Denied.  All accounts come from Dr. Doe who is not a reliable witness.

51.      Admitted the paragraph accurately reflects deposition testimony. But, Dr. Doe's alleged statement is inadmissible hearsay to which Dr. Knapik objects.  Please refer to ¶ 208 below.

52.      Denied.  The deposition testimony speaks for itself and does not support the statement.

53.      Admitted.  The implication that it was somehow not authorized is denied.

54.      Admitted, but please refer to ¶ 221 below.

55.      Denied as speculative with the term "apparently."  The fellowship application completed in 2011 and the medical license application which was sent to Dr. Doe directly by Kentucky was completed in 2012.  MHMH attempts to characterize them as one application.  Each document speaks for itself and Dr. Doe is not a reliable witness.   Please refer to ¶¶ 224-227 below.

56.      Denied.  Dr. Doe is not a reliable witness and the characterization of chronology is denied.  To the extent defendant is referring to the "application materials for fellowship" Dr. Doe received from Kentucky in 2012, including the medical license materials, Dr. Doe completed those medical license application materials she received directly from Kentucky in 2012 – after Dr. Finlayson had departed from DHMC.

57.      Denied.  Dr. Doe is not a reliable witness.

58.      Denied.  Dr. Doe is not a reliable witness.

59.      Admitted.

60.     Denied.  As paragraph 61 below makes clear, Dr. Doe's only knowledge of the alleged conversation is inadmissible hearsay to which plaintiff objects.   Dr. Doe is not a reliable witness.  Please refer to ¶ 204 below.

61.     Denied.  Dr. Doe's only knowledge of the alleged conversation is inadmissible hearsay to which plaintiff objects.   Dr. Doe is not a reliable witness.  Please refer to ¶ 204 below.

62.     Admitted.

63.     Denied.  The Amended Complaint speaks for itself and the purported summary of its contents and selected quotations misrepresent the contents of the complaint.

64.     Deny the paragraph contradicts the previous paragraph.   The document speaks for itself.

65.     Denied.   The document speaks for itself.  The questions are out of context and distort the testimony and MHMH is confusing two separate applications and two separate events.   Please refer to ¶¶ 224, 226 below.

66.     Deny the paragraph contradicts previous paragraphs.  The document speaks for itself.

67.     Admitted.

68.     Admitted that the PPM and ACGME policies were integral to the agreement as were the medical profession general tenets including those of the American Medical Association ("AMA").

69.     Admitted but allegation fails to note that MHMH could terminate Dr. Knapik only upon compliance with its own rules as set forth in the PPM.

70.     The characterization is denied.   Plaintiff fully completed all requirements of training.  Please refer to ¶ 175 below.

71.     Denied.  Dr. Knapik and Dr. Goodwin were the chiefs.  Dr. Doe did not become a "chief" until she was retroactively promoted in October 2011 after the semi-annual fall promotions meeting in Fall 2011.  Please refer to ¶¶ 195 and 228 below.

72.     The email contents speak for themselves.  Please refer to ¶ 193 below.

73.     Admitted that the application is so dated and speaks for itself.  Denied that Dr. Doe's testimony is valid support for the statement as she is an unreliable witness.

74.     Admitted that Dr. Doe checked "no" to the identified question.  Deny the answer was truthful as she is an unreliable witness and she was clearly "reprimanded" on several occasions.  Please refer to ¶ 228 below.

75.     Admitted Dr. Doe so testified but denied it is a truthful statement.   Dr. Doe is an unreliable witness.   Please refer to ¶¶ 194-198 and 226 below.

76.     Admitted.

77.     Denied as pure speculation.  The characterization is also denied; the statement is taken totally out of context from the February 24, 2012 e-mail.  The documents speak for themselves.

78.     Denied that this paragraph accurately reflects the full import of the Kispert/Knapik e-mail exchanges.   The documents speak for themselves.

79.     Denied.  Although an unreliable witness, Dr. Doe testified that the relationship changed in January 2012.   Emails contradict this testimony and support that the relationship changed after Dr. Knapik implored Dr. Doe to be correct the falsifications on her medical license application.  Please refer to ¶ 193 below.

80.     Denied.   Dr. Doe is an unreliable witness.   Please refer to ¶¶ 238-242 below.

81.     Denied. Please refer to ¶ 239 below.

82.     Denied.   Please refer to ¶¶ 238-242 below.

83.     Denied.   The documents do not express any of these claims, are out of context and plaintiff did not refer to Doe as a "bitch."   She was referring to the circumstances at the time.   (Clayton Deposition 29:17-18).

84.     Admit the quoted language appeared in the e-mail but it is wholly out of context and the document speaks for itself.

85.     The allegation and the characterization of the "list of issues" is denied and the context is seriously misleading.   The email speaks for itself.

86.     Admit the quoted language appears in the document.   The e-mail speaks for itself. Please refer to ¶ 242 below.

87.     Admitted [5]/ but please refer to ¶ 231 below.

88.     Denied as Dr. Doe's testimony is unreliable.   Admit that she so testified and that the quoted language appeared in the e-mail but deny the connection that defendant has made between Dr. Doe's statements and this e-mail.   The document speaks for itself and needs to be viewed in context to understand its significance – if any.

89.     The characterization is denied, Dr. Doe's testimony is unreliable and the statements are taken out of context.   Please refer to ¶ 206 below.

---

[5] /     The paragraph appears to contain a typographical error.   Plaintiff's response assumes the second reference to "Dr. Knapik" in the paragraph should refer to "Dr. Doe."

90.     Admitted as to the document reference but note that Dr. Doe's testimony is unreliable.

91.     Denied the e-mail summary is accurate.   The document speaks for itself. Admitted plaintiff inquired in an e-mail addressed to Karen Lee about the "chances" of moving her vacation.

92.     Denied.  The quote is out of context and Doe is an unreliable witness.

93.     Denied.  Please refer to ¶ 244 below.

94.     Denied as to the characterization and context.  Please refer to ¶ 244 below.

95.     Denied as to the characterization and context.  Please refer to ¶ 244 below.

96.     Denied as to the characterization and context.  Please refer to ¶ 244 below.

97.     Denied as to the characterization and context.  Please refer to ¶ 244 below.

98.     Denied.  Drs. Doe and Knapik did exchange e-mails but deny that they were "terse" as the documents speak for themselves.  But deny that there is any connection between plaintiff's web search and the subject e-mails.  The reference to the website itself is inadmissible hearsay.

99.     Admitted.

100.    Admitted.

101.    Admitted.

102.    Admitted.

103.    Admitted.

104.    Admitted.

105.    Admitted.

106.    Admitted.

107.    Denied that Dr. Knapik's concerns related to Dr. Doe's performance.  The PPM procedure for raising performance concerns is unrelated to Dr. Knapik's motivation in sending the Finlayson letter to Kentucky.  Please refer to ¶ 233 below.

108.    Admitted that plaintiff did not give any value to an internal complaint given that defendant was aware of Doe's status but graduated and certified her.  Hence, plaintiff did not implement PPM procedures.  Please refer to ¶ 235 below.

109.    Denied that none of Dr. Knapik's closest associates knew of her concern about Dr. Doe's ethical transgressions.   Denied also is the reference to the Doe fellowship application.  Admitted Dr. Knapik did not discuss her own ethical duties with Ms. Clayton or Dr. Prock.  Please refer to ¶ 236 below.

110.    Admitted.

111.    Admitted, but please refer to ¶ 247 below.

112.    Deny hearsay statements attributed to Dr. Endean.  Admitted that the paragraph accurately reflects the deposition testimony.

113.    Deny hearsay statements attributed to Dr. Endean.   Admitted the paragraph accurately reflects the deposition testimony.

114.    Admit the excerpted language appears in the document.  The document speaks for itself.

115.    Deny the summary of the email contents or that they accurately reflect the entire document, the context within which the statements were made or the accuracy of any hearsay contained in the documents.  Object to the inadmissible hearsay.  The documents speak for themselves.

116.    Deny the hearsay references.

117.    Denied.  Dr. Doe's testimony is unreliable and the reference to an "incident" is ambiguous.   Admit that there was a discussion between Drs. Kispert and Rosenkranz regarding the Finlayson letter being sent to Kentucky.

118.    In so far as Doe's testimony supports the allegation it is denied.  But admit that MHMH received the letter from Kentucky.

119.    Admitted.

120.    Admitted.

121.    Admitted.

122.    Admitted.

123.    Denied.  Please refer to ¶ 153 below.

124.    Admitted.

125.    The characterization is denied.

126.    Denied.

127.    Admitted.

128.    Admit that Dr. Rosenkranz so testified but the deposition transcript speaks for itself.  Dr. Doe's testimony is denied as she is an unreliable witness.  Deny that Dr. Doe either stated that she was on rounds at the time the email was sent or that she was not at her computer or any other computer at the time the email was sent.  The document speaks for itself and shows that Dr. Doe asserted that she was "surely on trauma rounds, etc."

129.    Denied as there is no description of "the matter" claimed to be discussed.

130.    Admitted.

131.    Admitted.  Please refer to ¶ 157 below.

132.    Denied that the quotes adequately or accurately summarize the full contents of the emails.  The documents speak for themselves.

133.    Admitted Dr. Knapik explained her ethical obligations.   Denied the cited deposition testimony accurately depicts her explanation.    Please refer to ¶¶ 230-237 below.

134.    Admitted, the paragraph accurately quotes the email cited but please refer to ¶ 163 below.

135.    Denied as to the completeness and context of the quotes.  The document speaks for itself.  The paragraph only references a portion of the document and omits relevant statements.   Please refer to ¶¶ 163, 164 below.

136.    Denied that the quotes fully express the document's contents.  Admit that the quoted statements are contained in the document.

137.    Denied that the quotes fully express the document's contents.  Admit that the quoted statements are contained in the document.

138.    Denied that defendant informed plaintiff of any aspect of the internal grievance procedures beyond the 6/13/12 termination letter signed by Dr. Kispert and Dr. Bertrand and providing her with Dr. Bertrand's name.  Admit that the termination letter contained the quoted information.  Please refer to ¶¶ 164, 167 below.

139.    Denied that the quotes from *Connors* apply to this case.  The documents speak for themselves.  Please refer to ¶¶ 161-172 below.

140.    Denied that the quotes from *Connors* apply to this case.  The documents speak for themselves.  Please refer to ¶¶ 161-172 below.

141.   Denied in so far as the paragraph implies that there was an opportunity for a grievance hearing or that defendant properly offered that opportunity.  Please refer to ¶ 173 below.

142.   Admitted.

143.   Denied as un-authenticated document containing inadmissible hearsay. Defendant was the source of the Board's information rendering it unreliable.  Otherwise, the document speaks for itself.  The language quoted does appear in the document but it is out of context and misleading.  Please refer to ¶ 254 below.

144.   Denied as un-authenticated document containing inadmissible hearsay. Defendant was the source of the Board's information rendering it unreliable.  Otherwise, the document speaks for itself.  The language quoted does appear in the document but it is out of context and misleading.  Please refer to ¶ 245 below.

145.   Denied that there is any admissible evidence supporting the allegation.

### ***Dr. Knapik's Supplemental Statement of Genuine Issues of Material Fact For Trial***

### INTRODUCTION

146.   MHMH dismissed Dr. Knapik at the end of her five year surgical residency because she anonymously forwarded a letter, provided to her by another resident ("Dr. Doe"), to Dr. Doe's licensing authority and fellowship program in Kentucky. (Exhibit 2, 6/13/12 Termination Letter, Bates P227).

147.   The letter showed that MHMH placed Dr. Doe on probation during her fourth year of residency for several serious deficiencies including lying on a patient-care. Related issue.  (Exhibit 2, 2/11/11 Finlayson Letter, Bates P263; See also, Exhibit 3, Red Book (the applicable GME policy in February 2011 and predecessor to the PPM) @ p. 31 (Bates

MHMH 661) (Listing elements of "Probation" including "C. Written evaluation considering dismissal, non-renewal.")

148.   Dr. Doe had previously emailed the letter to Dr. Knapik.  (Exhibit 4, Knapik Affidavit, 11/21/13, ¶13).

149.   Dr. Knapik sent the letter after trying, in vain, to convince Dr. Doe to truthfully answer questions on her license application that inquired if she had been on probation or subject to disciplinary action during her residency. (*Id.*, ¶¶ 17, 21; Exhibit 5, Baker Affidavit ¶ 7).

150.   Dr. Knapik realized that AMA ethical standards required her to disclose the lie to the relevant licensing authority and clinical service.  The AMA permitted such reports to be submitted anonymously where there was fear of retaliation.  (Exhibit 4, ¶¶ 19-21; Exhibit 5, ¶10).

151.   When the Kentucky fellowship program received the letter, it confronted MHMH. Kentucky was unaware of the probation letter.  The disclosure embarrassed MHMH. (Cronenwett Transcript, 17:9; 20:9-21:6).

152.   The Kentucky fellowship program was concerned that Dr. Doe was "tainted goods." (Freeman Transcript, 59:11-13)

153.   MHMH spoke with Dr. Doe who accused Dr. Knapik of electronically stealing the letter and sending it out of malice toward Dr. Doe.  (Doe Transcript, 54:10-55:1, 55:18-20; 139:15-16).  When Dr. Rosenkranz arrived at Dr. Knapik's home on June 1, 2012, Dr. Rosenkranz alleged that MHMH had "strong evidence" that Dr. Knapik had illegally obtained an internal letter from the institution's electronic mail system, sent an internal document to outside authorities and that she wanted Dr. Knapik to know that the program

officials were exploring the possibility of "prosecution for breaking and entering, trespassing and serious breach of security." (Exhibit 4, ¶ 4).

154.    MHMH accepted Dr. Doe's false and uncorroborated allegations, made no genuine investigation of Dr. Doe's allegations, did not speak to Dr. Knapik until its officials had already decided to act, never informed Dr. Knapik that they were considering dismissing her, terminated her and advised her fellowship program of her termination on the same day.

155.    The Program Director ("PD"), Dr. Kispert, advised plaintiff that the termination decision was irrevocable.  "I plan on simply saying that after careful deliberation, we have decided to terminate [your] employment at DHMC which will include not completing the residency and not receiving a certificate.  I will tell [Dr. Knapik] that this is irrevocable and that the reason for this decision was a gross breech[sic] of professionalism for which we saw termination the only option."  (Exhibit 6, Selected Documents Produced by MHMH, June 10, 2012 Kispert Email, Bates MHMH 3043).

156.    MHMH asserts that Dr. Knapik's motivation was malicious but the program director who dismissed her never asked her about her motivation.  The program director who sent the letter to Dr. Doe testified that if Dr. Knapik misunderstood the nature of the letter and mistakenly believed it was a "probation" letter, then sending the letter to KY authorities did not constitute "unprofessional conduct."  (Kispert Transcript 88:17-19; Finlayson Transcript 59:16-23).

157.    In dismissing Dr. Knapik without any warning and without any opportunity for a fair hearing before her termination became effective, MHMH violated its contractual due process requirements. (Exhibit 1, PPM @ p. 48 of 106, Bates MHMH 571).

158.    MHMH communicated to Dr. Knapik's dismissal to her fellowship program and to the American Board of Surgery and New Hampshire licensing authorities.  (Exhibit 6, Thaller/Kispert Emails and 6/14/12 Kispert-Thaller Letter, Bates EMAILS RE: TK (POST) 000025-000026, KNAPIK TRAINING 000079/MHMH 456; 7/2/12 Kispert-Lewis Letter, Bates KNAPIK 000750/MHMH 508, KNAPIK 758-760/MHMH 516-518; 6/18/12 Bertrand-Tothill Letter, Bates KNAPIK TRAINING 000078/MHMH 457).

159.    MHMH's actions substantially damaged Dr. Knapik's career and personal life. (Exhibit 7, Knapik 12/14 Affidavit, ¶ 1).

160.    Since Dr. Knapik filed suit to reverse MHMH's actions and for compensation for her substantial professional and personal injuries, MHMH has compounded the damage by expressing false and insupportable allegations about her in effort to portray her as evil and ill-intentioned.  (Exhibit 7, ¶ 2).

## PLAINTIFF'S TERMINATION WAS FINAL ON JUNE 13, 2012

161.    The PPM promised plaintiff a "Fair Hearing and Due Process" before MHMH could dismiss her.  The PPM promised that she would receive the minimal due process requirements of timely, pre-dismissal "notice and opportunity to be heard"—by providing her a "written notice" of particulars on the charges against her before scheduling and holding a pre-dismissal hearing on those charges.  (Exhibit 1, pp. 48-49, Bates MHMH 571-572).

162.    But, MHMH did not provide Dr. Knapik with "written notice" before it dismissed her.  MHMH did not provide Dr. Knapik with a hearing before it dismissed her. Defendant dismissed plaintiff on June 13, 2012.  The decision was final at that point. Defendant violated the PPM by offering her a hearing after the final dismissal.  No appeal

was available.  (Exhibit 1, p. 48 (Bates MHMH 571); Exhibit 6, Kispert 6/10/12 Email, MHMH 3043).

163.    Dr. Kispert advised Dr. Freeman that he explained Dr. Knapik's story to Dr. Bernat, a medical ethicist at DHMC.  (Exhibit 6, 6/12/12 Email, Bates MHMH 3046; Kispert Transcript, 33:6-11).  But, Dr. Kispert failed to explain Dr. Knapik's true reason for forwarding the letter to Kentucky.  Dr. Kispert never asked Dr. Knapik why she sent the letter.   Dr. Bernat testified at deposition that he did not have all the facts.  (Kispert Transcript, 33:23-34:7; Bernat Transcript, 67).

164.    On June 13, 2014 Paul Kispert, MD met with Dr. Knapik to terminate her employment.  They hand-delivered a termination letter, signed by Dr. Kispert and Dr. Bertrand, Associate Dean for Graduate Medical Education and Designated Institutional Official ("DIO"), informing her of her dismissal effective that same date.  The letter indicated "[a]s a consequence of your dismissal, the Program Director will not certify you as being eligible to sit for the General Surgery Boards.  Non-academic deficiencies have resulted in your dismissal." (Exhibit 2, P227; Kispert Transcript, 31:24-32:2)

165.    The written notice of immediate termination further advised she would receive a final paycheck and that "[c]onsistent with your termination of employment, effective June 13, 2014 [the same date], your life and disability insurance will end."  (Exhibit 2, P227).

166.    Dr. Kispert notified the General Surgery Faculty and Residents of plaintiff's termination on June 13, 2012.  (Exhibit 6, Kispert 6/13/12 Email, Bates EMAILS RE: TK (POST) 000062).

167.    Dr. Kispert telephoned Dr. Knapik's Miami fellowship director, Seth Thaller, MD, on the same day he delivered the written notice of termination to plaintiff.  Dr. Kispert

notified Dr. Thaller that defendant had dismissed Dr. Knapik effective June 13, 2012.  He further advised he would "not be certifying her to be eligible to sit for the General Surgery Boards."   Dr. Kispert confirmed the conversation in a writing transmitted the next day. (Exhibit 6, 6/14/12 Email, EMAILS RE: TK (POST) 000025-000026; 6/14/12 Letter, KNAPIK TRAINING 000079/MHMH 456).

168.   The written notice to Dr. Thaller conveyed the finality of the termination.  The letter fails to mention plaintiff's purported opportunity to grieve the decision.  (Exhibit 6, Bates MHMH 456).

169.   The University of Miami, Jackson Health System rescinded plaintiff's fellowship offer upon hearing from defendant.  The "decision is based on written notification dated June 14, 2012 from Dr. Kispert, your General Surgery Program Director advising of your dismissal from the Dartmouth-Hitchcock General Surgery Residency program on June 13, 2012...."  (Exhibit 2, 6/21/12 Miami Letter, Bates P275).

170.   Defendant's grievance policy explains "[t]he purpose of this policy is to delineate Fair Hearing procedures which assure due process to Residents who...are recommended for non-renewal or dismissal from a program due to academic deficiency, non-academic deficiency or behavior incompatible with the role of the physician."  (Exhibit 1, p. 48, Bates MHMH 571, Emphasis Added).

171.   Prior to dismissal, defendant failed to inform Dr. Knapik of the charges against her or what, if any action, was being recommended.  Dr. Knapik was summoned to a meeting with Dr. Freeman on June 6th.  (Exhibit 6, Knapik-Freeman emails 6/4-6/12, Bates EMAILS: TO/FROM TK 000010-000011)  Dr. Knapik advised Dr. Freeman that "she felt

ethically responsible" to the Finlayson letter to Kentucky.    The only purpose of the meeting was to find out what Dr. Knapik did and why.  (Freeman Transcript, 55:5-13).

172.    Defendant's grievance process text repeats the "recommended"—only condition five more times.  The subsequent preferences are contained in the PPM sections on "Behavior Incompatible with the Role of the Physician," "Procedure for Notification of … Dismissal …," "Hearing Procedure" and "Post-Hearing Procedure."  (Exhibit 1, pp. 49-50, Bates MHMH 572-573).

173.    Defendant only offered Dr. Knapik an undefined and unprecedented "evidentiary hearing."  This occurred after it had decided to dismiss her and after, by its own actions, it had actually dismissed her.  (See MHMH Memo [Doc. 141] p. 13, MHMH Statement of Facts ("SOF")¶ 141).

174.    Defendant's actions denied plaintiff a meaningful opportunity to participate in its grievance procedure.   Plaintiff was informed her termination was effective immediately – it was not a "recommendation."

175.    Dr. Knapik completed all clinical requirements for training program completion and "participated in all necessary rotations."  (Exhibit 6, Kispert 8/20/12 Letter, Bates KNAPIK 000762-000763/MHMH 520-521).

**DEFENDANT DID NOT TERMINATE PLAINTIFF FOR ACADEMIC OR CLINICAL DEFICIENCIES**

176.    The first paragraph of defendant's written notice of dismissal provides: "This letter is to inform you of your dismissal…. <u>Non-academic deficiencies</u> have resulted in your dismissal."  (Exhibit 3, P227, Emphasis Added).

177.    Similarly, the first paragraph of MHMH's June 14, 2012 advisory letter to Dr. Thaller admitted that Dr. Knapik's dismissal "was not the result of academic or clinical deficiencies."   (Exhibit 6, MHMH 456, Emphasis Added).

### DR. KNAPIK WAS A WELL-RESPECTED RESIDENT

178.    In the spring of 2007, plaintiff was admitted to defendant's surgical residency program for the complete five year program assuming good standing.   She executed the first of five Resident/Fellow Agreement of Appointments as a Resident in General Surgery-Categorical on April 19, 2007.  The Resident/Fellow Agreement incorporated the PPM, which includes the Grievance Procedure ("DHMC-GP")(Exhibit 2, 3/20/07 Walsh Letter, Bates P11; Exhibit 2, Knapik PGY 1 Resident/Fellow Agreement of Appointment, Bates P12-P13).

179.    There were four categorical residents who began the program in June 2007: plaintiff, Dr. Doe, Dr. Isak Goodwin and Dr. Piroska Kopar.  (Goodwin Transcript 6:24-7:1).

180.    Plaintiff was well respected by the surgery residency program.  David Axelrod, MD, MBA, Section Chief, Solid Organ Transplant Surgery at Dartmouth Hitchcock Medical Center recommended plaintiff without hesitation and lauded her "welcome blend of maturity, leadership, and work ethic."  (Exhibit 2, 11/29/10, Axelrod Recommendation, Bates P5).

181.    Dr. Axelrod described plaintiff as "an excellent physician, a gifted surgeon, and an asset to [a] training program."  (*Id.*).

182.    Defendant's portrayal of plaintiff's residency at ¶ 13 above is grossly misleading. The alleged "downs" cited are: a) an informal e-mail from Dr. Zwolak (not Dr. Walsh, PD

at that time, as defendant claims (Please refer to FN 3 above) very early in plaintiff's residency; b) plaintiff's first Semi-Annual evaluation in January 2008; and 3) an evaluation in March of 2010.  These sentiments represent a tiny percentage of plaintiff's more than 60 evaluations during her residency.

183.    By April of 2008, plaintiff's performance was rated more than satisfactory (4 on a 1-5 scale) in all areas rated and by July 2008 she was receiving "vastly improved faculty evaluations" and "making excellent progress."  (Exhibit 2, Corwin eval, Bates P99-P100; Exhibit 2, Finlayson Semi-Annual Review, July 17, 2008, Bates P107).

184.    Defendant only cites Dr. Zwolak's email regarding one patient discharge summary. Dr. Zwolak mentioned the same incident in his formal evaluation, but also noted that when he "pointed out the flaws [in cutting and pasting an older discharge summary], she was quick to respond."  (Exhibit 2, Zwolak Evaluation, 7/23/07-8/19/07, P214-P217 @ P217).   Plaintiff met expectations on all sections of that same evaluation.  (*Id.*)   *See also* ¶ 78 above describing another incident in which Dr. Knapik accepted criticism and Dr. Kispert applauded her attitude.

185.    The March 2010 evaluation that defendant cited (P126) coincided with her own diagnosis of breast cancer.

186.    Dr. Knapik was diagnosed with breast cancer in or about the spring of 2010.  She underwent a bilateral mastectomy and chemotherapy treatments, continuing to maintain her full residency schedule.  She sought only minor accommodations related to her treatment schedule (such as not being on call the first weekend after an infusion), a short leave of absence and slight rotation scheduling changes.  (Knapik Affidavit ¶ 5; Exhibit 2, Arrick 7/28/10 Email Finlayson and Freeman, Bates P437).

187.    Defendant also speculates that Dr. Knapik "had particular trouble" with ABSITE exams. (¶ 14 above).  Residents sit for the ABSITE exam each January.  Dr. Knapik had been on the Trauma Service in January 2010 and in January 2011, the years she received her lowest scores.  Trauma "takes a lot of time and focus" and does not leave "much time to read" or study.   Dr. Knapik's scores improved dramatically when she was able to arrange her schedule.  (Exhibit 6, 3/18/12 Email, Bates MHMH 1223-1224).

188.    In addition, "[a] significant percentage of [DHMC surgical residents] scored at or below the 30th percentile" in 2011.  Dr. Knapik scored in the 89th percentile that year.  (*Id.*)

189.    Another attending noted that plaintiff was "Very honest.  Reliable.  Integrity one of her strongest assets."  (Exhibit 6, Erkmen evaluation, 9/27-11/14/10, Knapik Training 263-264/MHMH 318-319).

190.     In 2011, her peers elected plaintiff as the upper level representative during an ACGME accreditation site visit.  Dr. Freeman invited her to be part of a faculty panel to address medical student complaints and lauded her for her efforts in addressing LCME concerns.  (Exhibit 6, 9/4/11 Email, Bates EMAILS: TK/KD 000157; Freeman Transcript, 16:18-21).

191.    Plaintiff also took an active role in collecting resident feedback/recommendations concerning appointment of a new program director once Dr. Finlayson announced his departure and was instrumental in starting a women in surgery group.  (Exhibit 6, 9/7/11 Knapik Email, Bates MHMH 1111-1112; Exhibit 6, Knapik 7/20/11 Email, Bates EMAILS: TK/KD 000188).

192.    Two months before summarily dismissing her, Dr. Kispert described plaintiff as "an honest and reliable resident" and an "individual with high standard to which she holds herself and those around her."  (Exhibit 2, 4/10/12 Kispert Letter, Bates P429).

### DR. DOE GAVE DR. KNAPIK THE FINLAYSON LETTER

193. Dr. Doe, Teresa Prock, MD and plaintiff were close friends through most of residency.  They often socialized and as friends, often commiserated about work, family and other issues.   (Exhibit 6, 3/23/12 Doe to Knapik Email, Bates EMAILS: TK/KD 000023 (RE: Gossip); 3/21/12 Doe to Knapik Email, Bates EMAILS: TK/KD 000024 (Sharing a link "fattest human;" 3/12/12 Prock Email, Bates EMAILS: TK/KD 000035 (Re: Dr. Knapik birthday dinner); 3/5/12 Doe to Knapik Email, Bates EMAILS: TK/KD 000044 ("When are our job offers coming in?"); 2/2/12 Doe to Knapik Email, Bates EMAILS: TK/KD 000081 ("Do we really have to go through 4 more months???"); 7/9/11 Email String, Doe/Prock/Knapik, Bates EMAILS: TK/KD 000200-201 (RE: road Trip).

194.  Dr. Doe experienced multiple problems in residency and consulted with plaintiff frequently about ways to improve her rapport with attending physicians.  (Suciu Transcript, 78; Clayton Transcript, 45-46).  She also sought advice from Dr. Prock. (Prock Revised Affidavit, ¶ 5, 8).

195. On February 12, 2011, Samuel Finlayson, MD, then Program Director for Surgical Residents ("PD"), emailed Dr. Doe from a gmail address: srgfin@gmail.com.  The email did not originate from Dr. Finlayson's "hitchcock.org" email address.  The email included a letter dated February 11, 2011 addressed to Dr. Doe.  The letter read:

> This is a difficult letter to write because I like you personally, but I am
> required by my duty as the program director at Dartmouth to summarize

for you the aggregate concerns of our faculty regarding your progress as a trainee in our program. I hope you will appreciate that I will not mince words, but instead address the issues in a way that is direct and to-the-point.

Last month, the faculty met and discussed several specific concerns along the lines of what you and I discussed about a week ago. I will frame these concerns in terms of specific ACGME competencies below.

1. Patient Care
- Several faculty comment that you still seem to have significant difficulty with clinical judgment. There is concern that you approach patient care too concretely and in an inflexible way rather than a patient-specific, problem-solving way. It is felt that you have trouble prioritizing patient with sufficient depth of thought and clinical understanding.
- Concerns were raised with respect to your "attention to detail," illustrated by an incident in which you reported on the results of a CT scan that you did not personally look at a CT[sic] when doing so was clearly expected of you.
- Some faculty members have voiced concern that your operative technical skills are not at the level expected of a resident at your level of training, and that you do not clearly know the steps of the operations you are performing.

2. Medical Knowledge
- Although your performance on the ABSITE test has been satisfactory, one faculty member questioned our ability to read a journal article and glean the clinical significance of the findings. Insofar as independent learning from surgical literature is the mainstay of medical knowledge acquisition, this is a skill that you will certainly need to hone. Thorough preparation for and regular attendance at journal club and Wednesday morning teaching conferences should allow our faculty to confirm your progress in this regard.

3. Practice-based Learning and Improvement
- Some faculty comment that you seem to be reticent to receiving instruction in the operating room, and are quick to give up the surgeon role in the case rather than try the technique that you are being asked to use. Some also feel that you continue to function at a junior resident level, and have not advanced cognitively to the level of proficiency in clinical decision making expected of someone in the more advanced years of training.

4. Professionalism and 5. Interpersonal and Communication Skills
- As we discussed, there were some interactions with nurses and one of our faculty members in the emergency department that did not reflect the degree of professionalism and interpersonal skills that are expected of a surgeon. I know that you have been making efforts to repair the damage these interactions caused, and I would encourage you to follow through with that.

<u>The faculty feels (and I concur) that your promotion to the 5th year of training at DHMC should be delayed</u>.   Clear improvement in your performance must be manifest over the next few months.  If you are unable to garner faculty support for your promotion in the surgical training program, you will either have to repeat the 4th year, or end your training at DHMC.  <u>At our semiannual promotions meeting in the Fall, a decision will be made to either advance you to the 5th year (retroactive to July 2011),</u> or determine that the 2011-2012 year be a repeat of the 4th year, or (less likely) end your training at DHMC.

The CCC meets every month, and will actively follow your progress.  I will remain in touch with the faculty overseeing your coming rotations, and will give you regular feedback with respect to the level of support our faculty affords your advance to the 5th year.  I might add that your informal reviews on the vascular service appear to be good.  That's an excellent start, and hopefully signals that you have begun to turn the corner in your progress from junior to senior level work.

If there are personal or learning issues that we do not know about that are impeding your progress, I would be happy to direct you toward resources at our institution where such could be addressed in a confidential and constructive way.  Also, I am required to call your attention to the office of GME's Fair Hearing policy that can be found on the DHMC intranet.

My interest is in your success, and where I can facilitate it, I will.  However, my responsibility and moral obligation to ensure that general surgery residency graduates meet established professional competency standards cannot be compromised, regardless of my personal affection for you and the other residents in our program.

(Exhibit 2, Finlayson Letter 2/11/11, P263-P264)

196.   Dr. Doe was understandably very troubled by this news.  Dr. Doe approached plaintiff and informed her that Dr. Doe was on probation and was in danger of termination.  At the time, she did not tell plaintiff that she had received a letter detailing the concerns.  (Knapik Affidavit, 11/21/13, ¶11).

197.   Later, Dr. Doe informed plaintiff that an incident had occurred and that Dr. Doe was concerned that the incident was similar to something that led her to being placed on probation.  Plaintiff attempted to reassure her that she might be overreacting and she

became frustrated with plaintiff.  Dr. Doe informed plaintiff that she would be emailing plaintiff "something."   She did not inform plaintiff what she was emailing plaintiff. (Knapik Affidavit, 11/21/13, ¶ 12)

198.   On March 24, 2011, Dr. Doe forwarded plaintiff an email from Dr. Finlayson to Dr. Doe, with Dr. Finlayson's 2/11/11 letter attached.  This is how plaintiff learned the probationary status Dr. Doe described was documented in a letter written on 2/11/11 by Dr. Finlayson. (Knapik Affidavit, 11/21/13, ¶13)

199.   The letter was <u>not</u> stamped with defendant's Quality Assurance Stamp purporting to identify it as a confidential document.   Dr. Doe waived any expectation of privilege when she voluntarily emailed it to plaintiff.  (Exhibit 2, P263).

200.   On that same date, Dr. Doe forwarded an email from Dawn Robinson which included Dr. Doe's ABSITE scores as an attachment to Dr. Knapik.  (Exhibit 6, Screen Shot of 3/24/11 Forward, Bates MHMH 1079).

**Dr. Knapik Did Not "Hack" Into Dr. Doe's Email Account**

201.   MHMH has not produced any documents showing that anyone other than Dr. Doe forwarded the emails referenced in ¶¶ 196-197 above.   Dr. Freeman testified that defendant's information services department conducted an audit of Dr. Doe's account and found no evidence that anyone had hacked into the email.  (Freeman Transcript, 50-51).

202.   Plaintiff did not hack into or otherwise access Dr. Doe's email account on March 24, 2011 or any other day.  (Knapik Affidavit 12/14, ¶ 6).

203.   Plaintiff did not forward the Finlayson email with attached Finlayson letter Doe to herself.   Nor, did she forward the Robinson email with Doe's ABSITE scores. (Knapik

Affidavit 12/14, ¶6).  Doe herself forwarded the emails to plaintiff as "evidence" that she was not "overreacting."  (See ¶ 196  above).

204.    Defendant's sole basis for the notion that plaintiff accessed Dr. Doe's email is Dr. Doe.    But, Dr. Doe's deposition testimony confirms that she lied about Dr. Knapik stealing the Finlayson letter from Dr. Doe's email account.  Dr. Doe testified that in May of 2011, Dr. Knapik and Dr. Doe's mother discussed the letter, and whether Dr. Doe would report her probationary status to her fellowship program.   Dr. Doe testified that her mother later recounted this conversation confirming that Dr. Doe knew Dr. Knapik had the letter in 2011 and yet said nothing about it being "stolen" from her until May 2012. (Doe Transcript, 39:11-25).

205.    Dr. Doe also testified that she never told anyone she had received a letter, never told them it was sent by email and never discussed its contents.  (Doe Transcript, 92-93). DHMC is unable to explain how Dr. Knapik would have been able to hack into Dr. Doe's computer to steal a letter she did not know existed, in an e-mail she did not know was sent and on a date of which she was unaware.   The statement also contradicts the reported conversation discussed in the previous paragraph.

206.    Dr. Doe also asserts that Dr. Knapik stole an access code for an online medical book from her.   The allegation is false.  When Dr. Knapik provided direct evidence to Dr. Doe that Dr. Knapik was accessing the medical book using her own access code, Dr. Doe never responded.  When asked to produce the book whose access code she claimed Dr. Knapik had used, so its access code could be compared to the one Dr. Knapik used, Dr. Doe testified she had sold the book just before the deposition. (Exhibit 6, 4/20/12 Email, Bates KNAPIK 000724/MHMH 482; Doe Transcript, 67:21-22)

**DR. KNAPIK DID NOT HACK ANYONE ELSE'S EMAIL ACCOUNT**

207.   Dr. Doe also alleges Dr. Knapik had previously bragged about hacking into someone else's online dating account.  (Doe Transcript, 31:1-2)   Defendant alleges the testimony concerned an email account.  (¶ 47 above).  The allegation is false.  (Knapik Affidavit 12/14, ¶ 7).

208.   On May 27, 2011, Dr. Isak Goodwin forwarded an email to Dr. Knapik.  The forwarded email was an email from Ms. Robinson to Dr. Goodwin which included Dr. Goodwin's ABSITE scores and an attachment.  (Exhibit 6, 5/27/11 Goodwin Email, Bates MHMH 1089-1091).

209.   Dr. Knapik did not hack into or otherwise access Dr. Goodwin's email account on May 27, 2011 or any other day.  (Knapik Affidavit, 12/14, ¶ 8).

210.   MHMH has a robust and comprehensive IT program.  (¶ 200 above).

211.   Defendant has failed to produce any documents showing that anyone other than Dr. Doe herself forwarded the emails from her account or that Dr. Knapik somehow accessed the account.  (¶ 200 above).

212.    Defendant has failed to produce any documents showing that anyone other than Dr. Goodwin himself forwarded his ABSITE scores to Dr. Knapik in May of 2011.  Dr. Goodwin simply testified at deposition that he does not remember forwarding the scores. (Goodwin Transcript 15:8-18)

213.   At the time the emails were forwarded (March and May 2011), email accounts in defendant's system were protected by two passwords for HIPAA compliance.  (Gallant Transcript 33).

**DR. DOE ALSO DISCUSSED HER PROBATIONARY STATUS WITH DR. PROCK**

214.    Doe also informed Dr. Prock that she received a letter from Dr. Finlayson placing her on probation.  (Prock Affidavit ¶ 6)

215.    She discussed the letter with both Dr. Knapik and Dr. Prock on several occasions. (Prock Affidavit, ¶6  - Prock Transcript, 67).

216.    Doe repeatedly expressed to Dr. Prock that the DHMC surgical attending physicians were not treating her fairly.   Doe informed Dr. Prock that there were personality conflicts between the attendings and Doe that led to her probationary status; she asserted that the surgical faculty were "out to get me."  (Prock Affidavit, ¶ 7).

217.    While on what she described as "probation," Doe sought Dr. Prock's advice on how to be more deferential, stating that she "needed coaching on demeanor."  (Prock Affidavit, ¶ 8).

**FELLOWSHIP APPLICATIONS**

218.    Plaintiff applied for plastic surgery fellowship in the fall of 2010.   She submitted one common application through an online application service for highly competitive fellowship positions at multiple institutions.  (Knapik Affidavit 12/14, ¶ 9).

219.    She was invited for interviews at several programs, including her first choice at the University of Miami.    Other programs declined to interview her.  (Exhibit 42, 3/24/11 Email, Bates MHMH 1069; Knapik Affidavit, 12/14, ¶ 10).

220.    During the interview season, Dr. Knapik also investigated other employment opportunities as alternatives to a fellowship because of the large number of applicants per available plastic surgery positions.  (Knapik Affidavit, ¶ 11).

221.    In May 2011, Dr. Knapik matched at the prestigious University of Miami, Jackson Health System.  (Exhibit 6, 5/12/11 Email, MHMH 1843).

222.    Dr. Doe applied for vascular surgery fellowship in late March/early April of 2011. (Exhibit 6, Doe 3/28/11 Email, Bates MHMH 3108).

223.    Contrary to defendant's allegations, Dr. Knapik was happy for Dr. Doe when she was invited for interviews at the Mayo Clinic.    (¶ 31, above.) Dr. Knapik was experiencing the typical frustrations of applying in a highly competitive field.

**MHMH KNEW OF DR. DOE'S HISTORY OF LYING AND INCOMPETENCE**

224.    In the <u>spring of 2011</u>, Dr. Doe sought a letter of recommendation for her fellowship application from the vascular surgeons at MHMH, but she failed to inform them that her promotion to PGY5 might be delayed. Dr. Cronenwett testified he was unaware of the letter, or its contents, when he recommended Dr. Doe and only found out about it when contacted by the Kentucky fellowship program.  (Cronenwett Transcript, 20).

225.    Dr. Knapik was concerned that Dr. Doe did not tell Dr. Cronenwett or her fellowship programs of the possibility that her promotion and/or graduation might be delayed.  But, at that point she did not believe she was ethically obligated to act.

226.    A year later in the <u>spring of 2012</u>, when Dr. Knapik was completing her own application for a Florida medical license, she noticed a question about disciplinary history.  She asked Dr. Doe if her Kentucky medical license application included a similar question.  Dr. Doe confirmed the application did and that she intended to respond "no." (Knapik Affidavit, 11/21/13, ¶17).

227.    Dr. Doe's application for a medical license in Kentucky asked her, inter alia, "Have you ever been disciplined by any licensed hospital (including postgraduate training) or the medical staff of any licensed hospital, including removal, suspension, probation, limitation of hospital privileges or *any other disciplinary* action if the action was based

upon what the hospital or medical staff found to be unprofessional conduct, professional incompetence, malpractice or a violation of a provision(s) of a Medical Practice Act?" Dr. Doe responded "No". (Exhibit 2, Doe Kentucky Medical License Application, Bates P733).

228.   Dr. Kispert signed that application on behalf of MHMH attesting to the lack of competency problems (Exhibit 2, Bates P771) but at the time he signed it he was, or should have been, aware of the following facts:

- Two attendings, (Dr. Strong and Dr. Tansky) at an outside rotation (Concord) wrote independently to the PD that Dr. Doe was performing inadequately and should be counseled to seek a different career altogether outside of surgery.

- Dr. Henriques documented to the PD in early 2011 that Dr. Doe had lied in reporting findings on a CT scan that she had not viewed, as cited in the Finlayson letter.

- Dr. Finlayson's 2/11/11 letter documented deficiencies in 5 of 6 core competencies, and notified Dr. Doe that unless she improved by fall 2011 she would either have to repeat her PGY-4 year or would be dropped from residency.

- Shortly after the Finlayson letter, Dr. Gupta (another trauma attending) documented that Doe had lied on rounds about lab values on a patient.  He was so outraged he terminated rounds to file a written complaint with the PD.

- Dr. Doe was retroactively promoted to PGY5 status in the fall of 2011.

- After serving as the new PD for approximately three months and observing Dr. Doe, Dr. Kispert send Dr. Freeman an email in January 2012 stating that Dr. Doe lacked the skills to safely practice independently and should not graduate in June 2012.

- An episode where Dr.Doe falsely reported that she had reviewed a patient's radiology prior to an amputation surgery, but when the attending attempted to amputate patient's leg a metal plate was discovered on the bone.   The plate was clearly visible on the radiology.  (Knapik Affidavit, 12/14 ¶14).

229.   During its investigation of Dr. Knapik, MHMH was also aware of inconsistencies and unexplained anomalies in Dr. Doe's statement.

- Initially Dr. Doe insisted that the Finlayson letter must have been stolen from MHMH files and when that was shown to be wrong and evidence was presented it had been forwarded from her e-mail account she changed her story to say it was stolen from

her e-mail account.  However, she had already told MHMH that no one knew about the letter and she had never discussed it with anyone and MHMH should have wondered how someone could have stolen a letter they did not know existed. (¶¶ 203-204 above).

•       When asked about her whereabouts on the day the email was forwarded from her account, Dr. Doe provided an ambiguous answer that she was "surely on trauma rounds, etc." but there is no evidence MHMH made any effort to verify the claim.  Doe may still have had access to a computer or the iPad which she routinely carried with her during rounds.  (Exhibit 6, 6/5/12 Email, Bates MHMH 3032).

## DR. KNAPIK BELIEVED SHE WAS ETHICALLY OBLIGATED TO SEND THE LETTER TO KENTUCKY AUTHORITIES

230.     There were several events that combined to convince plaintiff that her ethical obligations mandated that she report Dr. Doe for unethical conduct.  Dr. Knapik was first concerned with Dr. Doe's lack of honesty in the spring of 2011.  (Exhibit 6, 7/2/12, MHMH 508, ¶14; ¶ 224 above).

231.     Then, in 2012 Dr. Knapik was completing her own state medical licensing application for a Florida license.   She inquired of Dr. Doe whether the Kentucky application included a similar question and if Dr. Doe had revealed the stipulations of the Finlayson letter in response.  Dr. Doe confirmed her application included the question but asserted that she was not going to disclose the existence or contents of the Finlayson letter.  (Knapik Affidavit, 11/21/13 ¶ 17).

232.   At that point Dr. Knapik became concerned about her own ethical duty to report Dr. Doe as a colleague who was lying on a medical license application.  Dr. Knapik had documentary proof of the lie and after many attempts to convince Dr. Doe to tell the truth, Dr. Knapik quit trying to help Dr. Doe and focused on her own ethical obligations. (Knapik Affidavit, 12/14 ¶ 15).

233.   Once Dr. Knapik realized she was potentially culpable in Doe's apparent decision to lie on a medical license application, she reviewed the Dartmouth Code of Ethics, ACS and the AMA Physician Ethical Obligations as well as the ACGME guidelines.  The AMA obligations were the most specific and declared that physicians have an ethical obligation to report unethical conduct, especially conduct that "Unethical conduct that threatens patient care or welfare should be reported to the *appropriate authority for a particular clinical service*. Unethical conduct that violates state licensing provisions should be reported to the *state licensing board*." AMA Code of Medical Ethics, Opinion 9.031(emphasis added).  Anonymous reporting was acceptable.  (Exhibit 2, Opinion 9.031, Bates P265-P266).

234.   By March 2012, Dr. Knapik learned that defendant intended to permit Dr. Doe to graduate despite the PD's serious concerns about her skills.  (Knapik Affidavit, 11/21/13 ¶¶ 15-16).

235.   Dr. Knapik believed she could be found complicit in Dr. Doe's lying.   She did not believe she could report internally, to the same officials who had already decided Dr. Doe would be permitted to graduate despite that the PD's belief Dr. Doe could not safely practice independently.  (Knapik Affidavit, 11/21/13 ¶ 18).

236.    Dr. Knapik discussed her moral and ethical responsibilities with her therapist. After considerable research and thought, Dr. Knapik complied with the AMA Code of Medical Ethics and mailed the Finlayson letter to the "state licensing board," which was the State of Kentucky Board of Medicine and to the "appropriate authority for a particular clinical service," the University of Kentucky where Dr. Doe was to continue her training. Dr. Knapik did not believe she was qualified to tell either the University of Kentucky or

the Kentucky licensing authority what she believed were the implications of the Finlayson letter, she sent the letter with the minimum comment. (Knapik Affidavit, 11/21/13 ¶ 24; Baker Affidavit ¶12).

237.   Dr. Knapik was not motivated by anger, animosity or with the intent to harm Dr. Doe.   Her only motive was her ethical duty.   (Knapik Affidavit, 11/21/13 ¶ 23; Baker Affidavit, ¶12).

## PLAINTIFF'S ETHICAL OBLIGATION WAS THE ONLY MOTIVATION FOR FORWARDING THE LETTER TO KENTUCKY

238.   Defendant raises several theories of why plaintiff forwarded the Finlayson letter to Kentucky authorities. (See, ¶¶ above.) All are false.

239.   Dr. Knapik celebrated a birthday in March 2012.  Dr. Doe gave her cash as a gift. Dr. Doe did not tell Dr. Knapik that the cash was meant to replace her Christmas gift. (Knapik Affidavit, 12/14 ¶ 16 ).

240.   Dr. Doe became angry when Dr. Knapik told her she could not help her, that she needed to study.  (Exhibit 6, MHMH 482)

241.   As a result, Dr. Doe sent Dr. Knapik an email requesting that she return the birthday gift and that it was meant to replace the Christmas gift.   (Exhibit 6, EMAILS: TK/KD 000018).

242.   Dr. Knapik returned the cash.  She did not send the Finlayson letter because of the request. (Exhibit 6, MHMH 483)

243.   In the same time period, Dr. Doe accused Dr. Knapik of stealing a book code for online access to a study manual – months earlier.  Dr. Knapik denied the accusation.  She did not send the Finlayson letter because of the accusation.

244.     Next, Dr. Doe scheduled plaintiff for call during her planned vacation time.   Dr. Doe describes their email exchanges as "terse."  The description is false.  Dr. Knapik was amicable in her reply, advising Dr. Doe not to worry, that it would all work out.    Dr. Knapik did not send the Finlayson letter to Kentucky because of the scheduling errors.

**PLAINTIFF'S ACTIONS DID NOT WARRANT TERMINATION**

245.     Furthermore, Dr. Finlayson testified that if plaintiff's report to Kentucky was based on the mistaken understanding that Doe was on probation, the remedy of dismissal was inappropriate.  (Finlayson Transcript 59:16-23; Bernat Transcript 146:10-11).

246.   Defendant's  PPM  indicates  "performance  evaluations"  are  "considered confidential" but defendant's practices show otherwise.    Attending physician's use personal email accounts to send evaluations.  (See ¶ 181 and FN 3 above (Dr. Zwolak used personal email to evaluate plaintiff) and ¶ 194 above (Dr. Finlayson transmitted his 2/11/11 letter via personal email to Dr. Doe).

**DEFENDANT WAS EMBARRASSED AND FEARED DR. DOE'S REACTION**

247.     Dr. Endean telephoned Dr. Cronenwett when he received the Finlayson letter.  Dr. Endean knew Dr. Cronenwett; he was a trainee at the University of Michigan while Dr. Cronenwett was a faculty member.   Dr. Endean spent a year in Dr. Cronenwett's research laboratory.  (Cronenwett Transcript 17:22-18:1).

248.     As summarized above at ¶, Dr. Cronenwett was not aware of the Finlayson letter. He testified he "felt embarrassed for the institution."   He felt compelled to attempt to assure Dr. Endean that Dr. Doe would graduate as expected.  (Cronenwett Transcript 21:1, 4-6)

249.   Dr. Cronenwett's "concern was this reflected extremely poorly on our institution, for [Endean] to have received a communication, an internal communication that was disclosed to him in this manner." (Cronenwett Transcript 20:1-5)

250.   Department Chair, Dr. Freeman believes Dr. Knapik's action damaged defendant's reputation.  He believes it "taints the program for potential applicants."  He testified that he was concerned with the "image this kind of incident portrays for the program." (Freeman Transcript 59:23-24; 60:8-10; 62:7-10)

251.   Defendant feared Dr. Doe's reaction.  (See Exhibit 49, 5/17/14 Email, Bates MHMH 3005 ("Paul and I spoke with [Dr. Doe].  It went exactly as we had anticipated").

252.   A few months prior to this, Dr. Kispert had displayed the email he had sent to Dr. Freeman about Dr. Doe's performance during a resident education conference.  The email was projected from Dr. Kispert's laptop computer to the auditorium screen – in view of all the residents in attendance.  It was displayed long enough for Dr. Doe (and other residents) to read more than once.  Dr. Doe's reaction was anger.  When relaying the incident to Dr. Prock, Dr. Doe asserted "Oh no, they are not going to do this to me." (See ¶ above and Prock affidavit ¶¶ 9-10).

253.   After Dr. Kispert displayed the email, Dr. Doe complained to Dr. Freeman.  Dr. Kispert offered to resign his position as program director.  (Exhibit 6, 2/10/12 Emails, MHMH 3062-3068)

**THE AMERICAN BOARD OF SURGERY FOUND DR. KNAPIK BOARD ELIGIBLE**

254.   New Hampshire and North Carolina have granted Dr. Knapik full and unrestricted licenses to practice medicine.  (Knapik 12/14 Affidavit ¶17).

255.    The American Board of Surgery rejected MHMH's position and declared Dr. Knapik board eligible on July 18, 2014.   She will take the surgical boards in August of 2015.  (Knapik 12/14 Affidavit ¶ 18).

Dated:___12/15/14___                                    /s/Norman E. Watts_____
                                                        Norman E. Watts, Esq.
                                                        Anthony Z. Roisman, Esq.
                                                        Watts Law Firm PC
                                                        PO Box 270
                                                        Woodstock, VT 05091
                                                        (802) 457-1020
                                                        wattslawfirmpc@gmail.com


## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified  on the Notice of Electronic Filing (NEF) on December 15, 2014.


Dated:___12/15/14___                                    /s/Norman E. Watts_____
                                                        Norman E. Watts, Esq.
                                                        Anthony Z. Roisman, Esq.
                                                        Watts Law Firm PC
                                                        PO Box 270
                                                        Woodstock, VT 05091
                                                        (802) 457-1020
                                                        wattslawfirmpc@gmail.com