U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 FEB -3  PM 5: 12

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| THERSIA J. KNAPIK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:12-cv-175 |
| | ) | |
| MARY HITCHCOCK MEMORIAL | ) | |
| HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER RE:**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(Doc. 137)**

Plaintiff Thersia Knapik brought suit against Mary Hitchcock Memorial Hospital (MHMH) for wrongful termination and breach of contract after she was dismissed from MHMH's general surgery residency program for sending a letter concerning another resident to a medical fellowship program and state licensing board. Currently before the court is MHMH's motion for summary judgment on all of Dr. Knapik's claims. A hearing was held on MHMH's motion on January 7, 2015. The parties agree that this case is governed by the law of New Hampshire.

**I.      MHMH's Request to Strike Post-Hearing Letter**

Following the oral argument on January 7, plaintiff's counsel filed a letter with the court addressing two issues which came up during MHMH's final remarks. (Doc. 148.) MHMH has filed a detailed response. In addition, MHMH requests that the court strike plaintiff's letter. (Doc. 149.) The court declines to strike the letter. As occasionally happens, new issues arose at the end of the oral argument. Both sides have now addressed these issues. The court was assisted both by the letter from plaintiff's counsel and by the additional memorandum filed by MHMH. The record should include both statements, and the court considered both in drafting this decision. The request to strike the letter from plaintiff's counsel (Doc. 148) is DENIED.

1

## II.     Factual Background

The undisputed facts are as follows.  In June 2007 two young physicians commenced their residency training in general surgery at MHMH.  (Doc. 138 ¶ 8.)  Dr. Knapik and her colleague, who is identified as "Dr. Doe," became friends in the early years of their training. Over time and as a result of several small slights and disputes, the friendship between the two women cooled.  (Doc. 138-8 at 41.)

In February 2011, Dr. Samuel Finlayson, program director for the general surgery residency program, sent Dr. Doe a letter detailing serious concerns about her performance as a resident.  (Doc. 138-3 at 31-32.)  The letter urged her to address these shortcomings in order to complete the residency program on time.  The letter expressed Dr. Finlayson's concern that Dr. Doe needed to show improvement in the areas of patient care, medical knowledge, clinical decision-making, and professional relations.   It warned that without "[c]lear improvement in your performance . . . you will either have to repeat the 4th year [of residency], or end your training at DHMC."[1]  (*Id*. at 32.)  The letter noted that informal reviews of Dr. Doe's recent performance in the vascular service were good and that this "hopefully signals that you have begun to turn the corner in your progress from junior to senior level work."  (*Id*.)

The letter from Dr. Finlayson does not state that Dr. Doe was placed on probation, and Dr. Doe was never on probation at any time during her residency at MHMH.  (*Id*. at 32, 47; Doc. 138-9 at 4-5.)

At some point in the spring of 2011, Dr. Knapik came into possession of a copy of Dr. Finlayson's letter.  The parties disagree about whether Dr. Doe voluntarily shared the letter with Dr. Knapik.  (Doc. 9 ¶ 24; Doc. 138 ¶ 33.)  For purposes of MHMH's motion for summary judgment, the court assumes that Dr. Knapik's version—that Dr. Doe gave her a copy of the letter—is correct.

Residents at MHMH, including Dr. Knapik, serve successive one-year terms and sign a new residency agreement for each term.  (Doc. 138-3 at 2-3, 9-11, 14-16, 20-22, 25-27.)  Their

---

[1]  Defendant's official name is Mary Hitchcock Memorial Hospital at Dartmouth-Hitchcock Medical Center.  (Doc. 138-3 at 20.)  In this case, MHMH, "Dartmouth-Hitchcock" and DHMC are used interchangeably to refer to defendant.

stipend increases slightly each year.  In other respects, the conditions of their employment remain the same.  Dr. Knapik signed the residency agreement for her fifth and final year of the residency program in June 2011.  (*Id*. at 27.)  Paragraph 5 of the residency agreement incorporates the provisions of MHMH's Graduate Medical Education Policies and Procedures Manual for Residents and Fellows (the Manual) into the residency agreement.  (*Id*. at 25.)  The paragraph identifies twelve provisions of the Manual which govern the resident's relationship with the residency program.  "Grievance procedures and due process" are specifically identified at paragraph 5(a).  (*Id*.)

In the spring of 2012, both Dr. Doe and Dr. Knapik were approaching the end of their residencies.  Graduation was scheduled for June 2012.  Prior to graduation, Dr. Doe was accepted into a surgery fellowship at the University of Kentucky.  (Doc. 138 ¶ 54.)  As part of the application she submitted to the Kentucky Board of Medical Licensure, she was required to disclose any disciplinary proceeding against her, including whether she had ever been placed on probation by MHMH.  (Doc. 138-3 at 41-46.)  The specific question was "Have you ever been dismissed from, resigned while under investigation, been placed on a disciplinary probation or reprimanded at a medical school or a postgraduate training program?  (Academic probation is not reportable.)"  (*Id*. at 42.)

Dr. Doe checked with Dr. Finlayson to make certain that his letter of February 2011 did not place her on probation.  (Doc. 138-8 at 24-25.)  He advised her that she had not been placed on probation.  (*Id*.)  She answered the question concerning probation and other discipline "No."  (Doc. 138-3 at 42.)

Through an informal conversation with Dr. Doe's mother at a social gathering in the spring of 2011, Dr. Knapik learned that Dr. Doe had not disclosed the February 2011 letter to the fellowship program or the licensing authority in Kentucky.   (Doc. 138-8 at 26-27.)  In May 2012, Dr. Knapik mailed a copy of the letter to both offices in anonymous envelopes that bore the MHMH return address.  (Docs. 138-2 at 10; 138-13 at 16.)

The director of the Kentucky fellowship program, Dr. Endean, was disturbed when he received the anonymous mailing.  (Doc. 138-7 at 2.)  He contacted the director of the vascular surgery fellowship program at MHMH.  (*Id*.)  Through a process of tracing computer inquiries

on the MHMH system, the MHMH administration developed a suspicion that Dr. Knapik was the source of the anonymous letter. (Doc. 138 ¶¶ 119-21.)

When confronted by administrators of the residency program, Dr. Knapik first denied and later admitted that she had sent the letter. (Docs. 138-13 at 17; 138-6 at 5.) Dr. Knapik believed she was required to send the letter as a matter of professional ethics because in her view, Dr. Doe had been dishonest with the medical authorities in Kentucky. (Docs. 9 ¶¶ 42-43; 138-13 at 9.)

The administrators of the residency program determined that Dr. Knapik had acted in a manner incompatible with the role of a physician and in violation of the Dartmouth-Hitchcock Code of Ethical Conduct. On June 13, 2012, Dr. Paul Kispert, director of the General Surgery Residency Program, and Dr. Marc Bertrand, Associate Dean for Graduate Medical Education, sent Dr. Knapik a letter which informed her of her dismissal from the General Surgery residency program. (Doc. 138-2 at 1.) The letter stated in part:

> On or about May 5, 2012, you sent a Dartmouth-Hitchcock privileged Quality Assurance (QA) document regarding a colleague to that colleague's future employer. You have admitted to anonymously sending this QA document to the fellowship director. Your printing and forwarding of this document was not authorized by your colleague, nor was it authorized by the author of the document. This egregious action violates the Dartmouth-Hitchcock (D-H) Code of Ethical Conduct (Practice Respect for Persons; Protect Confidential and Proprietary Information; Maintain Personal Honesty and Integrity; Respect for Property and Laws) and Dartmouth-Hitchcock Information Systems Policies (Appropriate Use of Computer Resources; Electronic Mail). Additionally, according to the ACGME [Accreditation Council for Graduate Medical Education], "residents must demonstrate a commitment to carrying out professional responsibilities and an adherence to ethical principles." Your actions violate the ACGME core competency of Professionalism.
>
> Furthermore, you have not taken responsibility for the consequences of your actions. Although you admit to sending the QA documents without permission, you do not appear to understand the seriousness of this behavior and have shown no remorse for your actions. . . .
>
> Included with this notice of termination is a copy of our GME grievance process and procedures. Should you choose to pursue the grievance option described in these attachments, you must notify Dr. Bertrand in the Offices of Graduate Medical Education within five (5) days of receipt of this letter. (*Id.*)

4

The Policies and Procedures Manual for the Dartmouth-Hitchcock Residency and Fellowship Programs describes the grievance process in several related chapters. First, it sets out a definition of the grievance policy:

> The purpose of this policy is to delineate Fair Hearing procedures which assure due process to Residents who have concerns or are recommended for non-renewal or dismissal from a program due to academic deficiency, non-academic deficiency or behavior incompatible with the role of the physician, or for other reasons that, if not resolved, could significantly threaten a Resident's intended career development. (Doc. 138-1 at 48.)

Second, it sets out the "Procedure for Notification of Non-renewal, Dismissal or Other Concerns":

> The Resident shall be informed in writing of the documented deficiencies or allegations and of the recommendation for non-renewal, dismissal or remedial training in a private meeting with the Program Director or a duly appointed representative. At this meeting or as soon thereafter as possible, the Resident shall be provided with a copy of this policy." (*Id.*)

Upon receipt of written notice, "[t]he Resident shall have five days, or within a mutually agreed upon time, from the date of this written notification to either (a) agree to the remedial plan (b) submit a resignation effective at a mutually acceptable date within the context of these guidelines, or (c) request a review of the case from the Director of Graduate Medical Education." (*Id.*)

The Manual includes detailed rules governing the grievance hearing. These call for the formation of a committee consisting of physicians and administrators who do not have "a direct working relationship with the Resident." (*Id.* at 49.) The grievance process includes a fourteen-day deadline for holding a hearing and requires evidence to be provided to the resident in advance of the hearing. Each side may present up to five witnesses at the hearing, and may present written statements from others. Hearsay is admissible. Neither the Program Director nor the resident may bring counsel to the hearing. The resident may bring another physician or staff member as an advisor. The hearing is not recorded. There is a deadline for issuance of a final decision which is not appealable. (*Id.*)

Dr. Knapik did not request a hearing or seek a review of her case by the Director of Graduate Medical Education. (Doc. 138 ¶ 141.)

5

On the same day that he sent the letter to Dr. Knapik, Dr. Kispert informed the general surgery faculty and residents of Dr. Knapik's termination. (Doc. 143-7 at 16.) He also contacted the plastic surgery fellowship program in Miami where Dr. Knapik was scheduled to work following graduation from DHMC. He informed the Miami program that Dr. Knapik had been dismissed from the DHMC program on June 13, 2012 and that he would "not be certifying her to be eligible to sit for the General Surgery Boards." (Doc. 143-7 at 14-15.) As a result, the Miami program rescinded its offer of employment to Dr. Knapik. (Doc. 143-3 at 19.)

Dr. Knapik filed this suit in August 2012, alleging claims of wrongful termination, breach of contract, and breach of the implied covenant of good faith and fair dealing. (Doc. 9.)

## III.   Analysis

Defendant MHMH makes two principal arguments in support of its motion for summary judgment. The first is that Dr. Knapik is not entitled to bring suit against MHMH because she failed to exhaust the grievance process available to her. The second is that MHMH's decision to dismiss her was an appropriate exercise of judgment by the institution.

### A.   Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B.   Whether Plaintiff's Suit Must Be Dismissed for Failure to Exhaust Remedies

American law, including the law of New Hampshire which governs in this case, has long recognized the obligation of parties who take issue with a decision of a governmental agency or private institution to pursue any available grievance process before having recourse to the courts. *See Huard v. Town of Pelham*, 986 A.2d 460, 465 (N.H. 2009) ("The general rule is that administrative remedies must first be exhausted before a party brings a matter to the courts."); *In re Linn*, 761 A.2d 502, 505 (N.H. 2000). This common-law rule has its origins in three related policy concerns. First, if an organization creates a grievance process, requiring parties to go

through the process before filing suit will save judicial resources and limit damages to the aggrieved party if the institution modifies or reverses the original decision. Second, even if the decision remains unchanged, the court and the parties will benefit from the development of an administrative record before the grievance committee or other administrative body. Finally, institutions are strengthened when the courts honor and enforce their internal process and procedure for resolving disputes. *See Huard*, 986 A.2d at 465 (explaining that purposes of exhaustion rule are to encourage exercise of administrative expertise, preserve agency autonomy, and promote judicial efficiency).

Although the doctrine of exhaustion of remedies has its origins in the body of administrative common law governing public agencies, it has long been applied to private institutions, including hospitals and other non-profit organizations like MHMH. *See* Z. Chafee, *The Internal Affairs of Associations Not for Profit*, 43 Harvard L. Rev. 993, 1019 (1930) (explaining that exhaustion-of-remedies doctrine applies to not-for-profit associations); *see also* Comment, *Exhaustion of Remedies in Private, Voluntary Associations*, 65 Yale L.J. 369, 387 (1956) (noting that exhaustion rule is typically applied to appeals of decisions by nonprofit associations); *see also Reardon v. Lemoyne*, 454 A.2d 428, 433 (N.H. 1982) (acknowledging that employees of religious organization must follow internal dispute resolution process, but holding that exhaustion doctrine did not bar employees' lawsuit because they attempted to exhaust remedies prior to filing suit).

The New Hampshire Supreme Court has not specifically considered the application of the exhaustion-of-remedies rule to physicians. However, the overwhelming majority of courts that have considered the issue have held that the rule applies to disputes concerning the dismissal of physicians by hospitals and other disciplinary measures. The principles which underlie the exhaustion rule apply to employment disputes involving doctors in the same way that they apply to other disputes subject to grievance procedures. *See Brooks v. Arlington Hosp. Ass'n*, 850 F.2d 191 (4th Cir. 1988); *Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W. 2d 73 (N.D. 1991); *Nemazee v. Mt. Sinai Med. Ctr.*, 564 N.E.2d 477 (Ohio 1990); *Eidelson v. Archer*, 645 P.2d 171 (Alaska 1982); *Garrow v. Elizabeth Gen. Hosp. & Dispensary*, 79 N.J. 549, 401 A.2d 533 (1979); *Westlake Cmty. Hosp. v. Superior Court*, 551 P.2d 410 (Cal. 1976); *but see Doe v. Cmty. Med. Ctr., Inc.*, 221 P.3d 651, 660 (Mont. 2009) (holding that physician whose privileges were

7

summarily suspended was not required to complete hospital's peer review process before suing hospital for injunctive relief where physician alleged that hospital itself failed to follow process). These cases recognize both the potential savings to the parties and the courts through compliance with the grievance mechanism as well as the value of developing a more complete administrative record below. *E.g., Nemazee*, 564 N.E.2d at 480. These are the same policies which have led to the frequent enforcement of the exhaustion doctrine in many other settings.

As this court has previously determined, there is no reason to anticipate that the New Hampshire Supreme Court would reach a decision at odds with other state supreme courts. (Doc. 116 at 7-8.) The policy purposes of the exhaustion doctrine are present in this case as they are in other cases involving physician discipline and dismissal. These include the potential savings to the parties and the judiciary if the grievance committee had convened and reached a result which did not lead to litigation. Additionally, enforcing the grievance process strengthens the institution which developed it. Put another way, permitting parties to ignore the process laid out in the Manual clearly weakens the institution. The remaining policy concern—the development of a factual record—does not apply in this case since proceedings before the grievance committee are not recorded and no significant record is likely to result.

Plaintiff argues that exhaustion should not be required in her case because MHMH failed to follow its own policy. She points to the policy language stating that MHMH will inform a resident of its "recommendation" for dismissal in writing, at which point the resident has five days to request a hearing. According to her, the June 13, 2012 letter skipped the "recommendation" step, and dismissed her immediately. Plaintiff argues that any recourse to the grievance process would have been futile because the outcome was, in her view, predetermined.

The court finds this argument to be persuasive. Proof of futility affords an exception to the exhaustion doctrine. *See DeVere v. State*, 827 A.2d 997, 999 (N.H. 2003). The plaintiff must show that the administrative tribunal lacked power to grant the relief sought, or that the process was so marked by delay or bias that enforcement of the internal process is unreasonable. *See id.* (holding that petitioner's declaratory judgment petition seeking release of license plate records from state department of safety was not barred by exhaustion rule due to petitioner's failure to file formal application, where matter had been pending for five years and state conceded it would have rejected formal application as well); *see also McCarthy v. Madigan*, 503

8

U.S. 140, 148 (1992) ("[A]n administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it."). While "[a]n administrative appeal is not futile just because it will 'probably' fail," Charles Koch & Richard Murphy, 4 Admin. L. & Prac. § 12:22 (3d ed.), the New Hampshire Supreme Court has excused compliance with the exhaustion doctrine where the plaintiff has shown that the administrative body had predetermined the outcome of the appeal. *DeVere*, 827 A.2d at 999.

A grievance committee would have had the authority to reinstate Dr. Knapik and clear her record, and there is nothing inherently unfair about the grievance process as it appears in the MHMH Manual. The Manual addresses concerns of bias by requiring committee members to have had no direct supervisory contact with the grievant. Concerns over delay are met by relatively short timeframes for a hearing (not less than seven nor more than fourteen days after request) and for a decision (fourteen days or a reasonable period.) *See Konefal v. Hollis/Brookline Co-op. Sch. Dist.*, 723 A.2d 30, 32 (N.H. 1998) (holding that school district's administrative process may have taken time, but was not futile because employee could have obtained relief sought).

The problem here is not with the grievance process as written, but with the fact that MHMH failed to follow it. In its June 13 letter, MHMH did not recommend Dr. Knapik for dismissal—it dismissed Dr. Knapik immediately. While the letter stated that Dr. Knapik had five days to pursue the grievance process, MHMH behaved as if the decision was final and irrevocable. On the same day that he sent the letter to Dr. Knapik, Dr. Kispert notified the Miami fellowship program of Dr. Knapik's dismissal. The program rescinded her fellowship position within the week. Dr. Kispert also informed the DHMC general surgery faculty and residents that Dr. Knapik was no longer part of the program, a step that should have been delayed if there was any possibility of a different outcome for Dr. Knapik. By these actions, MHMH effectively foreclosed meaningful resort to the grievance process. Even if Dr. Knapik had requested a hearing within the five-day period stated in the letter, it is highly unlikely that the hearing would have taken place before the Miami program rescinded its offer. The damage to her career and reputation had taken place. The court is satisfied that pursuing the administrative appeal process in Dr. Knapik's case would have been futile.

The court therefore declines to grant summary judgment on the basis of Dr. Knapik's failure to pursue the grievance process outlined in the Manual.

### C.  Whether MHMH Acted Within Its Discretion

MHMH claims that even if exhaustion does not apply, it is entitled to summary judgment because its dismissal of Dr. Knapik represents the type of discretionary judgment which a hospital must exercise in supervising its residents.[2]

As the court noted in its May 30 order, New Hampshire courts have not addressed whether a hospital's dismissal of medical resident for ethical violations is entitled to the substantial deference generally afforded to academic decisions.  (Doc. 116 at 8.)  A medical residency is both an employment relationship and an educational relationship.  For this reason, courts have examined the context of the cause of action to determine whether the resident is to be treated as an employee or a student in a given case.  *See Gupta v. New Britain Gen. Hosp.*, 687 A.2d 111, 117 (Conn. 1996) ("Because of the hybrid nature of the residency agreement . . . the agreement is more properly interpreted, under any particular set of circumstances, by a functional analysis of its terms in relationship to the nature of the alleged breach, rather than by

---

[2]  MHMH also argues that because Dr. Knapik's employment as a resident with MHMH was governed by a contract, she cannot sue for wrongful termination, citing *Censullo v. Brenka Video, Inc.*, 989 F.2d 40 (1st Cir. 1993).  In *Censullo*, the First Circuit held that under New Hampshire law, "[c]ontract employees are limited in their remedies for breach by the terms of the contract.  In contrast, at-will employees are limited in their remedies to claims for wrongful termination."  *Id.* at 42.  It is questionable whether *Censullo* is still good law in light of the New Hampshire Supreme Court's decision in *Porter v. City of Manchester*, 849 A.2d 103 (N.H. 2004).  In *Porter*, the court held that wrongful termination is a cause of action in tort.  In so ruling, it explained that if "the facts constituting the breach of the [employment] contract also constitute a breach of a duty owed by the defendant to the plaintiff *independent* of the contract, a separate claim for tort will lie."  *Id.* at 114.  Since *Porter*, New Hampshire courts have allowed contract employees to simultaneously bring claims for wrongful termination and breach of contract.  *See, e.g., Attard v. Benoit*, No. 06-cv-355-PB, 2007 WL 4380065, at *3 (D.N.H. Dec. 12, 2007) ("[T]he court's reasoning in *Porter* leaves little room for the argument that an employee should be deprived of the ability to seek relief for the tort of wrongful termination simply because he also has the benefit of an employment contract."); *Jeffery v. City of Nashua*, 48 A.3d 931 (N.H. 2012).  The court need not resolve this question because MHMH's decision to terminate Dr. Knapik was an academic decision, rather than an employment decision, and is therefore governed by a different standard as explained below.

an overarching search for the purpose or purposes of the parties."); *see also Hernandez v. Overlook Hosp.*, 692 A.2d 971, 975 (N.J. 1997).

Courts have consistently held that the dismissal of a resident for poor clinical performance is an academic decision. *See Fenje v. Feld*, 398 F.3d 620, 626 (7th Cir. 2005); *Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001); *Gupta*, 687 A.2d at 117; *Hernandez*, 692 A.2d at 975; *Ross v. Univ. of Minnesota*, 439 N.W.2d 28, 32 (Minn. Ct. App. 1989); *Gul v. Ctr. for Family Medicine*, 762 N.W.2d 629, 636 (S.D. 2009).

Dismissal for ethical concerns may also constitute an academic decision. For instance, in *Fenje v. Feld*, the Seventh Circuit upheld the dismissal of a medical resident for failure to disclose his termination from a prior residency program and his subsequent lawsuit against that hospital. The court explained that:

> The nexus between Dr. Fenje's lack of candor in the application process and his capacity to be trusted with patient care clearly pushes this decision into the realm of an academic dismissal. [The program director] made a professional judgment that a doctor-in-training who has demonstrated a willingness to withhold damaging information when it serves his purposes cannot be fully trusted to convey all information crucial to the health of the patients committed to his care. . . . [T]his represents an academic judgment by school officials, expert in the subjective evaluation of medical doctors, that Dr. Fenje did not possess the attributes necessary to adequately perform his clinical duties as an anesthesiology resident.

*Fenje*, 398 F.3d at 625; *see also Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 90 (1978) (holding that medical resident's dismissal was academic decision despite being based in part on erratic attendance and poor personal hygiene); *Al-Dabagh v. Case W. Reserve Univ.*, No. 14-3551, 2015 WL 342822, at *3 (6th Cir. Jan. 28, 2015) (holding that decision to dismiss medical student for lack of professionalism was academic judgment); *Ezekwo v. New York City Health & Hospitals Corp.*, 940 F.2d 775, 784 (2d Cir. 1991) (suggesting that concerns about interpersonal skills and combative nature may have been academic in nature); *Fuller v. Schoolcraft Coll.*, 909 F. Supp. 2d 862, 876 (E.D. Mich. 2012) (holding that termination of plaintiff from nursing program "as a result of her criminal history and lack of candor about it, pertains to her ability to function as a nurse and provide quality patient care, and thus, constitutes an academic dismissal"). Likewise, MHMH's decision to dismiss Dr. Knapik for anonymously sending a private letter containing potentially damaging information about another resident was

11

an "academic" decision as that term has been used in the law because it involved a professional judgment about Dr. Knapik's ability to interact honestly and forthrightly in her interactions with colleagues.

Dr. Knapik contends that MHMH cannot argue that her dismissal was an academic decision because the June 13, 2012 letter of dismissal and Dr. Kispert's letter to the Miami fellowship program both state that her dismissal was for "non-academic reasons." In those letters, the term "academic" is clearly being used in a more specific way to refer to matters of patient care and exam scores, as opposed to concerns about professionalism or ethics. For the purposes of judicial review, however, "academic" decisions encompass ethics and professionalism because they are an essential part of a resident's training. *Fenje*, 398 F.3d at 625; *see also Horowitz*, 435 U.S. at 90. Confidentiality and honesty are central to the practice of medicine, as evidenced by the DHMC Policies and Procedures Manual, which lists professionalism, protection of confidentiality and property, and personal honesty as core attributes of the successful resident. (Doc. 138-1 at 82-86.)

Academic decisions are entitled to substantial deference. "When judges are asked to review the substance of a genuinely academic decision . . . they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985); *see also Horowitz*, 435 U.S. 78, 92 (1978) ("Courts are particularly ill-equipped to evaluate academic performance."). The parties agree that a genuinely academic decision may be set aside only if it is arbitrary, capricious or unreasonable. *See, e.g., Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. Cir. 1999) (collecting cases applying arbitrary and capricious standard to dismissal for academic reasons); *Clements v. Cnty. of Nassau*, 835 F.2d 1000, 1004 (2d Cir. 1987) ("In cases involving academic dismissal, educational institutions have the right to receive summary judgment unless there is evidence from which a jury could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance."); *Amadasu v. Bronx Lebanon Hosp. Ctr., Inc.*, 782 N.Y.S. 2d 82, 83 (N.Y. App. Div. 2004) (holding that it was not arbitrary and capricious to dismiss resident for inappropriate treatment of patient); *Univ. of Mississippi Med. Ctr. v. Hughes*, 765 So. 2d 528, 541 (Miss. 2000) (holding that dismissal of

resident for academic reasons is reviewable only if arbitrary, capricious or made in bad faith); *Abdullah v. State*, 771 N.W.2d 246, 255 (N.D. 2009) (holding that dismissal of medical resident for unprofessional behavior was academic decision that was not arbitrary, capricious or in bad faith); *see also Bricker v. Sceva Speare Mem. Hosp.*, 281 A.2d 589, 592 (N.H. 1971) (holding that doctor's exclusion from staff privileges at hospital will be set aside only if arbitrary, capricious or unreasonable).

Based on the undisputed facts of this case, no reasonable jury could find that MHMH's dismissal of Dr. Knapik was arbitrary, capricious, or unreasonable.

The only significant disputed issue of fact is how Dr. Knapik came to possess the February 2011 letter from Dr. Finlayson to Dr. Doe. Dr. Knapik says that Dr. Doe gave it to her. MHMH believes that Dr. Knapik somehow accessed the hospital's email system in an unauthorized manner and obtained the letter as well as certain test scores of Dr. Doe and another surgery resident. The court assumes for the purpose of summary judgment that Dr. Knapik is credible, that Dr. Doe gave her the letter voluntarily, and that the hospital was mistaken in its belief that Dr. Knapik hacked into Dr. Doe's email account.

Both the written, contemporaneous records of the dismissal and the subsequent testimony of the MHMH officials demonstrate that the manner in which Dr. Knapik obtained the letter was not the basis for her dismissal. MHMH's reason for dismissing Dr. Knapik was her action in anonymously sending copies of the letter to Dr. Doe's Kentucky fellowship program and medical board. There is no record evidence to the contrary.

Regardless of how Dr. Knapik obtained the letter, it is undisputed that she did not have permission from Dr. Doe or Dr. Finlayson to share it with anyone. The Policies and Procedures Manual states that performance evaluations of residents "are considered to be confidential and privileged." (Doc. 138-1 at 45, Doc. 143-4 at 2.) Although the copy of the letter sent by Dr. Knapik did not have a "Quality Assurance" stamp stating that it was privileged, the letter contained sensitive material and was clearly intended for Dr. Doe's eyes only.

Dr. Knapik maintained that she sent the letter because she felt that Dr. Doe had lied on her fellowship and license applications by stating that she had never been on academic probation. (Doc. 143-5 at 4.) It is undisputed, however, that that MHMH officials never considered Dr.

13

Doe to have been placed on academic probation.  In April 2012, Dr. Kispert, the program director, signed a "Verification of Graduate Medical Education" form stating that Dr. Doe had never been placed on probation.  (Doc. 138-3 at 47.)  The February 2011 letter nowhere mentions the word "probation."  Dr. Finlayson, the author of the letter, testified that he did not consider the letter to put Dr. Doe on probation or to be a reprimand.  Rather, it indicated that she was in need of remediation and the decision whether to promote her to the next year would be postponed.  (Doc. 138-9 at 4-5.)  Ultimately, Dr. Doe was promoted to the next year.  Dr. Doe asked Dr. Finlayson if she needed to answer "yes" to application questions inquiring whether she had ever been on probation, and he told her no.  (Doc. 138-8 at 25-26.)

Further, the DHMC Policies and Procedures Manual lists several options for residents to report ethical concerns about their colleagues in a confidential manner.  (Doc. 138-1 at 32.)  Dr. Knapik did not pursue any of these options.  She claims that she did not feel she could seek advice from MHMH officials because they had decided to graduate Dr. Doe despite her deficiencies to protect the reputation of the program.  (Doc. 143-5 at 4-5.)  There is no evidence, however, that Dr. Doe was unqualified to graduate; after the February 2011 letter, she was promoted to the next year, indicating that she improved her performance.  Ultimately, Dr. Knapik did not mention her concern about the letter to anyone at MHMH.  (Doc. 138-13 at 10-11.)  She did not tell Dr. Doe or anyone else that she planned to send the letter, with the exception of her therapist.  (*Id.* at 11, 14.)  When confronted about sending the letter, she lied about it.

The record is clear that from the outset, MHMH officials viewed Dr. Knapik's anonymous transmittal of the letter—quite apart from how she obtained it—as the unprofessional and inappropriate action which merited dismissal.  A few days after an MHMH official initially confronted Dr. Knapik about sending the letter, MHMH officials held a meeting with Dr. Knapik.  Dr. Richard Freeman, the chair of the Department of Surgery, informed Dr. Knapik by email that "[t]he purpose of our meeting tomorrow (Wednesday, June 6 at 3:00 pm) is to discuss what I consider [to] be a serious breach of the professionalism standards to which we hold all of our faculty, trainees, and employees."  (Doc. 138-2 at 70.)  In response to Dr. Knapik's subsequent offer to bring her personal computer to the meeting to show that Dr. Doe forwarded the February 2011 letter to her, Dr. Freeman wrote that Dr. Knapik was welcome to bring the

14

computer but "I want to emphasize to you that there is much more that is troubling to me about this situation than just the mechanism by which you obtained this letter." (*Id.* at 73.) In a later deposition, Dr. Freeman explained that in his opinion, Dr. Knapik violated the core competency of professionalism by "forwarding . . . a confidential quality protected document without the authorization of the person to whom it pertains." (Freeman Dep. at 72:9-11.)

Similarly, the June 13 letter dismissing Dr. Knapik from the residency program stated that her dismissal was "based on behavior incompatible with the role of a physician and counter to the Dartmouth-Hitchcock Code of Conduct," namely, "sen[ding] a Dartmouth-Hitchcock privileged Quality Assurance (QA) document regarding a colleague to that colleague's future employer" anonymously and without the permission of the colleague or the author of the document. (Doc. 138-2 at 1.) The dismissal letter does not mention the manner in which Dr. Knapik obtained the February 2011 letter as a reason for dismissal.

Dr. Jack Cronenwett, the MHMH official contacted by the Kentucky fellowship program director who received the letter, testified that "any physician has a responsibility . . . to report what they consider to be potentially problematic behavior, and there are established mechanisms to do that; and none of them involve anonymous letters to other institutions. And that's what appalled [the Kentucky program director] and that's what appalled me." (Cronenwett Dep. at 55.) He noted that "if Dr. Knapik had concerns that she felt ethically obligated to raise, there are many appropriate mechanisms to do that, none of which involves sending an anonymous letter purportedly from this institution . . . there is nothing in my opinion that would justify that." (*Id.* at 61.)

Likewise, program director Dr. Kispert stated that "[i]ndividuals can inform anyone they want to of observations that they have and concerns that they have. They're not limited in doing so. The manner in which this was done was objectionable." (Kispert Dep. at 68.) Dr. Kispert stated that even if Dr. Doe gave Dr. Knapik the letter voluntarily, it was still inappropriate for Dr. Knapik to send it to Kentucky because it was a quality assurance document. (*Id.* at 69.)

Dr. James Bernat, a neurologist who was on the MHMH ethics committee who was consulted by Dr. Kispert about the situation prior to Dr. Knapik's dismissal, agreed that it was an ethical violation to send the letter even if Dr. Doe gave it to her. (Bernat Dep. at 68.) He stated

that it was "disturbing" to him "to take an old formative report, over a year old, and send it out as if it were currently accurate." (*Id.* at 113.) He added that "if [sending the letter was] the appropriate thing to do, that one should be willing to admit . . . who the sender is." (*Id.*)

Under the circumstances, it was not arbitrary, capricious, or unreasonable for MHMH to dismiss Dr. Knapik. As in *Fenje*, MHMH officials made a professional judgment that a medical resident who anonymously discloses confidential information about another resident that could potentially cause great damage to the other resident's career, then lies about having done so and ultimately expresses no remorse for her actions, cannot be trusted to work with colleagues in a productive manner in a profession that requires candor and honesty. This falls well within the category of academic decisions because it "represents an academic judgment by school officials, expert in the subjective evaluation of medical doctors" that Dr. Knapik was lacking "the attributes necessary to adequately perform [her] clinical duties as [a surgery] resident." *Fenje*, 398 F.3d at 625. As Dr. Cronenwett testified, "my concern was this reflected extremely poorly on our institution, for him to have received . . . an internal communication that was disclosed to him in this manner. It was not about the content of the letter, it was . . . the mechanism in which this was delivered." (Doc. 138-7 at 5.)

Because academic decisions of this nature may form the basis for a claim for damages or other relief only if they are arbitrary, capricious, or unreasonable, the fact that there is conflicting evidence about how Dr. Knapik obtained the letter and what she thought it meant does not preclude summary judgment. The undisputed facts, interpreted in the light most favorable to Dr. Knapik, provide sufficient support for MHMH's decision to dismiss Dr. Knapik for academic reasons.

## IV.     Conclusion

For the foregoing reasons, defendant MHMH's motion for summary judgment is GRANTED.  (Doc. 137.)  This resolves all of the claims in this action.

Dated at Rutland, in the District of Vermont, this 3rd day of February, 2015.

_____
Geoffrey W. Crawford, Judge
United States District Court