# UNITED STATES DISTRICT COURT

## for the

## DISTRICT OF VERMONT

**THERSIA J. KNAPIK**            |
                                |
                                |
**PLAINTIFF**                   | **CASE NO. 5:12-cv-175**
                                |
**v.**                          |
                                |
**MARY HITCHCOCK MEMORIAL**     |
**HOSPITAL**                    |
                                |
**DEFENDANT**                   |
                                |

## DR. KNAPIK'S MOTION TO ALTER

## OR AMEND JUDGMENT FILED

## PURSUANT TO RULE 59(e) OF THE FRCP

Dated: 3/5/15            /s/Norman E. Watts.
                        Norman E. Watts, Esq.
                        Anthony Z. Roisman, Esq.
                        Watts Law Firm PC
                        PO Box 270
                        Woodstock, VT 05091
                        (802) 457-1020
                        wattslawfirmpc@gmail.com

## INTRODUCTION AND SUMMARY OF ARGUMENT

Pursuant to Fed.R.Civ.P. 59(e),[1] Plaintiff Dr. Thersia Knapik respectfully moves this Court to alter or amend its February 5, 2015 Order (Doc. 150) granting summary judgment to Defendant Mary Hitchcock Memorial Hospital ("MHMH") and dismissing her three claims.

There are two reasons why this Court should grant Dr. Knapik's instant motion.

First, although the Court agreed with Dr. Knapik's argument that "[i]n dismissing Dr. Knapik without any warning and without any opportunity for a fair hearing before her termination became effective, MHMH violated its contractual due process requirements"(Doc. 143 at 2) the Court nonetheless concluded MHMH's decision to terminate Dr. Knapik was subject to special deference because it was an "academic" decision. Doc. 150 at 9, 11-12. However, because MHMH violated its contract with Dr. Knapik by failing to follow the contractually required procedures for termination, it never completed the process required to make a final decision to terminate for any reason, academic or not.

Second, even if MHMH were entitled to claim a decision it reached without following the contractually required procedures, which included substantial internal review of a proposed termination which was not provided to Dr. Knapik, the Court evaluated MHMH's action by resolving matters of disputed fact in concluding that MHMH's decision was academic and

---

[1] For a Rule 59(e) motion, a movant must show either "that the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion ... and which, had they been considered, might have reasonably altered the result before the court" or to "correct a clear error or prevent manifest injustice" *Chet's Shoes, Inc. v. Kastner*, 710 F.Supp.2d 436, 454-55 (D. Vt. 2010)(citations omitted). In *Kirkpatrick v. Merit Behavioral Care Corp.*, 128 F.Supp.2d 186 (D. Vt. 2000), the Court reversed a grant of summary judgment where plaintiff had coupled his claim of bad faith with claims for breach of contract and of the covenant of good faith and fair dealing. The Court held "it erred in granting summary judgment," explaining it had "overlooked the existence of other theories of recovery that were pled in the complaint and which [the defendant] did not address in its motions for summary judgment." Id. at 190.

concluding the reasons stated in the termination letter were the real reasons for its actions.

**ARGUMENT**

I.    **THE COURT SHOULD REVERSE ITS GRANT OF SUMMARY JUDGMENT TO MHMH AND REINSTATE DR. KNAPIK'S CLAIMS BECAUSE THE COURT ERRONEOUSLY APPROVED MHMH'S VIOLATION OF ITS CONTRACT WITH DR. KNAPIK**

   **A. MHMH'S BREACH OF ITS CONTRACT VOIDS ITS TERMINATION OF DR. KNAPIK**

   In this case, Dr. Knapik and MHMH entered into a contract that simultaneously provided MHMH with substantial discretion regarding the substantive grounds it could cite to justify a discharge, while providing Dr. Knapik with procedural protections that must be followed before MHMH could exercise its discretion. Dr. Knapik's actions and MHMH's reactions should have been judged under the terms of the contract, not under standards imposed by Federal Courts in resolving wrongful termination claims where no contractual rights were involved and where plaintiff asserted rights under the Constitution and statutes limiting conduct by state actors. *See E.g. Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78 (1978) and its progeny.

   Dr. Knapik's contractual protections are greater than "the 'minimal historic safeguards'" the Constitution affords. *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1988). Included among the contract provisions was the right to a grievance hearing at which Dr. Knapik would be allowed to present her own arguments, introduce her own evidence, and seek to controvert MHMH's argument's and evidence, and to do so before impartial adjudicators. "A grievance committee would have had the authority to reinstate Dr. Knapik and clear her record, and there is nothing inherently unfair about the grievance process as it appears in the MHMH Manual." (Doc. 150 at 9). If, as MHMH argues and the Court held, Dr. Knapik's termination was for academic reasons, and if Dr. Knapik had the opportunity to appear before a grievance committee the

2

standard of review of MHMH's "recommendation" of termination would have been far less restrictive than the standard applicable to Court review of properly adopted academic decisions.

Although the Court held MHMH had deprived Dr. Knapik of significant rights under the contract, it failed to consider the implications of that holding on Dr. Knapik's claims and MHMH's arguments. Once the Court held the issues were governed by contract, and once it found MHMH had violated the contract, this Court should have reviewed MHMH's discharge of Dr. Knapik under New Hampshire law—which gives no deference to colleges in construing the contracts they draft and execute—instead of under the Fourteenth Amendment and *Horowitz, et al.,* pursuant to which universities are owed—and this Court gave—great respect.

New Hampshire courts gives no "great" or special deference to any party—including even Dartmouth—in construing a contract. "We focus on the intent of the parties at the time of the agreement, and, in the absence of ambiguity, we determine the parties' intent from the plain meaning of the language used … and ascertain the intended purpose of the contract based upon the meaning that a reasonable person would give to it." *Sabinson v. Trs. of Dartmouth College*, 999 A.2d 380, 385-86 (N.H. 2010)(citation omitted).

Rather than judge MHMH's actions under the terms of the contract it entered into with Dr. Knapik, as Dr. Knapik urged, the Court looked to cases that are inapposite. It turned to the Supreme Court's seminal 1978 decision in *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78 (1978) and similar cases holding that certain minimal due process rights are to be provided where a state actor takes actions against one of its employees or students and that the action taken can be protected as an academic decision, even if the alleged misconduct involves lack of professionalism or ethical lapses. Doc. 150 at 11-12. This Court relied heavily on *Horowitz* and three of *Horowitz's* progeny: *Fenje v. Feld*, 398 F.3d 620, 626 (7th Cir. 2005);

3

*Fuller v. Schoolcraft Coll.*, 909 F.Supp.2d 862 (E.D. Mich. 2012), and *Ezekwo v. N.Y.C. Health & Hosp. Corp.*, 940 F.2d 775 (2d Cir. 1991).

Those cases are inapposite because none, except one (which actually supports Dr. Knapik), involved claims raised under contract and the claimants in each of those cases filed civil rights actions against state actors under 42 U.S.C. §1983 where each claimant argued the Fourteenth Amendment required that state actors were required to afford them procedural due process before they could be discharged. *Horowitz*, 435 U.S. at 79-80 ("Respondent sued petitioners under … §1983"); *Fenje*, 398 F.3d at 623 ("Fenje filed this action pursuant to 42 U.S.C. §1983"); *Fuller*, 909 F.Supp.2d at 866 (E.D. Mich. 2012)(six of plaintiff's seven claims sounded in §1983). In those cases there was no claim that the alleged "academic" decision was reached without compliance with a contract. In *Al-Dabagh v. Case W. Reserve Univ.*, No. 14-3551, 2015 WL 342822 (6th Cir. Jan. 28, 2015), also cited by the Court, there was no claim the University failed to follow its own contractual procedures in taking action, only a claim that it wrongly concluded that Al-Dabagh had engaged in academic misconduct.

MHMH could not reach a final conclusion to terminate Dr. Knapik until, and unless, it provided her with the contractual right to challenge the proposed conclusion. It failed to complete its decision making process and thus the decision does not qualify as "academic" but as nothing more than the untested preliminary opinion of a few MHMH surgeons.

In the one case cited by the Court where the plaintiff pressed a claim for breach of contract, *Ezekwo*, the Court held that even though the bases for the hospital's actions may have been academic, nonetheless the plaintiff had a valid claim because in reaching its purported academic decision, the hospital breached its contract with plaintiff. Id. 940 F.2d at 785-86.

4

Given *Horowitz's* looming presence, given that MHMH is an academic institution just like the ones in *Horowitz, et al.*, and given that MHMH belatedly argued that it discharged Dr. Knapik on nothing but "academic" grounds (just like the defendants in *Horowitz, et al.*), the Court's heavy reliance on *Horowitz, et al.* was understandable. That reliance nevertheless was misplaced—not because *Horowitz* and its progeny are no longer good law but rather because the facts of this case do not come close to fitting the *Horowitz* paradigm.

Equally significant, while federal "procedural due process does not require **any** form of hearing before a decisionmaking body, either before or after the termination decision is made," *Fenje*, 398 F.3d at 626 (emphasis added), the contract Dr. Knapik signed specified specific procedures, which MHMH did not follow, as a condition for any final decision.

MHMH had implicitly relinquished all of her rights under the contract because of her failure to exhaust her administrative remedies, i.e., her supposedly inexcusable failure to request a hearing before she was finally and irrevocably discharged. The Court disagreed finding that MHMH "effectively foreclosed meaningful resort to the grievance process."  Doc. 150 at 9.

 Regrettably, although this Court rejected MHMH's procedural argument and accepted both Dr. Knapik's argument and her reliance on New Hampshire law, when it came time for the Court to assess the merits of Dr. Knapik's substantive contract claim, the Court decided to eschew New Hampshire contract law and treat her claim as if it was nothing but another civil rights/§1983 claim arising the Fourteenth Amendment—just like *Horowitz, Fenje, Al-Dabagh,* and *Fuller.* But, as noted above, those cases are completely inapposite.

### B.   MHMH's Did Not Act With Good Faith and Fair Dealing

The above identified principles of contract law apply as much to claims of implied covenants as to any other contract claim. See *Centronics Corp. v. Genicom Corp.*, 562 A.2d 187,

193 (N.H. 1989). Here, Dr. Knapik alleged MHMH breached the covenant of good faith and fair

dealing by the manner in which it exercised the discretion provided it under its contract with

MHMH to determine whether she should be terminated. Implicit in the contract between MHMH

and Dr. Knapik, and particularly in the PPM, was MHMH's power to terminate Dr. Knapik and

Dr. Knapik's right to have MHMH exercise its discretion fairly and in good faith.

The purpose of Dr. Knapik agreeing to provide her services to MHMH for 5 years was to

both learn to be a surgeon—which MHMH concedes she did learn—and also to graduate. Dr.

Knapik described the bases of her claim that were not dependent on whether MHMH wrongfully

discharged her or whether it breached the explicit terms of her contract.

- MHMH failed to conduct a thorough and fair investigation of the charges of theft and ill motives leveled against her by Dr. Doe. Appendix ("App.) ¶5

- MHMH's willingness to believe the allegations of Dr. Doe even though MHMH had documented her history of lying on matters related to patient care;  App. ¶2

- MHMH faulted Dr. Knapik for disclosing the internal disciplinary actions of MHMH regarding Dr. Doe, but then proceeded to do just that by disclosing the internal disciplinary actions MHMH took against Dr. Knapik to her fellowship program and the ABS, thus effectively ending Dr. Knapik's surgical career, before Dr. Knapik even had a chance to challenge MHMH's actions;Doc. 150 at 9

- the reasons asserted in the termination letter were pretextual and sought to cover up MHMH's real motives:either retaliation against Dr. Knapik for embarrassing MHMH and/or capitulation to Dr. Doe, whose ire MHMH feared. App. ¶¶ 1, 7

*See* Appendix for detailed citations to the record. MHMH's actions, which led up to the decision

to terminate Dr. Knapik, were neither fair nor performed in good faith.

Once the Court concluded MHMH had breached its contract with Dr. Knapik by failing

to provide her with the critical procedural rights guaranteed under her contract, it should have

followed by recognizing that Dr. Knapik's claim for the breach of the covenant of good faith and

fair dealing was viable. However, the Court appears to have held that because it concluded that Dr. Knapik's termination was an "academic decision" the claims for breach of contract and for breach of the covenant of good faith and fair dealing are to be judged by the same standard. Doc. 150 at 10, n.2 ("MHMH's decision to terminate Dr. Knapik was an academic decision, rather than an employment decision, and is therefore governed by a different standard as explained below") and Doc. 150 at 16 ("academic decisions of this nature may form the basis for a claim for damages ... only if they are arbitrary, capricious, or unreasonable").

However, even if MHMH's decision were academic, which it was not, that academic decision could only be made within the limits set by the contract between Dr. Knapik and MHMH. Since MHMH did not obey the contract limitations on its actions, it cannot avoid the consequences of its action by asserting that if it had obeyed its contractual obligations its decision would have been academic and require substantial deference from this Court. The very fact MHMH did not complete the decision making process required to reach a conclusion about academic misconduct, deprives it of the right to hide behind the academic deference shield.

## II.   THE COURT ERRED IN RESOLVING GENUINE DISPUTES OF MATERIAL FACT REGARDING WHETHER MHMH'S PURPOSE IN DISCHARGING DR. KNAPIK TRULY WAS "ACADEMIC" AND NOT "ARBITRARY"

The Court compounded its error of applying the federal constitutional "arbitrary and capricious" standard to Dr. Knapik's contract and state law claims, and to Dr. Knapik's actions prior to MHMH's discharge of her, by failing to scrupulously follow the relevant test for granting summary judgment and thus failing to "believe[]" the non-movant's evidence and failing to follow the requirement that "all justifiable inferences are to be drawn in h[er] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, in concluding there was no credible evidence that MHMH's conduct was arbitrary, capricious or unreasonable, the Court

made several factual decisions in the face of substantial contrary evidence.

**A. There Is Ample Evidence Dr. Knapik Did Not Violate Academic Standards**

MHMH asserts the reason for Dr. Knapik's termination was "academic" although it had unequivocally stated both to Dr. Knapik and her fellowship program that dismissal was for "non-academic" deficiencies. The Court concluded that when MHMH referred to "non-academic" deficiencies it was only referring to "matters of patient care and exam scores" and not to "confidentiality and honesty". Doc. 150 at 12. But in its letter to Dr. Knapik's fellowship program MHMH stated the dismissal "was not the result of academic *or* clinical deficiencies." (Doc.143-1, ¶177)(emphasis added). Patient care and exam scores would be covered by the phrase "clinical deficiencies." Thus if it was "not the result of academic" deficiencies or "clinical deficiencies" it was for other non-clinical and non-academic reasons.

The PPM confirms this distinction where it identifies the bases for termination. "**Academic Deficiency Definition**: Academic deficiency shall include, but not be limited to: a) insufficient fund of medical knowledge, (b) inability to use knowledge effectively, and/or (c) behavior detrimental to the educational process or the care of patients" and lists separately "**Behavior Incompatible with the Role of the Physician Definition**: Some behavior may be judged by the Program Director to be illegal, immoral, unethical or so objectionable as to be incompatible with the role of the physician."Doc.143-2 at 50.

In addition Dr. Knapik's opposition to the Summary Judgment Motion relied on the decision by the American Board of Surgery ("ABS") that she met all their requirements to be eligible to take the surgery boards, as evidence that MHMH's judgment that her actions were wrong or violated academic standards was in error. Doc. 143-1 at ¶ 255. The Court did not make

8

reference to this important evidence that disputes MHMH's fundamental claim that its decision was based on "academic" principles. The ABS requirements for board eligibility include "satisfactor[y]" adherence to "ethical behavior and professionalism in all conduct." American Board of Surgery, Booklet of Information: Surgery (2013–2014) at p.16, http://www.absurgery.org/xfer/BookletofInfo-Surgery.pdf (accessed on 3/4/2015). In essence, the ABS found no ethical professional deficiencies that bar Dr. Knapik from being certified.

MHMH's assertions—expressed for the first time in this Court and after suit was filed—that the termination was for academic reasons is also internally inconsistent. If, as MHMH now asserts, Dr. Knapik's alleged violations of PPM requirements and core competencies are violations of academic standards then there was no reason for it to inform her and her fellowship program that her dismissal was not for "academic deficiencies".

## B. There Is Ample Evidence That Dr. Knapik Did Not Violate PPM Criteria

MHMH's listed the bases for the decision to terminate Dr. Knapik in the letter of termination. The weakness of MHMH's alleged motivation for terminating Dr. Knapik is underscored by the fact the Court had to reach for reasons not contained in the termination letter to bolster its conclusion that MHMH was justified in terminating Dr. Knapik. For example, on at least two occasions the Court notes that Dr. Knapik lied about being the one to send the letter. Doc. 150 at 14, 16. But the termination letter does not accuse Dr. Knapik of lying. The record demonstrates that while she initially denied she sent the letter, when confronted on the porch of her home and threatened with potential criminal prosecution for stealing the letter, within minutes she acknowledged that she was the one who sent the letter (Doc.143-5, ¶8).

The Court and MHMH frequently cite Dr. Knapik's anonymous dispatch of Finlayson's letter as grounds for termination but there is nothing in the PPM or the termination letter that

alleges anonymity constitutes unprofessional conduct. This is especially true in light of the AMA Code of Professional Ethics' explicit endorsement of anonymous reports of ethics violations if the reporter fears retaliation, a fear which the evidence shows was well-founded here. App. ¶ 6

The Court and the termination letter fault Dr. Knapik for not expressing "remorse" but again there is nothing in the PPM about remorse nor should Dr. Knapik feel remorse for risking her medical career in order to fulfill her AMA ethical obligations. App. 6; Bertrand Dep. at 27 ("I don't believe that remorse is included in our policy").

Even the reasons actually listed in the termination letter are indefensible. The Court characterized the basis of MHMH's decision to terminate Dr. Knapik as based on "a professional judgment about Dr. Knapik's ability to interact honestly and forthrightly in her interactions with colleagues." Doc. 150 at 12. But there is no evidence Dr. Knapik was dishonest in her dealings with colleagues or that MHMH claimed dishonesty as a reason for termination. App. ¶ 6 Perhaps the Court felt an anonymous letter was "dishonest." But since the AMA's ethics rules expressly authorize that practice it cannot be "dishonest" to send the report anonymously. App. ¶ 6.

Nor is there any credence to MHMH's frequent claim that because the letter was sent in an MHMH envelope it implied that it was sent officially by MHMH. It is not credible that anyone receiving the letter, without any explanation, would assume that MHMH sent it officially just because it was in an MHMH envelope. There is no evidence Kentucky authorities believed MHMH sent it officially—only that it was sent by someone from MHMH. (Doc.143-13, p.18).

Similarly, there is no basis for the conclusion Dr. Knapik did not act forthrightly with her colleagues. First, Dr. Knapik sent the letter only after a lengthy and fruitless effort to convince Dr. Doe to honestly answer the questions on her application (Doc.143-1, ¶¶149, 232). She was

very forthright with Dr. Doe. It is not rational to believe that once she determined a report of dishonesty by Dr. Doe had to be made, she had to inform Dr. Doe.

Second, there is no lack of forthrightness in Dr. Knapik's decision not to pursue an internal grievance against Dr. Doe. The PPM has no such requirement and the relevant ethical requirements specify that concerns about dishonesty should be made to the affected institutions. (Doc.143-1, ¶¶233, 236). Those institutions were in Kentucky. MHMH already knew Dr. Doe was not disclosing her  prior discipline/probation status as it signed off on her applications and had already decided to ignore shortcomings identified by her program director, Dr. Kispert, in Dr. Doe's basic surgical skills to allow her to graduate. App. ¶ 4

In sum, as shown in more detail in the Appendix, there is substantial evidence that contradicts the ever shifting reasons MHMH has expressed to justify terminating Dr. Knapik:

- Dr. Knapik stole the letter—but there was no proof except Dr. Doe; App. ¶ 2

- Dr. Knapik sent the letter anonymously—but the AMA explicitly recognizes the propriety of doing that if retaliation is feared; App. ¶ 6

- Dr. Knapik had no legitimate reason for her actions—but she did and Dr. Kispert never tried to know what it was; App. ¶ 5

- Dr. Knapik failed to use MHMH internal procedures to lodge her complaint—but there is no requirement for that and MHMH did not say that was a reason for termination in the letter to Dr. Knapik; App. ¶ 6

- Dr. Knapik sent a confidential letter without permission—but Dr. Knapik was given the letter without limitation and no confidential stamp; App. ¶ 6

- Dr. Knapik was wrong in believing Dr. Doe lied on her application because MHMH doctors said the letter was not a probation letter - but the letter met PPM standards for probation and read like such; App. ¶ 3

- Dr. Doe was being truthful in her allegations against Dr. Knapik – but MHMH had ample examples Dr. Doe lied on several occasions; App. ¶ 2

- Dr. Knapik's conduct was a violation of standards of professionalism and

11

ethics imposed by the PPM—but those standards say nothing about the specific actions of Dr. Knapik that MHMH relies on.  App. ¶ 6

**C.      There was Ample Evidence that MHMH's Asserted Grounds for Terminating Dr. Knapik Were Pretextual**

In addition to undermining MHMH's contention that its motives for discharging Dr. Knapik was solely and purely "academic" in nature, Dr. Knapik presented considerable evidence MHMH did not terminate her Dr. Knapik for "academic" reasons. Rather MHMH's actions against her were motivated by a desire to punish her and retaliate against her for the "trouble" she caused MHMH. App. ¶ 1. Testimony from Drs. Freeman and Cronenwett demonstrate the degree of anger they felt about the impact Dr. Knapik's letter had on MHMH and its reputation. App. ¶ 1. Their annoyance about the manner in which Dr. Knapik communicated her concerns about Dr. Doe's veracity to the Kentucky authorities was not focused on amorphous professional standards in the PPM. Rather they concentrated on what other institutions would conclude because MHMH had not disclosed its Dr. Doe's serious shortcomings when it recommended her.

There is also considerable evidence that MHMH's real motive was to appease Dr. Doe who was furious about the letter being sent to Kentucky. App. ¶ 7. Only a few months earlier she had raged about Dr. Kispert inadvertently displaying his candid assessment of her academic inadequacies to all the surgical residents. App. ¶ 7.  Although MHMH refused to disclose Dr. Doe's complaints to about the Kispert incident, it was likely extremely harsh since Dr. Kispert twice indicated he was going to resign as Program Director as a result of the incident. App. ¶ 7

In the final analysis, even giving MHMH the benefit of the Court's view of MHMH's justifications for terminating Dr. Knapik (many of which were not mentioned in the termination letter or verbally express to Dr. Knapik), it is clear there is a substantial dispute about whether

they were MHMH's actual justifications for termination—especially since they were erroneous.

### D.  Divining MHMH's Intent for Discharging Dr. Knapik are Fact Issues for a Jury

Whether the provisions of the PPM which were cited in Dr. Knapik's termination letter were "academic" criteria, whether Dr. Knapik violated those provisions and whether the reasons stated in the termination letter were MHMH's real reasons, cases, like this one, which involve "[i]ssues of intent and credibility [are] inappropriate for summary judgment," "should be resolved by the fact finder after a trial," and are ill-suited for summary judgment. *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2d Cir. 1991). The New Hampshire Supreme Court agrees. Thus, while "a question involving state of mind or intent does not automatically foreclose the application of summary judgment, ... it should be cautiously and sparingly invoked in such instances." *Concord Group Ins. Cos. v. Sleeper*, 600 A.2d 445, 446 (N.H. 1991)(citing *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473 (1962); C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL §2730, at 236-38 (2d ed. 1983)). See *Mundaca Inv. Corp. v. Febba*, 727 A.2d 990, 992 (N.H. 1999). See also *Lee v. Tr. of Dartmouth College*, 958 F. Supp. 37, 44 (D.N.H. 1997)("While courts 'should show great respect for [a staff's] professional judgment,' if the plaintiff brings forth facts showing that the[] reasons [for dismissal] are genuinely in dispute, summary judgment must be denied.").

### E. The Cases Do Not Support the View Dr. Knapik's Discharge Was Academic

The Court relied on *Fenje, Horowitz, Al-Dabagh, Ezekwo,* and *Fuller* for the proposition that ethical violations  are "academic" and subject to substantial deference. But, in all but one case, the institution linked the ethical or professional violations to clinical care and in one case, *Ezekwo,* the Court upheld plaintiff's contract claim because the hospital failed to provide *any* procedures to permit a pre-decision challenge. *Fenje* held plaintiff's dishonesty showed he could

13

not "be trusted with patient care" and it was that linkage that "pushes this decision into the realm of an academic dismissal". *Id. Horowitz* was based on the plaintiff's lack of "clinical skill." Id. 435 U.S. at 89-90. In *Al-Dabagh* the school insisted from the outset that the reason for termination was "academic." *Id. Fuller* recognized a nexus between the misconduct charged and providing "quality patient care". Doc. 150 at 11. Neither MHMH nor the Court make any link between the complained of actions of Dr. Knapik and patient care.

When the Court cited cases to support its conclusion that MHMH's decision was academic and subject to deference, it stated "Courts have consistently held that the dismissal of a resident for **poor clinical performance** is an academic decision." Doc. 150 at 11 (citations omitted, emphasis added). But, as MHMH conceded in its letter to Dr. Knapik's fellowship program, it did not discharge her for "academic or clinical deficiencies." (Doc.143-1, ¶177).

**CONCLUSION**

This Court should alter and amended its Order to reverse its grant of summary judgment to MHMH and to reinstate all of Dr. Knapik's claims.

Dated: 3/5/15 .                     Respectfully submitted,

                                    /s/Norman E. Watts
                                    Norman E. Watts, Esq.
                                    Anthony Z. Roisman, Esq.
                                    Watts Law Firm PC
                                    PO Box 270
                                    Woodstock, VT 05091
                                    (802) 457-1020
                                    wattslawfirmpc@gmail.com

**FACTUAL APPENDIX TO RULE 59(e) MOTION**

**1.  MHMH WAS EMBARRASSED BY DR. KNAPIK'S ACTIONS**

**a**. Dr. Cronenwett, who was the principal sponsor for Dr. Doe's fellowship, testified the

14

"concern was this reflected extremely poorly on our institution, for [Endean] to have received a communication, an internal communication that was disclosed to him in this manner." Cronenwett Dep. 20:1-5 (Doc. 143-13)); Doc. 143-1 at ¶¶ 151, 152, 249

**b**. Even though the Finlayson letter was sharply critical of Dr. Doe's surgical skills, at the time of his recommendation of her, Dr. Cronenwett was not aware of the Finlayson letter. "Of course I had not seen this letter". Cronenwett Dep. at 20 (Doc. 143-13); (Doc.143-1, ¶224)

**c**. Dr. Freeman, the head of surgery at MHMH, testified he believed "our program is damaged by her actions", it "taints the program for potential applicants," and that he was concerned with the "image this kind of incident portrays for the program." (Freeman Dep. 59:23-24; 60:8-10; 62:7-10); Doc. 143-1 at ¶ 250;

**2. MHMH HAD SUBSTANTIAL EVIDENCE THAT DR. DOE HAD A HISTORY OF DISHONESTY BUT NONETHELESS ACCEPTED HER ALLEGATIONS AGAINST DR. KNAPIK**

**a**. MHMH had documented on at least two occasions Dr. Doe lied about issues directly related to patient care; Doc. 143-3; Doe Dep. at 115-116 (Doc. 143-14); Knapik Dep. at 224-226 (Doc. 137-13); Knapik Affid. at ¶ 21 (Doc. 143-9).

**b**. Dr. Doe's statements to MHMH were demonstrably not credible since she insisted she never told Dr. Knapik or any other person that, in early 2011, she had received a letter from Dr. Finlayson regarding her performance and yet she also insisted that without that information Dr. Knapik must have "hacked" into her e-mail to then forward a copy of the letter she did not know exist; Doe Dep. at 25, 28, 34, 35, 39, 54-5, 92, 93-4, 95, 139 (Doc. 143-14); Prock Affid. at ¶¶ 6-7, 11, 13-14 (Doc. 143-10); Knapik Affid. at ¶¶ 11-17 (Doc. 143-9).

**c**. Dr. Knapik testified that in addition to the incident of Dr. Doe lying about a matter related to

patient care, which Finlayson described in his letter, there were at least two other incidents of

which Dr. Doe made Dr. Knapik aware where Dr. Doe lied on matters related to patient care.

Knapik Dep. at 224-226. Dr. Doe confirmed that the doctor involved in one of the incidents, Dr.

Gupta, was critical of her and her performance. Doe Dep. at 115-116 (Doc.143-1, ¶228)

**d**. Dr. Doe had substantial motivation to lie once her licensing falsification was disclosed to

authorities; lying distracted MHMH from focusing on Dr. Doe's licensure falsification and

ruined Dr. Knapik's credibility as the reporter of this infraction. Dr. Kispert testified to Dr. Doe's

anger toward Dr. Knapik. Kispert Dep. at 87 (Doc. 143-19);

### 3.   PURSUANT TO MHMH'S POLICIES AND PROCEDURES MANUAL DR. FINLAYSON'S LETTER WAS A PROBATION LETTER

**a**. The MHMH Policy Manual, which the Court recognized as a document that binds both Dr.

Knapik and MHMH, identifies only three categories of actions that MHMH may take in its

quality assurance algorithm if there are problems with resident performance and only one,

"Probation," includes "Written evaluation considering dismissal, non-renewal." Doc. 143-1 ¶

147. The Finlayson letter listed both non-renewal and dismissal as possible actions if Dr. Doe did

not show marked improvement (Doc.143-1, ¶195). Doc. 138-3 at 2.

**b**. Dr. Kispert testified the Quality Assurance Algorithm in the PPM establishes the criteria for

determining whether a resident who falls below MHMH standards will be placed in

"observation" "concern" or "probation." Kispert Dep. at 20-21 "We have a quality assurance

algorithm that describes a series of steps that can be gone through."

**c**. Any fair reading of the language of the Finlayson letter indicates Dr. Doe was on probation -

unless she improved she would be dismissed from MHMH - a reasonable inference from this,

and other statements, in the letter is that it placed Dr. Doe on probation (Doc.143-1, ¶195)

**d**. Not only did Dr. Knapik testify that Dr. Doe described the Finlayson letter as a probation

letter, but Dr. Prock similarly testified that Dr. Doe described the letter as a probation letter.

(Doc.143-1, ¶¶ 214, 215); Prock Affid. at ¶¶ 6-7, 11, 13-14 (Doc. 143-10); Knapik Affid. at ¶¶

11-13, 17; Knapik Dep. at 56-7, 70-1, 131-32, 135, 142, 187, 205-06, 228 (Doc. 137-13).

**e**. In May 2011 Dr. Knapik and Dr. Doe's mother discussed the probation letter and Dr. Knapik

expressed the view that Dr. Doe should advise the fellowship program of her status in the

residency program in light of the letter because it is possible she will not graduate in June 2012

and that will be a problem for the fellowship program (Doc.143-1, ¶204).

**4.  DR. KNAPIK HAD AMPLE EVIDENCE THAT MHMH WAS NOT COMMITTED TO UPHOLDING ACADEMIC OR ETHICAL STANDARDS AND THUS SHE HAD GOOD REASONS TO TAKE HER CONCERNS ABOUT DR. DOE LYING DIRECTLY TO THE KENTUCKY AUTHORITIES, AS THE AMA'S ETHICAL RULES BOTH PERMIT AND REQUIRE**

**a**. In 2012 just a few months before Dr. Doe was to graduate, Dr. Kispert, the Program Director

for surgery residents, concluded "[Dr. Doe] was at the level where I was concerned about her

practice, her ability to practice independently," "I was pretty strident about her -- about concerns

I had about her operative skills and that I thought she should be performing at a higher level"

"Following directions in the operating room is a concern I expressed in the e-mail" (Kispert Dep.

at 45, 55, 56).

**b**. Dr. Kispert himself testified that the plan going forward following his e-mail was "that no

further action should be taken" with regard to Dr. Doe, and Dr. Rosenkranz, one of the MHMH

surgeons actively involved in supervising residents, testified she knew nothing of any meeting to

discuss a remediation plan. Rosenkranz Dep. at 29. Nonetheless Dr. Kispert signed a document

within two months of that opinion indicating that, with regard to Dr. Doe the answer to each of

these questions was "no": "was this individual ever placed on probation"; "was this individual ever disciplined or placed under investigation"; "were any negative reports for behavioral reasons ever filed by instructors" Federation Credentials Verification Service Form. Doc. 143-3 at 24

**c**. Dr. Gupta, a MHMH surgeon expressed his strong reservations about Dr. Doe: "Isn't it also true that Dr. Gupta expressed similar criticisms of you? A. Yes. ... Yes, he was critical of me through much of my residency, yes" (Dr. Doe Dep. at 115-16 ).

**d**. In addition there was evidence that Dr. Russell Strong, a general surgeon at a hospital in Concord with whom Dr. Doe worked for two years during her residency concluded, after working with Dr. Doe, that "I should do something else, I should choose another profession". Dr. Doe Dep. at 115-116.

**e**. Dr. Tanski, another attending with whom Dr. Doe worked, also questioned Dr. Doe's surgical skills. Doe Dep. at 113 (Doc. 143-14).

**f**. MHMH knew Dr. Doe had not revealed on her Kentucky licensing application that she had been disciplined by MHMH, even though they documented her residency as fraught with discipline issues, including those cited in the 2011 Finlayson letter and 2012 Kispert e-mail.

## 5.  MHMH'S INVESTIGATION OF THE ALLEGATIONS AGAINST DR. KNAPIK WAS A SHAM

**a**. Once MHMH confirmed the letter was not stolen from its files, MHMH's investigation relied almost entirely on Dr. Doe's allegations without any effort to individually verify any of Dr. Doe's assertions other than checking with Dr. Doe. Kispert Dep. at 86-7 (Doc. 143-19); Rosenkranz-Doe e-mail exchange (Doc. 143-7 at 38).

**b**. It was Dr. Doe who accused Dr. Knapik of stealing the e-mail from her account, but only after she learned that MHMH was aware that it had been forwarded to Dr. Knapik from Dr. Doe's e-mail account. Doe Dep. at 139 (Doc. 143-14). It was Dr. Doe who said there was anger between her and Dr. Knapik even though Dr. Kispert testified he never heard Dr. Knapik say anything negative about Dr. Doe. Kispert Dep. at 86, 88 (Doc. 143-19).

**c**. MHMH was told by Dr. Knapik and then confirmed that the e-mail had been forwarded to Dr. Knapik from Dr. Doe. However, rather than MHMH reaching the logical conclusion that Dr. Doe had sent it, MHMH again turned to Dr. Doe for direction, answers and an alibi for the time the letter was forwarded. Rosenkranz-Doe e-mail exchange (Doc. 143-7 at 38).

**d**. Dr. Doe, alerted to MHMH knowing about the forward, reported to MHMH that there was no trace of the forwarded e-mail on her account and further impugned Dr. Knapik by alleging that Dr. Knapik had erased it the day it was sent. Doe Dep. at 28 (Doc. 143-14) MHMH relied on Dr. Doe's assertions of if, when, and by whom the forward trail was erased, rather than their own IT department and "robust audit trail". Doc. 143-7 at 1. Properly utilized this audit system and IT department could have documented whether Dr. Doe erased all evidence herself in an attempt to cover her tracks and support her lies. Dr. Knapik had no motive to do so since the forwarded e-mail was her proof she did not steal the Finlayson letter.

**e**. By May 24th MHMH knew the letter had not been stolen from a file and did not have a quality assurance stamp, soon thereafter MHMH was directed by Dr. Knapik as to it being forwarded by Dr. Doe and approximately when this occurred. Even though Dr. Knapik was the only one who provided statements that were validated Dr. Doe continued her suspect assertions that the letter was stolen and MHMH continued to defer to Dr. Doe's assertions.

19

**f**. Dr. Kispert continued to consult with other doctors about what he should do by telling them the situation as painted by Dr. Doe, namely that a resident had illegally obtained the letter, sent it anonymously to the Kentucky authorities and either did it out of personal animus or for no discernible reason. Bernat Dep. at 17-18, 23-24 (Doc. 143-11); Bernat Report (9/5/13)("[Dr. Kispert] and his colleagues concurred that the manner in which she obtained and communicated the document strongly supported malice rather than some other motive."

**g**. Although Dr. Kispert believed it was important to know Dr. Knapik's motive (Kispert Dep. at 34-35) and Dr. Bernat, MHMH's in-house ethics consultant, based his opinion in part on the lack of an acceptable motive (Bernat Report (9/5/13)), Dr. Kispert never sought to learn Dr. Knapik's motive (Doc.143-1, ¶163) and Dr. Freeman, who was told the motive by Dr. Knapik (Doc.143-1, ¶171), never shared the information with Dr. Kispert, or those Dr. Kispert consulted.  Bernat Dep. at 17-18, 23-24 (Doc. 143-11).

**h**. Although MHMH purported to spend considerable effort investigating the allegations against Dr. Knapik, they had decided long before the "investigation," had been completed to terminate Dr. Knapik. Bernat Dep. at 141 (Doc. 143-11).

**i**. Even when MHMH realized the letter had been forward to Dr. Knapik from Dr. Doe's e-mail and that proof of that had been erased from Dr. Doe's e-mail account, MHMH devoted all of its efforts to finding an alibi for Dr. Doe (Doc. 143-7 at 38), an alibi MHMH never investigated nor verified. No evidence was released by MHMH detailing any audit trail of Dr. Doe's e-mail account. All statements regarding this are directly from Dr. Doe, who had already in the past few days contradicted herself multiple times.

**j**. Dr. Kispert conceded the investigation process did not follow the MHMH specified procedures because, although all decisions regarding possible termination of a resident should be reviewed by the Clinical Competency Committee (Kispert Dep. at 25-26(Doc. 143-19)), in Dr. Knapik's case, in early May, he did not consult with the Committee because "we were not aware of all the facts involved". In June, when he felt he did have all the facts, he still did not consult with the Committee. Kispert Dep. at 35 and at deposition, 18 months after Dr. Knapik's termination he testifies that he still did not have all the facts, namely Dr. Knapik's motives. Kispert Dep. at 34-35. Doc. 143-19

**k**. A far more rational explanation of MHMH's conduct is that, by fulfilling her AMA ethical obligation Dr. Knapik caused MHMH extreme embarrassment. Paragraph 1 supra. MHMH reacted by setting on a course to punish her, egged on by Dr. Doe, a resident who was already angry with MHMH for the Kispert email display where Dr. Kispert's candid judgment of her skill was shown to all the residents. Paragraph 7 infra. Now Dr. Doe was angry over her performance record being shared with those authorities she had hidden the information from - the State of Kentucky and her future fellowship program at the University of Kentucky. (Doc.143-1, ¶251-253); Kispert Dep. at 87(Doc.143-19)

**6.  DR. KNAPIK'S CONDUCT DID NOT ACTUALLY VIOLATE ANY OF PPM CRITERIA**

**a**. Sending the letter anonymously was allowed by the American Medical Association ("AMA"). AMA Code of Medical Ethics, Opinion 9.031 (Doc.143-3) recognizing that reports should be investigated even if made anonymously ("reports submitted anonymously") and AMA Council on Ethical and Judicial Affairs Report A – I-91("In cases where the potential for negative effects on the reporting physician's practice or career are great, some physicians may be prompted to

21

make anonymous reports to an authority. While necessary under certain circumstances in order to minimize potential damage to the reporting physician, anonymous reports are not encouraged because of the potential for abuse. However, because physicians may have legitimate justification for making anonymous reports, such reports should receive appropriate review and confidential investigation by any disciplinary or investigation bodies")

**b.**  A failure to show remorse is not identified as a basis of unprofessional conduct. Bertrand Dep. at 27 ("I don't believe that remorse is included in our policy");

**c.**  Misuse of computer resources and e-mail is not only not proven, and assumed by the Court to not have occurred, but the Court found MHMH did not rely on this as a basis for termination of Dr. Knapik (Doc. 150 at 13) which is ironic since the alleged theft of the e-mail was a central part of MHMH's "investigation" and was a critical factor used in soliciting the opinions of others on what course of conduct to pursue. See Paragraph 5 supra.

**d**.  Sending a confidential document to a third party without permission is not a violation of MHMH standards where, as here (Paragraph 3 supra) the person sending the letter believes the letter is a probation letter and the resident lied about its existence in seeking a medical license. Doc 143-1 ¶ 156 (Finlayson Dep. at 69 (Doc. 143-15) ("I don't think that I could say it was unprofessional conduct if she truly believed that Dr. [Doe] had prevaricated on her accreditation materials"); Bertrand Dep. at 30 ("if Dr. Doe informed her that she was going to falsify her application, would that raise a duty on Dr. Knapik's part to report it? ... If an individual was informed by someone that they were intentionally falsifying an application to a program, yes, I would say that." Incredibly Dr. Kispert acted without knowing her motive.

22

**e**.  The Finlayson letter Dr. Knapik received from Dr. Doe had no indication that it was a confidential quality assurance evaluative document since it was not so marked and it was sent to Dr. Doe through a private e-mail account, and not through the MHMH official e-mail system. (Doc.143-1, ¶199; Doc. 143-7 at 29, 38); The letter was voluntarily given to Dr. Knapik, its contents were openly discussed between Dr. Knapik and Dr. Doe's mother and were shared with Dr. Prock by Dr. Doe. Prock Affid. at ¶ 6 (Doc. 143-10); Doe Dep. at 39 (Doc. 143-14). Dr. Knapik had a reasonable basis to believe the document was not a protected confidential document since Dr. Doe did not treat it as such.

**f**.  The only person in this entire sordid affair who has maintained "honesty and integrity" is Dr. Knapik. It is she who, after unsuccessfully seeking to persuade Dr. Doe to honestly disclose that she had a received a probation/discipline letter, had the integrity to risk her career to report Dr. Doe's ethical violation to the appropriate Kentucky officials. Knapik Affid. ¶¶ 17-23 (Doc. 143-9). MHMH officials, on the other hand, bent over backwards to hide from Kentucky, and other surgeons, like Dr. Cronenwett, not only the many academic problems Dr. Doe incurred during her residency but even the candid and extremely harsh judgment from her Program Director, Dr. Kispert, that even as late as the last half of her final year she was not competent to function as an independent surgeon. Rather, all these MHMH doctors signed off on Dr. Doe, chastising Dr. Knapik by telling her that if Dr. Doe had committed ethical violations it was not Dr. Knapik's business. Freeman Dep. at 58 (Doc. 143-16) The AMA code of ethics says to the contrary and so does the PPM which states "All professional staff members at D-H have additional ethical obligations that exceed legal and regulatory requirements by virtue of their professional training and because of their positions of responsibility. Professionals have responsibilities to those

23

whom they serve, their colleagues, and the public." PPM at 82 (Doc. 143-2).

**g**. While the Court focused on what it believed was Dr. Knapik's lie – i.e. her initial refusal when faced with a threat of criminal prosecution to admit she sent the letter and her admission of that fact a few minutes later – MHMH never mentions "lying" as a basis for its decision to terminate.

**7.   MHMH** HAD THEMSELVES DOCUMENTED AND WERE OTHERWISE AWARE OF **DR. DOE'S** TENDENCY TO REACT POORLY WHEN SHE WAS SUBJECTED TO CRITICISM AND TO ACT VINDICTIVELY AGAINST THOSE WHOM SHE BELIEVED HAD DONE HER HARM

a. When Dr. Kispert displayed his e-mail criticizing Dr. Doe's academic skills Dr. Doe "expressed mostly horror. It was a terribly embarrassing and painful and humiliating moment in my residency career." Doe Dep. at 120 (Doc. 143-14). Dr. Doe wrote a letter to Drs. Freeman and Kispert about the incident (Doe Dep. at 126), which MHMH has refused to produce, but it must have been strongly worded since immediately after receiving the letter Dr. Kispert told Dr. Freeman "I am going to resign as the program director ... The issue with Dr. DOE regarding the inadvertent e-mail that I never even knew was up had put me over the edge." (Doc. 143-1, ¶253 (Doc. 143-7 at 46))

**b**. When Dr. Doe learned the Finlayson letter had been sent to Kentucky she spoke with Dr. Kispert and expressed anger with Dr. Knapik. Kispert Dep. at 87 (Doc. 143-19).

**c**. On May 18th, shortly after MHMH learned of the letter being sent to Kentucky it met with Dr. Doe to "let her know that this would be dealt with in a very serious manner" (5/18/2012 Kispert e-mail) and MHMH knew how angry Dr. Doe was and how embarrassed MHMH was. See Paragraphs 1 and 7. a. and b. supra. There was no real chance for a sober consideration of Dr. Knapik's motive, a motive Dr. Kispert never learned before deciding to terminate Dr. Knapik. See paragraph 5 supra.

**8.  Dr. Knapik's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor" (Doc. 150 at 6 (quoted citation omitted)) thus the Court should have concluded that evidence supported the following:**

**a**. MHMH terminated Dr. Knapik not because she violated MHMH's Policy and Procedures Manual, which she did not violate, but either because her actions embarrassed MHMH or it feared Dr. Doe's wrath, or both;

**b**.  MHMH never seriously considered Dr. Knapik's violations of PPM obligations but focused on the allegation she stole the letter from Dr. Doe and she had no justification for sending the letter even though there was ample evidence those allegations were false;

**c**. MHMH did not conduct a thorough or objective investigation of charges against Dr. Knapik

**d**.  MHMH chose to accept the word of Dr. Doe about Dr. Knapik, her motives and her actions when there was ample evidence available to, and documented by, MHMH that Dr. Doe was prone to lie, even when the safety of patients was at stake;

**e.** Plaintiff's motivation for sending the letter, and sending it anonymously were that she had a good faith basis to believe Dr. Doe had lied on her application and MHMH would take harsh action against Plaintiff, which they subsequently did.  Per the AMA, licensure falsification is unethical behavior that requires reporting to the appropriate authorities, in this case Kentucky, and this obligation is not relieved by any action other than reporting to those entities. Anonymous reporting is sanctioned by the AMA and is not considered unethical behavior;

**f.** Dr. Knapik had good reason to not use MHMH internal procedures to raise her concern about Dr. Doe because Dr. Knapik was aware of the extent to which MHMH was overlooking even more serious problems, and those were with Dr. Doe's surgical competency, just to protect their reputation as a training program.