UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

THERSIA J. KNAPIK                )

            VS                   )   CASE NO:   5:12-CV-175

MARY HITCHCOCK MEMORIAL          )
HOSPITAL
_____)   MOTION FOR SUMMARY JUDGMENT
                                          HEARING

BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          DISTRICT JUDGE

APPEARANCES:  ANTHONY Z. ROISMAN, ESQUIRE
              NORMAN E. WATTS, JR., ESQUIRE
                    Watts Law Firm, P.C.
                    P.O.  Box 270
                    Woodstock, Vermont    05091
                    Representing The Plaintiff

              EDWARD M. KAPLAN, ESQUIRE
              WILLIAM D. PANDOLPH, ESQUIRE
                    Sulloway & Hollis, PLLC
                    P.O. Box 1256
                    Concord, New Hampshire    03302
                    Representing The Defendant

DATE:        January 7, 2015

              TRANSCRIBED BY:  Anne Marie Henry, RPR
                    Official Court Stenographer
                         P.O. Box 1932
                    Brattleboro, Vermont    05302

1          (The Court opened at 1:30 p.m.)

2          THE CLERK:  Your Honor, the matter before the

3    Court is civil number 12-175, Thersia Knapik versus Mary

4    Hitchcock Memorial Hospital.  Present on behalf of the

5    plaintiff are Anthony Roisman and Norman Watts, Junior.

6    Present on behalf of the defendant are Edward Kaplan and

7    William Pandolph.  And Steve Ellis is also present for the

8    intervenor.  And we are here for a hearing on a motion for

9    summary judgment.

10          THE COURT:  All right.  Just preliminarily,

11   Mr. Ellis, good to see you like always.  I don't know quite

12   what to do with you here.  I know there was a kerfuffle

13   about notice, but you kind of outsmarted yourself by getting

14   everything sealed so nobody in the clerk's office really

15   knows that you exist.

16          And then I went back and looked at the record and

17   I read several very stern letters indicating that your

18   client's beyond the jurisdiction of the Court and you have

19   no part in the lawsuit.

20          So I respect your legal position, of course.  So I

21   don't really know what you want to do.  You are welcome to

22   come.  If we were to fast forward, and in the event that we

23   had a trial, I wouldn't have you seated where you are.

24   You'd be with the public like everybody else.

25          MR. ELLIS:  Would you like me to --

```
 1              THE COURT:  And if you don't -- no, no, you are
 2    totally fine here of course.  If you don't come I won't be
 3    hurt, but if you, I suppose you should file a limited
 4    appearance, if you haven't already, if you want to get
 5    notice of hearings because everything got locked up under
 6    the ruling of Judge Reiss and literally we don't know that
 7    you really exist.
 8              MR. ELLIS:  Well, Your Honor, I do get electronic
 9    notice.
10              THE COURT:  You do?  Oh, so you knew that the
11    hearing was coming?
12              MR. ELLIS:  Oh, yeah.
13              THE COURT:  I misunderstood.  I thought you didn't
14    get it.
15              MR. ELLIS:  No.  No.  No.
16              THE COURT:  All right.
17              MR. ELLIS:  On the ECF System I get notice like
18    everybody else.  I'm here in whatever capacity I'm required
19    to be here.
20              THE COURT:  Perfect.  Then we're fine.  I thought,
21    just to sort of complete the loop, I'm totally happy to
22    honor Judge Reiss' sealing order.  If the matter went to
23    trial and if your client testified I would expect her to
24    come in under her own name just like any other witness.  You
25    understand that?
```

1          MR. ELLIS:  Yes.

2          THE COURT:  Okay.  We don't need to go there.

3          So why don't we turn to the summary judgment and

4     the moving party.  Good to see you.

5          MR. PANDOLPH:  May I?

6          THE COURT:  Please.

7          MR. PANDOLPH:  William Pandolph for the defendant.

8     The hospital has moved for summary judgment on two grounds.

9     First, that Dr. Knapik failed to exhaust her administrative

10    remedies by not filing for a grievance and having an

11    evidentiary hearing on her dismissal.  That Dr. Knapik knew

12    that she could file the grievance and have a hearing, but

13    she knowingly and intentionally declined to do so after

14    consultation with counsel, and as we'll discuss, for reasons

15    that do not excuse her failure.

16          If that were not enough, the decision to dismiss

17    Dr. Knapik from the residency program for sending a

18    confidential and privileged letter about another resident to

19    that resident's fellowship program without permission, and

20    in a manner designed to make it appear that it was an

21    official communication from the residency program, was not

22    arbitrary and capricious.

23          In other words, a reasonable residency program

24    could have determined that Dr. Knapik engaged in conduct

25    that was unbecoming of a physician and in violation of the

1    residency program's ethical standards.  After all, Dr.

2    Knapik admits sending the letter and taking the action that

3    she was dismissed from the program for doing.

4          Also, as you may have noticed, Dr. Knapik has not

5    argued that the hospital's determination was arbitrary and

6    capricious.  That argument was not made in response to her

7    motion for summary judgment.

8          Instead, she relies, merely argues that it's the

9    wrong standard, end of story.  So to the extent that the

10   Court agrees with us and determines that this standard is

11   arbitrary and capricious we maintain that she has waived

12   that argument.

13         I'm going to expand on those arguments in some

14   detail, but I just wanted to spend a little time with a

15   brief overview of the essential facts if that's okay.

16         Dr. Knapik was a medical resident in the

17   hospital's general surgery residency program.  As the Court

18   has recognized, the primary purpose of the residency program

19   is not employment, it's not the stipend, but rather, it's

20   academic training and the academic certification of the

21   completion of the program.

22         THE COURT:  Right.  I mean the thing barely

23   squeaks past the 13th Amendment, right?

24         MR. PANDOLPH:  What's that?

25         THE COURT:  The thing barely squeaks past the 13th

1    Amendment.  In other words, they work all the time and they

2    get paid nothing, but they learn a lot.

3              MR. PANDOLPH:  Fair enough.  But how does one earn

4    that certification?  Well, if you look at the policies and

5    procedures manual, of course, it involves medical knowledge

6    and patient care, but also involves other things like

7    professionalism, interpersonal communication skills.

8    Professionalism includes integrity, respect for others,

9    commitment to ethical principles, accountability to the

10   profession.  The point is, it's not simply about patient

11   care and medical knowledge.

12             THE COURT:  Right.

13             MR. PANDOLPH:  So Dr. Knapik started in June,

14   2007.  And the resident who we refer to here is Dr. Doe and

15   also Dr. Isak Goodwin who I'll talk about.

16             THE COURT:  Doctor who?

17             MR. PANDOLPH:  Isak Goodwin.  It's I-S-A-K.  Also

18   began their general surgery residency program at the same

19   time, in June, 2007.

20             Now, the expected duration of the general surgery

21   residency program is five years, but despite that the

22   residents enter into annual agreements of appointments.  And

23   you'll see in the file that Dr. Knapik did so for five

24   years.

25             The agreements also incorporate the existing

1    policies and procedures of the residency program which

2    include a number of important things.  First, the residency

3    program's code of ethical conduct.  Second, the statement

4    that you will be evaluated and that those evaluations are

5    confidential and privileged, as the Court has already ruled.

6          Third, there are provisions about the confidential

7    reporting of issues and concerns that a resident might have,

8    the internal confidential reporting of concerns.  And, in

9    fact, you'll see that the policy manual says there will be

10   no retribution for asking questions or making a good faith

11   report of improper or questionable conduct.

12         And, finally, the policies and procedures also

13   include a grievance policy, which we will discuss.

14         If I can jump ahead from the beginning of the

15   program to 2011.  In early 2011 Dr. Finlayson, who was the

16   program director at that time, and Dr. Doe, met to discuss

17   some concerns about her performance.

18         Now, as you'll see the record Dr. Doe is sensitive

19   about those discussions.  Although, she did mention them to

20   Dr. Knapik.  In fact, you'll see an e-mail in there where

21   they sort of have an exchange of, well, how do you know, how

22   do you know we had this discussion.  And it's obviously that

23   Dr. Doe was extremely sensitive about those discussions.

24   And that's important because we get into the issue of this

25   letter and how it was communicated to Dr. Knapik.

1          So after they had that meeting Dr. Finlayson sends

2    an e-mail to Dr. Doe with a letter of, that is one of the

3    subjects of this litigation, I know the Court has seen the

4    letter.

5          THE COURT:  What do you call it, the warning

6    letter?

7          MR. PANDOLPH:  Yes.  Well, it's -- he calls it a

8    letter of concern.  So he sends a letter by e-mail.  He

9    testified, you know, that's what he has described in his

10   deposition is a letter of concern.  Dr. Doe calls it a

11   remediation or performance improvement.  But the important

12   thing was it's not probation.  And I'll talk about that.

13         So he sends the e-mail to her with the letter

14   attached.  The Court has acknowledged that this is a private

15   and confidential letter that's protected under New Hampshire

16   Law.  It says it in the policies and procedures manual.

17   That's, the residents know that.

18         Now, as I said, the letter doesn't say to Dr. Doe,

19   you are on probation.  It doesn't use the word probation.

20   Dr. Finlayson, the author of the letter, testified that he

21   did not consider Dr. Doe on probation.  The residency

22   program never considered Dr. Doe on probation.  As I said,

23   Dr. Doe described it as a remediation.

24         According to Dr. Knapik, Dr. Finlayson and the

25   residency program are wrong and it's a or that she knows

1    better than them and so it's probation.

2             Again, the author of the letter of the residency

3    program never considered that Dr. Doe was on probation.

4             So how does Dr. Knapik get the letter?  Well, to

5    step back a minute Dr. Knapik, Dr. Doe and Dr. Goodwin, the

6    three general surgery residents, receive what they call

7    ABSTES test scores, American Board of Surgery and Training

8    Examination Scores in February of 2011.

9             They get them individually by e-mails from, from a

10   residency program administrator.  Dr. Doe's test score was

11   good.  At 8:29 a.m. on March 24, 2011 Dr. Doe's test score,

12   the e-mail that sent Dr. Doe's test score, was forwarded to

13   Dr. Knapik.

14            Dr. Doe says, I never forwarded that to

15   Dr. Knapik.  No message with the e-mail like, here's my test

16   score.  Just simply forwarded.  And that's also part of the

17   record.  Most people, when you forward something, would

18   presumably send a message, but no message with this e-mail.

19            So, again, at 8:29 that e-mail was forwarded with

20   the test score.  At 8:49 that same morning, March 24, 2011,

21   the e-mail from Dr. Finlayson to Dr. Doe is also forwarded

22   to Dr. Knapik with the letter attached.  Again, no message,

23   here's the letter, no response, why are you sending me this

24   letter.  Nothing in writing that acknowledges anything about

25   sending of the letter other than the simple fact that it was

1    forwarded from --

2            THE COURT:  If I can interrupt, are these

3    circumstances for trial?  I mean, we're at summary judgment

4    so we have to accept the facts as they are sworn to by the

5    plaintiff.  And there's a dispute or really more of a

6    mystery I think than a dispute about how the thing came

7    over, but for summary judgment purposes don't we have to

8    start with Dr. Knapik's position, which is that Dr. Doe

9    voluntarily shared the letter with her?

10           MR. PANDOLPH:  Normally you would but let me

11   respond to that in two ways.  Under the arbitrary and

12   capricious standard a determination is, determination is not

13   arbitrary and capricious merely because there may be

14   contradictory evidence.  That's a little bit different than

15   a normal summary judgment, is there a genuine issue of

16   material fact.  Because you're looking at the decision of

17   the residency program to determine is there evidence to

18   support that determination, was there substantial evidence

19   to support that determination.

20           So the fact that this contradictory evidence -- so

21   there's a dispute between Dr. Doe's version and Dr. Knapik's

22   version that does not preclude summary judgment under an

23   arbitrary and capricious standard as long as a reasonable

24   residency program could have accepted Dr. Doe's version of

25   the facts.  But I also will say, I don't think it's a

1   material issue under, even under the normal summary judgment

2   rules for a couple of reasons.  Even if you assume, and

3   we'll accept Dr. Knapik's version of the fact that she

4   received the letter from Dr. Doe, that's really -- it was a

5   secondary issue.  Because she was dismissed not because she

6   received the letter, but because --

7          THE COURT:  No, because she published it.

8          MR. PANDOLPH:  -- what she did with it.  So,

9   again, there's two reasons why I don't think that precludes

10  -- admittedly Dr. Knapik says X., Dr. Doe says Y., but it

11  doesn't preclude summary judgment, again, for those two

12  reasons.  Primarily because under an arbitrary and

13  capricious review the Court sort of is sitting more as an

14  appellate court when you make a determine under a arbitrary

15  and capricious review.  So it doesn't, contradictory

16  evidence doesn't change that.  And, again, the residency

17  program had the right to accept, if it was reasonable, had

18  the right to accept Dr. Doe's version of the facts.

19          The other thing about the letter is, as I think we

20  mentioned, after it was forwarded, normally when you forward

21  an e-mail you'll see it in your sent directory.  Dr. Doe

22  checked.  It was not in her sent directory.  Somebody

23  deleted it from her sent directory.  When you normally

24  delete something from the sent directory it then goes to a

25  deleted file directory.  It was also deleted from that file.

1    So it appears that somebody took steps to make sure that it

2    was difficult to find that that was forwarded where Dr. Doe

3    did see other e-mails around the same period.

4            THE COURT:  So not to get too deep in the weeds

5    with you on this, but that would rule out something as

6    simple as Dr. Knapik having access to the log in e-mail

7    password, right?  Because that would, if she had simply

8    logged in as Dr. Doe, my wife logs in as me all the time,

9    then that would show up as a forward and would leave that

10   record.  So this is something --

11           MR. PANDOLPH:  That would show up as what?

12           THE COURT:  It would show up as a forward to her,

13   to her account.

14           MR. PANDOLPH:  No, you know, even on your e-mail

15   system you have -- if you are logged into your e-mail system

16   you have access to your e-mail's in box, you have access to

17   your sent items, and you have access to your deleted items.

18           So if I, if I forwarded an e-mail from my wife it

19   would, it would come forwarded to me.  And then she would,

20   you know, she would forward it to me, but she could also

21   then go into her sent items and delete it from there so it

22   wouldn't be -- while she was on the system and she could

23   also go into her deleted items and delete it.  You can do

24   that while logged on.  I mean that's my point.

25           So, anyway, Dr. Knapik prints the letter.  I think

1   one of her friends testified that she found it in a magazine

2   at her house and so she had it hanging around.  Again,

3   Dr. Doe testified that she never sent it to Dr. Knapik.

4          Interestingly, later that spring, another e-mail

5   with the test scores we talked about of Dr. Goodwin's, who I

6   mentioned earlier, was also forwarded to Dr. Knapik.

7          Now, he also testified, that I never forwarded

8   that e-mail to Dr. Knapik.  And he said, I had a very poor

9   test score and I was embarrassed by it.  I would never do

10  that.

11         So now you have two people who have no motivation

12  to lie say, we never forwarded those e-mails to Dr. Knapik.

13         And I think to step back this, you've heard in

14  their response they sort of suggest, well, how could

15  Dr. Knapik forward an e-mail with a letter if she didn't

16  know about the letter.

17         Well, again, it can be explained a couple of ways.

18  First of all, you have the test scores.  She had that.  She

19  got an e-mail herself from the test scores and knew that

20  those test scores were out there.  And the sequence is the

21  test score was forwarded first and then the letter second.

22  Dr. Doe obviously discussed the issue she was having with

23  Dr. Finlayson so she had knowledge about that.  But, you're

24  right, I think the bottom line is, although it is a

25  secondary issue, a reasonable residency program could

1    determine that Dr. Knapik had forwarded these e-mails to

2    herself.

3              THE COURT:  Is there a record that shows that

4    that's what they actually decided, that she has sort of like

5    a, one of these Chinese military groups with super hacking

6    powers and can get in or did they actually make a decision

7    about how she got the letter or is she sort of where I am, I

8    don't know?

9              MR. PANDOLPH:  What's that?

10             THE COURT:  Is she sort of where I am, which is I

11   don't know how she got the letter?

12             MR. PANDOLPH:  Well, again, it's a secondary

13   issue.  It was not part of the termination letter.

14   Although, they did mention electronic access.  So it is a

15   little bit of a mystery about that, but I think a reasonable

16   residency program could have made that determination.

17             THE COURT:  But do we know that they did?

18             MR. PANDOLPH:  Well, all I can glean from the

19   termination letter is they said she violated the electronic

20   e-mail system.  But, again, you're right, it was not, it was

21   not the basis, the primary basis for the, for the decision

22   to dismiss her from the program.  It is a secondary issue.

23             So Dr. -- we're also back still in 2011.  Dr. Doe

24   applies for a fellowship to continue her training, which

25   would have ended in June, 2012.  So you do that in your

```
 1   fourth year even though you're going to continue to a fifth

 2   year.

 3           So in connection with that application progress

 4   she asked Dr. Finlayson whether she should answer yes to the

 5   question of whether she was ever on probation.

 6           THE COURT:  Dr. Doe did?

 7           MR. PANDOLPH:  Yes.

 8           THE COURT:  Yeah, I remember that.

 9           MR. PANDOLPH:  Dr. Finlayson tells her no, you

10   don't have to do that because you were not, you were never

11   on probation.

12           THE COURT:  Right.

13           MR. PANDOLPH:  As an aside, in the response to the

14   summary judgment motion, all the plaintiff does is say,

15   well, Dr. Doe is not credible on that issue.  They don't

16   really counter it with any substantive evidence or anything.

17   So that's not sufficient to counter a statement of fact.

18           So Dr. Doe's testimony is that she spoke to

19   Dr. Finlayson and he said, no, you don't have to disclose

20   that.

21           THE COURT:  And he remembers it the same way in

22   his deposition?

23           MR. PANDOLPH:  He wasn't asked at his deposition.

24           THE COURT:  He wasn't?

25           MR. PANDOLPH:  The plaintiffs took his deposition.
```

1    But I just looked at it the other day and I didn't see that

2    he was asked the question.  So, all right, Dr. Knapik's

3    testimony is, well, Dr. Doe was supposed to disclose to the

4    fellowship program this letter that she was on probation.

5              No writing about this issue, but she testified

6    that even though really if you see the file every, seemingly

7    every small dispute is e-mail after e-mail, but nothing ever

8    about this issue.

9              THE COURT:  Right.  So we do have the strange

10   conversation with the mom, right?

11             MR. PANDOLPH:  You have the conversation with the

12   mom.

13             THE COURT:  And that I think is not disputed.

14   Does everybody agree that that conversation happened?

15             MR. PANDOLPH:  I can't answer that, but --

16             THE COURT:  No, I don't mean to interrupt your

17   presentation, but I didn't sort of track it down.  Do both

18   sides agree that the conversation with Dr. Doe's mom and

19   Dr. Knapik happened in the spring of 2011?

20             MR. WATTS:  Yes.

21             THE COURT:  Okay.  That's what I thought.  So we

22   know, one thing we can be certain of is by the spring of

23   2011 Dr. Knapik had the letter because she talked about it

24   with Dr. Doe's mother.

25             MR. PANDOLPH:  Yes.  Yeah.  And it was forwarded

1    to her.  We have evidence that the mother was --

2              THE COURT:  And you have evidence it was

3    forwarded?

4              MR. PANDOLPH:  Yeah.  The question is how did she

5    get it.  You know, they suggest that, well, Dr. Doe then

6    must have known that she had the letter.  It's not clear

7    when Dr. Doe and her mother had a conversation where she

8    relayed that.  So I don't think the timing is there.  But

9    you're right, that conversation was Dr. Doe's mother or

10   Dr. Knapik said, you know, you have to disclose this letter

11   to the fellowship application in 2011.  Again, Dr. Doe's

12   mother said, no, she talked to Dr. Finlayson, he said

13   didn't, she was hot on probation.  Of course, Dr. Knapik

14   takes no action in 2011.

15             THE COURT:  Well, we can sort of fast forward to

16   the spring of the 2012, right, because the thing just sat

17   for a year?

18             MR. PANDOLPH:  Right.  So the question is -- the

19   story, it's an ever changing story, Your Honor.  And I will

20   illustrate it this way, when you ask Dr. Knapik or when

21   Dr. Knapik has to present a reason why she sent the letter

22   to the fellowship program she says, well, and Dr. Doe lied

23   on her application.  Okay.

24             And then when you say, well, if that's the case

25   why did you wait till 2012 to do it and not do anything in

1    2011.  And then she responds and says, oh, well, no, it

2    wasn't the fellowship application, it was really the

3    application for a medical license to the Kentucky Board of

4    Medical Licensure in 2012 that prompted me to send the

5    letter.

6              And then you, say, well, okay, if that's the case,

7    you sent the letter to the Kentucky Board of Medical

8    Licensure why did you send a letter to the fellowship

9    program.  And you just keep going back and forth on the

10   issue.

11             Okay, you're right.  So let's jump to 2012.  First

12   of all, Dr. Doe and Dr. Knapik signed their last agreement

13   of appointment in June of 2011 that's supposed to run from

14   June, 2011 to June, 2012.

15             The agreement says that the hospital may terminate

16   her appointment at any time upon any reasonable basis,

17   including for conduct unbecoming of a physician.  That's the

18   agreement that was in place at the time that she was

19   dismissed.  Again, it incorporates the policies and

20   procedures we talked about a little bit earlier.

21             In our pleadings we provide a lot of detail about

22   how the relationship between Dr. Knapik and Dr. Doe changed

23   in early 2012.

24             THE COURT:  I'm pretty much up on it.  I've been

25   through it a bunch of times.

1      MR. PANDOLPH:  And just as one illustration of

2    this, and Dr. Knapik's really uttering ability to take

3    responsibility for anything, in an April, 2012 e-mail she's

4    critical of Dr. Doe for asking her to return a gift.  And

5    she states, quote, what a bitch.

6      Now, most people would say, you see that and you

7    say, yeah, I was mad, and I said that.  Not Dr. Knapik.

8    She --

9      THE COURT:  All right.  Let's get to the legal

10   issues.

11     MR. PANDOLPH:  Okay.  So Dr. Doe's application for

12   a Kentucky Medical License she makes her application for a

13   medical license.  Dr. Knapik says that she learned that in

14   March of 2012 that she was going to answer no to the

15   question of whether she was on probation, of course, based

16   on her conversation with Dr. Finlayson back in 2011.

17     Again, no writing about this issue.  But it was

18   simply not true.  She was not on probation.  And, moreover,

19   the application, if you have the application, it states that

20   only disciplinary probation needs to be disclosed, not

21   academic probation.

22     So even if she was on probation it wasn't

23   something that needed to be disclosed because it was

24   obviously an academic probation.

25     So we have this scheduling dispute in late April,

1   early May.  Dr. Knapik does not want to be on call on the

2   weekends before or after her vacation.  So at 6:43 a.m. on

3   May 3, 2012 Dr. Doe tells Dr. Knapik that she had to be on

4   call on June 16 even though she made travel plans.

5           At 7:38 a.m. on that same day Dr. Knapik goes on

6   line and gets information about Dr. Doe's fellowship

7   program, including the address of Dr. Endean who was the

8   program director.

9           THE COURT:  In Kentucky?

10          MR. PANDOLPH:  Yeah, in Kentucky.  Correct.  A few

11  days later, right in the middle of this scheduling dispute,

12  Dr. Knapik takes the 2011 letter from Dr. Finlayson, puts it

13  in a business envelope that has a Dartmouth Hitchcock

14  Medical Center return address, puts a DHMC postage label on

15  it, mails it to Dr. Doe's fellowship program without any

16  explanation.

17          Reasonable to conclude that it was meant to be

18  suggested that it was from the residency program, which in

19  fact is how it was taken.

20          No -- what doesn't she do?  She doesn't try to

21  confirm with anyone with the residency program whether

22  Dr. Doe was indeed on probation.  She doesn't discuss these

23  ethical concerns with anyone connected with the residency

24  program.

25          She doesn't use any of the means that were

1   provided by the program to raise confidential concerns

2   internally.  She doesn't send anything that --

3              THE COURT:  Right.  She pops it in the mail?

4              MR. PANDOLPH:  Yeah.  She doesn't say anything

5   to  --

6              THE COURT:  Yes, I know.

7              MR. PANDOLPH:  Okay.  The University of Kentucky

8   responds to the program and says, we got this letter.  On

9   May 31, 2012 we obtained information, the residency program

10  obtains information about Dr. Knapik's going on line on May

11  3, 2012, like I said, and found the address.

12             She's told about it on June 1, 2012, which is a

13  Friday.  Her first instinct is to deny that she sent the

14  letter.  Perhaps not a quality that one wants in a

15  physician, but she's persuaded by friends to admit that she

16  did it and she does.

17             She hires legal counsel.  And she's placed on paid

18  leave.  She then meets with representatives of the residency

19  program, explains why she did it and what she did.  They

20  review the matter internally including with an ethicist to

21  see what's the appropriate response.

22             And on June 12, 2012 they sent a letter that

23  dismisses her from the program, but also provides her with

24  the grievance option that she has available to her.

25             And it's important to note the dismissal was not

1    because of any ethical concerns that she may have had, but

2    the way that she acted on those purported ethical concerns.

3    And that's basically what happened.

4            As I said, the two arguments are that she failed

5    to exhaust her administrative remedies.  And the second

6    argument is that substantively it was not arbitrary and

7    capricious.

8            Now this Court has already said that the New

9    Hampshire, general rule under New Hampshire law is that

10   administrative remedies must be exhausted before a party may

11   bring a matter to court.  Although there's no New Hampshire

12   case on point, the Court has also noted that the weight of

13   authority that medical residents must exhaust the hospital's

14   internal grievance procedures before seeking the challenge

15   to dismissal in court.

16           The purpose of that is obviously judicial economy.

17   If the decision is overturned we don't have a case.  It

18   creates a record, etcetera.

19           THE COURT:  I'm with you on the general principle

20   without much trouble.  Here's the part that I've been

21   struggling with, which is the exception for institutions

22   that have already irrevocably committed themselves to an

23   outcome and whether you have to go through what looked like

24   the motions of the grievance at that point.  And I'm struck

25   by the things that the hospital, Dartmouth Hospital did

1    around June 12th that would indicate that they weren't

2    changing their mind no matter what.

3            And the one that really sticks out is their

4    contact with the Kentucky, not Kentucky, Florida where

5    Dr. Knapik was scheduled to start her job and some other

6    things, but that looks like an institution that when you

7    call your fellow institution and say, we're kicking out,

8    we're not graduating our resident that doesn't look like a

9    reversible decision.  What do you think?

10           MR. PANDOLPH:  Well, first of all, there was -- it

11   was a compressed time period.

12           THE COURT:  Right.

13           MR. PANDOLPH:  And the University of Miami was

14   requesting information about her status.

15           THE COURT:  Miami called or, I thought this was a

16   voluntary contact by Dartmouth?

17           MR. PANDOLPH:  There were e-mails exchanged.  And

18   I'll have to check to see who made the first contact, but I

19   believe that, I just don't recall it, but I will check on

20   that.

21           THE COURT:  I thought, my reading of the file was

22   that one of the doctors at Dartmouth took it on himself to

23   start that process, that it wasn't just a routine, oh, is

24   our person still good, you know, we're checking on the

25   status of our future fellow.

1              MR. PANDOLPH:  Well, that's the way -- this is the

2     way that they proceed with these kind of things.  They make

3     a decision and then they tell the residents that they have a

4     right to an appeal.

5              THE COURT:  Right.

6              MR. PANDOLPH:  That's how it happened in the

7     Connors case.  That's how it happened in this case.  And the

8     reason for that is you simply can't recommend, in the sense

9     of making no decision, because if the resident takes no

10    action to appeal it or file a grievance then what's the

11    status.  I mean --

12             THE COURT:  Well, it's got a five day clock on it,

13    right?

14             MR. PANDOLPH:  Right.  Now, I don't -- irrevocable

15    in the sense that the -- in the letter itself it says this

16    is the grievance policy and you have a right to a grievance.

17    A grievance committee is formed, it includes different

18    people, other program directors.  It also includes a

19    resident.  So I'm not sure why the Court would think that

20    that was irrevocable when you say, all right, we're

21    dismissing you from the program, but here's your appeal

22    right.

23             The second thing is --

24             THE COURT:  Because they've gone on record and

25    interfered with the future employment at the next

1    institution, which is maybe an appropriate step, but is a

2    hugely significant one.

3          MR. PANDOLPH:  But that doesn't mean that the fair

4    hearing committee cannot -- it's set out on the policies and

5    procedures.  The fair hearing committee can say no, you got

6    to take this resident back.  It can reverse the decision of

7    the program director.

8          Now, whether it's announced or not doesn't mean

9    that the committee can't do that.

10         The other point is Dr., you know, Dr. Knapik does

11   say, oh, yeah, I didn't know that I had -- it was

12   irrevocable, I had a right to a fair hearing.  That's not

13   how she testified about why she didn't proceed with the fair

14   hearing process.

15         In her deposition she said, I didn't think they

16   would make a correct decision or right decision.  She

17   doesn't say anything about, oh, I thought it was a final

18   irrevocable matter.  That's something that's just been

19   presented in opposition to the motion for summary judgment.

20         And you can't alter your deposition testimony in

21   response to a summary judgment motion.  The other thing is

22   she submits an affidavit from her therapist who says, yeah,

23   she told me the reason why she didn't proceed with the fair

24   hearing process is that she didn't have the right to have

25   counsel present.

1          Those are the reasons -- she knew -- the bottom

2    line she and her counsel knew that she had a right to this

3    hearing and it could have reversed the decision that was

4    made.  This idea that they thought there was no appeal right

5    or it was irrevocable is just something that's a new

6    argument that they've made.  It's inconsistent with what the

7    prior testimony is.

8          THE COURT:  But would it be a subjective, kind of

9    what was in her mind standard, or wouldn't we examine the

10   process from a more objective perspective?

11         MR. PANDOLPH:  I think it's more -- from what I've

12   seen in the case it's somewhat subjective.  What, you know,

13   she says I didn't, you know, it was nothing in there that I

14   had the right to do this, a right to do that.  She knew.

15   And that's the bottom line.  She knew that she had this

16   right to appeal.  She knew that she had a right to have this

17   evidentiary hearing.  It wasn't that she thought the

18   decision was final.

19         That's her own testimony.  She said, I knew I had

20   a right to do it, I wasn't going to do it, I decided not to

21   do it.  I consulted with counsel and simply decided not to

22   do it.  I don't think that that -- I think the failure to

23   exhaust applies in that circumstance.

24         THE COURT:  So that takes us to the, kind of the

25   merits, which is summary judgment, no fact finding, no jury

1   trial on the question of the correctness of the hospital's

2   decision?

3         MR. PANDOLPH:  Well, here's the, you know, the

4   first issue, of course, is the standard of review.

5         THE COURT:  Right.

6         MR. PANDOLPH:  That's the big issue.  The, as I

7   think the Court's prior order on the certification question

8   acknowledged, and just the cases from New Hampshire Supreme

9   Court that we cited, a hospital is entitled to deference

10  with respect to its determinations regarding a resident's

11  dismissal from their program.

12        I don't think that the defendant or the plaintiff

13  argues that it, that that's not the case.  They suggest that

14  it doesn't apply in this circumstance because the decision

15  was disciplinary and not academic.

16        Well, I think there's a difference between

17  academic grounds and the word academic deficiency, which is

18  used in the letter.  But putting that aside, that

19  distinction is not relevant for substantive claims.  That's

20  a distinction that's recognized by the courts in connection

21  with due process, constitutional due process claims.  And it

22  really affects the amount of due process required, whether

23  it's disciplinary or academic.  It's still an exercise of

24  professional judgment.

25        But in this case a couple things.  First of all,

1    Dr. Knapik has not made a procedural due process claim.

2    Okay.  Second of all, it is a private hospital so you have

3    issues about whether that even applies.

4            The bottom line is even in the cases that were

5    cited by the plaintiff the arbitrary and capricious standard

6    applies to both academic and disciplinary dismissals.

7            So, I mean, this was an academic.  And as the

8    Court's recognized in its order, dismissal based on ethical

9    concerns is a dismissal on academic grounds.  So I don't

10   think there's any dispute, no dispute that this is

11   deferential review and that the arbitrary and capricious

12   standard should apply.

13           And, again, what that means is the Court has to

14   assess whether a reasonable program, residency program could

15   have determined that Dr. Knapik engaged in conduct

16   unbecoming of a physician and a violation of that.

17           It's a very, very -- the courts, you know, the

18   cases we've cited is a very high standard.  In fact, I think

19   it basically says it has to be so out of bounds that it is

20   not an exercise of professional judgment at all.

21           Clearly, I think that the record supports that

22   this was an exercise of professional judgment by the

23   residency program.

24           Now, we started talking about this before in terms

25   of what does this mean in terms of the summary judgment

1    standard.  As I said before, when you engage in arbitrary

2    and capricious review I sometimes think of it as the Court

3    putting on the hat of an appellate court.  Whether, again,

4    whether there's contradictory evidence doesn't mean that

5    summary judgment should not be granted.  Whether the Court

6    might have decided it differently, whether the Court or a

7    jury might have decided it differently doesn't mean that the

8    decision was arbitrary and capricious.

9              That's a very different standard than the normal

10   summary judgment motions that we talked about before.

11             So that -- and, again, they don't even respond and

12   say -- they never argued that the decision was arbitrary and

13   capricious.  As I said, they, you know, they admit that they

14   sent the letter in the manner that they sent it and that was

15   found objectionable by the residency program.

16             So I think they waive that argument if the Court

17   finds that, that that's the standard.

18             There's also some other, other issues in terms of

19   whether this is wrongful termination of employment claim.

20   And we talked about that in our briefs.  And as I noted

21   before, the primary purpose is not an employment dispute.

22   The primary purpose of this is academic training and the

23   academic certification.

24             And even if you look at their complaint their

25   beef, what they say is that, well, I was not allowed to

1    graduate, I didn't receive the certification that I needed

2    to go forward.  It's not a dispute about anything related in

3    the employment context.  So for that reason alone it's not a

4    wrongful termination of employment claim.

5              Now, in the cases we've cited from New Hampshire,

6    you know, whether that allows a tort, public policy tort for

7    some other reasons I guess that can be debated.  There are

8    cases from New Hampshire that say when hospital privileges

9    are denied to a physician that there's a claim there or when

10   an HMO, you know, dismisses a physician from its, from its

11   network.  But even if those public policy reasons apply in

12   this circumstance, and there are reasons that it's not the

13   same kind of patient-physician relationship, that are at

14   issue in those cases that make that sort of fly, the

15   standard is still the same.

16             The Court says the standard is arbitrary and

17   capricious.  So whether it's a contract claim or a tort

18   claim, breach of good faith and fair dealing claim, it's

19   deferential review, arbitrary and capricious, and that's the

20   standard.

21             And if you apply that standard to these facts I

22   don't think you can reach any other conclusion that a

23   reasonable residency program could have made the

24   determinations that were made in this case and, therefore,

25   summary judgment should be granted in favor of the

1    defendants.

2           THE COURT:  So is the arbitrary and capricious

3    decision always made by the judge prior to the jury trial or

4    are there closer cases where the jury would decide whether

5    the action was arbitrary and capricious?

6           I mean, an example that occurs to me, the record

7    in this case and in any medical or residency program dispute

8    shows it's a kind of an intense environment, people stay up

9    too late, they work too hard, they get mad and they have

10   tiffs.  I'm not talking about the facts of this case, but

11   there are plenty of, you know, bursts of anger between the

12   attending physician and the resident that blow over and they

13   go on.

14          If one of those blew up into a dismissal of a

15   person, that's kind of a thin record, and they filed suit,

16   as the plaintiff has here, I would just look at this and

17   decide without a jury that this is arbitrary and capricious

18   or not or does the jury get to decide this at some point?

19          MR. PANDOLPH:  Primarily it seems that the courts

20   make these decisions.  I can't preclude that there may be a

21   circumstance where a Court could say, a reasonable jury

22   could find that it was arbitrary and capricious.

23          It's a very high standard.  I can't rule out that

24   that's possible in some circumstance.  I think you need to

25   play a gatekeeping role here.  And I don't think it's just

simply a normal summary judgment gatekeeping role.  It's a
very high standard.

So perhaps there's some circumstance where the,
you know, where the evidence is that maybe a reasonable
juror could find arbitrary and capricious conduct because it
was, as you say, it was so thin.  I don't think the facts
and circumstances --

THE COURT:  Or a personality dispute or something
like that?

MR. PANDOLPH:  Yeah.  Yeah.  I don't think the
facts of this case -- I can't rule that out.  No claim of
New Hampshire law on that point, but in a case like this
where there is, where there's plainly -- even if the Court,
as I said, even if the Court may have decided it differently
had it been looking at it de novo that it doesn't survive
that standard.

The bottom line it's not supposed to go to a jury
for them to say de novo, I think it's correct or incorrect
what the residency program did.  I would have done it
differently.  That's just not the test.  It's a very, I
think a very high, very high bar.

As I said before, it almost has to amount to a
finding by the Court that it was -- there was no -- there
was no professional judgment exercised.  As you know, you
could probably think of an example of that in some

1    circumstances.  Certainly not in this case.

2              THE COURT:  And then looking back over the factual

3    record before you started, which was very helpful, I think

4    almost, I'll hear the plaintiffs out on this, but I think

5    everything is pretty much agreed because it's in writing

6    except for that sort of initial question of how did

7    Dr. Knapik get the letter, which is sort of hotly contested.

8              MR. PANDOLPH:  I think that's absolutely correct.

9              THE COURT:  But I can't off the top, I've been

10    through it a couple of times, I can't really think of

11    another sort of decision point that is strongly disputed.

12    Though I'm sure I'll be reminded of one in a minute.

13             MR. PANDOLPH:  I think that's correct.

14             THE COURT:  Okay.  Good enough.  Thank you.

15             MR. WATTS:  May I?

16             THE COURT:  Please.  Good to see you.

17             MR. WATTS:  Good afternoon, Judge Crawford.  It's

18    a pleasure to be here in your court again.

19             I think it's important to understand in this case

20    that the defendant's role here, the defendant's position has

21    moved precipitously over time.  A good example of that is

22    they contended in their, they asserted clearly in the

23    termination letter, and in the letter to the Miami

24    fellowship, that Dr. Knapik was not terminated for academic

25    reasons.

1             THE COURT:  Was what?

2             MR. WATTS:  Dr. Knapik was not terminated for

3     academic reasons.

4             THE COURT:  Right.

5             MR. WATTS:  And yet here they are saying that she

6     was terminated for academic reasons.  I think that, among

7     other shifts that have occurred, undermine their, their case

8     for summary judgment.  And, of course, they have the burden

9     of proof in the summary judgment process.

10            First off though, they indicated a moment ago that

11    Dr. Knapik failed to exhaust her administrative remedies.

12    We've presented to you in our pleadings our side of that

13    issue.

14            More importantly, the defense didn't plead that.

15    It's an affirmative defense and they didn't plead it.  So

16    our contention is here that they waived it.

17            Beyond that, there were no administrative remedies

18    to exhaust.  If you look at the record, the chronology was

19    that when Dr. Knapik first learned that she had been

20    terminated, that the decision had been made to terminate

21    her, there had been no recommendation for her dismissal.

22            The rules clearly say in the personnel policy

23    manual that the process is this, there's a recommendation

24    for the resident's dismissal.  That goes to the resident.

25    And from that point on the resident for five days has the

1   opportunity to appeal.

2          Well, that didn't happen with Dr. Knapik.  The

3   defendant precipitously jumped right to termination and

4   said, you're fired and Dr. Kispert said it's irrevocable.

5   And on the very same day that she received the termination

6   letter Dr. Kispert, the program director, cancelled her

7   board certification, her graduation and her fellowship.

8   That's a fait accompli.  Dr. Kispert said it's irrevocable.

9          In her -- she has testified that she felt in

10  effect that it was futile for her to exhaust administrative

11  remedies.  And that's one of the exceptions, as you pointed

12  out up front, that's one of the exceptions to any duty to

13  exhaust administrative remedies.

14         Well, in New Hampshire there is no such duty any

15  way.  The case law that the defense is relying on is old,

16  antiquated, outdated case law.  The current case law is that

17  with a statute or with a specific agreement a C.P.A., or

18  whatever, there may be a duty to exhaust.  But in this case

19  the agreements between the parties, there's no such animal

20  that says you must exhaust administrative remedies, you must

21  appeal here before you can go elsewhere.

22         THE COURT:  What about the handbook that

23  has --

24         MR. WATTS:  Pardon?

25         THE COURT:  What about the handbook that has these

1    rules?  When they sign on a resident don't they sign on to

2    the terms of this, the handbook is not quite what they call

3    it, but this manual?

4             MR. WATTS:  The manual.  Yes, the manual says you

5    will have an opportunity to a fair hearing once the

6    recommendation was made.  There was no recommendation made

7    in this case.  She was canned immediately.

8             THE COURT:  That part I'm sympathetic to, but the

9    part that haunts me a bit is I can't imagine why a person

10   wouldn't, given the stakes, go forward and at least try.  I

11   mean --

12            MR. WATTS:  Well, if you look at, if you look at

13   what she knew -- well, Dr. Kispert told her it was

14   irrevocable, period.  And based upon that, plus her

15   knowledge that her -- everything had been cancelled

16   irrevocably, what good does it do.

17            Plus the institution that would be managing the

18   appeal process had already endorsed Dr. Doe's graduation and

19   sanctioned her even though Dr. Kispert, Dr. Finlayson and

20   others had already asserted in the record that she was a

21   liar and that she was incompetent on occasion in terms of

22   her clinical skills.  And so --

23            THE COURT:  Well, it isn't that only one of these

24   women can graduate.  There's room for two to walk across the

25   stage.  I mean, Dr. Doe's situation has got nothing to do

```
 1   with Dr. Knapik's by the spring of 2012.
 2            MR. WATTS:  Well, of course, they both could
 3   graduate, but the fact is when we're talking about her
 4   potential appeal or interest or concern or devotion to
 5   appealing she looked at the organization, the institution
 6   and it had already endorsed Dr. Doe and taken Dr. Doe's side
 7   of the story about the letter being sent, about how
 8   Dr. Knapik acquired it.  All of that.  They had bought hook,
 9   line and sinker Dr. Doe's story, at the same time overlooked
10   all of the terrible things that Dr. Kispert had said in his
11   e-mail that he posted in the resident's meeting about
12   Dr. Knapik, I mean about Dr. Doe.  And all of the, and all
13   of the, what all the other attendings had said about her.
14            So Dr. Knapik is looking at this picture, all
15   these things that in her life, her future had been
16   cancelled.  Plus the fact that Kispert said it was
17   irrevocable and they had already endorsed Dr. Doe's version
18   of the facts.  So it's a totally futile effort.  So it
19   certainly fits within the exception assuming that they
20   haven't waived the argument.
21            THE COURT:  Will I find in the record that
22   Dr. Kispert confirms that he said at that first meeting that
23   it was irrevocable?
24            MR. WATTS:  It's in Dr. Knapik's --
25            THE COURT:  It's, that's her recollection of the
```

1   discussion?

2           MR. WATTS:  That's correct.  And I believe --

3           THE COURT:  What about his?

4           MR. WATTS:  I think in his deposition transcript

5   it's also there.  I think I asked him that very question.

6   We would have presented it to you in the pleadings.  So it

7   should be readily available to you.

8           THE COURT:  All right.  I'll have a look.

9           MR. WATTS:  So there's been much discussion about

10  the standard of arbitrary and capricious.  It's important

11  for us to look at the truth here.  Arbitrary and capricious

12  standard is, is not a standard in and of itself.  The case

13  law expresses a much broader standard.  And it's arbitrary,

14  capricious, unreasonable, unsound.  And there's ors between

15  all of those words.  It's not arbitrary and capricious per

16  se.  It's not an appellate decision for the Court, with all

17  due respect.  It's a matter of what was reasonable.

18          And we plead reasonableness in our complaint.  I

19  can't tell you the exact paragraph, but I think it's around

20  71.  And so the idea that we didn't plead that standard,

21  what the standard is, the standard of review is absolutely

22  wrong.

23          THE COURT:  All right.  But you agree with the

24  addition of these other words, unreasonable and so forth,

25  that what you are after is a jury trial in which the jury

1   would determine whether the action met that, fell below that

2   arbitrary and capricious and unreasonable standard?

3           MR. WATTS:  That's correct.  I think your

4   instructions to the jury would have to specify that under

5   the prevailing case law.

6           THE COURT:  Okay.  So that's a point on which you

7   agree with the defense?

8           MR. WATTS:  Well, I don't agree that it's

9   arbitrary and capricious.  Arbitrary and capricious is not

10  the standard.  It's arbitrary or capricious, etcetera,

11  etcetera.

12          THE COURT:  Right, okay.

13          MR. WATTS:  So it's much broader than what they

14  have portrayed here.  And, furthermore, even if arbitrary

15  and capricious were the sole standard, as they have

16  portrayed it, I think we could fit within that because they

17  arbitrarily dismissed her taking the word of Dr. Doe, not

18  even talking to Dr. Knapik about how she acquired the

19  letter, what her true motivation was.

20          Dr. Freeman asked her some of the questions about

21  what her motivation was, but he didn't communicate it to

22  Dr. Kispert who is the gentleman who made the decision.

23          So there's a gap there.  And I think it's

24  important the Court to be aware of that and understand that.

25          THE COURT:  As we look at what she did, I mean it

1   was probably the work of a few minutes for her, and we take,

2   of course, months and years to look in hindsight, and these

3   are young people also, but it strikes me that accepting her

4   subjective view of the problem and her --

5            MR. WATTS:  Which her?

6            THE COURT:  Dr. Knapik's, your client's.

7            MR. WATTS:  Okay.  Thank you.

8            THE COURT:  Understanding, accepting for purposes

9   of summary judgment, that she felt ethically compelled to

10  bring this problem forward, it strikes me she did it in

11  absolutely the worse combination of ways that a person

12  could.

13           In other words, she didn't go to Dartmouth, she

14  didn't kind of follow her institution, she did it

15  anonymously and she did it without notice to Dr. Doe.  And,

16  most importantly, from my perspective, it seems like she did

17  it in violation of the quality assurance law for, which is

18  binding on young doctors and all doctors in New Hampshire.

19           Am I missing it?  I mean, looking at it, did

20  she -- I couldn't imagine doing it in a worse way.

21           MR. WATTS:  Well, let's start with the last point

22  you made.

23           THE COURT:  Sure.

24           MR. WATTS:  Quality assurance.  The letter was not

25  stamped quality assurance.

1          THE COURT:  Is that the criteria for a trained

2    person?

3          MR. WATTS:  Well, every letter that is in a

4    quality assurance file or every notice or document in a

5    quality assurance file is stamped.  And the production, as

6    you probably have already seen, the productions from the

7    defense that are stamped quality assurance, that's the first

8    notice that, oops, this is something that's important.

9          But beyond that I think one has to look at what

10   the, what the rule here is.  Excuse me.  The American

11   Medical Association has said and portrayed an ironclad rule

12   that says the professionals must uphold the profession and

13   they must report fellow physicians who they understand or

14   believe to be either dishonest or incompetent, etcetera.

15         THE COURT:  Yeah, I mean we have the same, we have

16   the same rule here, lawyers.

17         MR. WATTS:  Oh, yes.  Of course.

18         THE COURT:  Right.

19         MR. WATTS:  And so that was her premise.  She, she

20   begged Dr. Doe, once she learned late in the spring of 2012,

21   not '11 but '12, she received -- she understood that there

22   was a letter in 2011, but she didn't know that Dr. Doe had

23   sent it, had sent her applications without checking that box

24   about disciplinary, discipline against her until 2012.

25         So that the gap there, the information is much

1  smaller than what's been portrayed to you.  But --

2          THE COURT:  Let me back up.  When does she say,

3  you'll remind me, I've been through this, and I get the

4  accounts kind of middled in my head, when does Dr. Knapik

5  say she received the letter and how did she get it?

6          MR. WATTS:  She received the letter from Dr. Doe.

7          THE COURT:  A paper copy?

8          MR. WATTS:  Either paper copy or computer copy

9  looking at her computer.  I think it was a paper copy

10 because she had it and she didn't print it out.  She,

11 Dr. Knapik, didn't print it out.  Dr. Doe gave her the

12 letter.

13         And so they debated it.  After Dr. Knapik learned

14 that -- let me back up.

15         In the spring of 2012 Dr. Knapik was filling out

16 her applications for fellowships and license.  And she saw

17 this question on the application which said, did you have

18 any discipline against you, probation, etcetera.

19         THE COURT:  Right.

20         MR. WATTS:  She didn't know that that was part of

21 the application process from 2011 on.  It wasn't until --

22         THE COURT:  If I can interrupt, she had already

23 had the rather intense conversation with Dr. Doe's mom a

24 year before in which she had asked about this very topic.

25         MR. WATTS:  About the letter.

1              THE COURT:  About disclosing it.

2              MR. WATTS:  Well, okay.  Disclosing it.  But that

3    doesn't mean that she had seen the application and she was

4    aware of the lie.

5              THE COURT:  I thought she was keenly alive to the

6    problem, as she saw it, that Dr. Doe was not going to tell

7    her fellowship application places about the letter of

8    concern.

9              MR. WATTS:  No.  The discussion with momma was

10   that she has this letter and it's something that needs to be

11   disclosed.

12             THE COURT:  Disclosed to whom?

13             MR. WATTS:  Disclosed to the proper authorities.

14   And that was another point that I thought you raised was,

15   which proper authority?  Are you talking about disclosing it

16   to or questioning about disclosing it to Dartmouth.

17             Well, the AMA Rule says that you disclose it to

18   whom the lie was made or to whom the issue was

19   mis-portrayed.  And that's why, that was one of the reasons

20   she sent it to Kentucky instead of going to Dartmouth.

21             The other reason she didn't send it to Dartmouth

22   was, again, that Dartmouth had already blessed Dr. Doe for

23   graduation and overlooked all these maladies that she had

24   engaged in.  And so she felt that it was hopeless to send it

25   to -- there would be no purpose served in sending it to,

giving it to Dartmouth.  Dartmouth already had it also.  But
alerting doctor, the Dartmouth facilities that Dr. Doe had
lied on an application.

It would have done no good in her view.  And
besides the lie, quote unquote, was made to the Kentucky
licensing authority and the Kentucky fellowship and that's
to whom she sent the letters.

And, furthermore, you made the point, it was sent
anonymously.  I think we pointed out in our briefs that the
AMA encourages letters or notices or information to be sent
to authorities in an anonymous way if she fears or if they
fear retaliation.

Dr. Knapik had brooded on this over several weeks,
many weeks.  And it wasn't an easy decision for her to make.
She and Dr. Doe had been friends.  They had worked together
side by side for years.  And she was aware of Dr. Doe's
shortcomings, but once she was aware of this verification on
the application under oath or what she perceived to be the
verification under oath she felt she had to act.

THE COURT:  Okay.  It just strikes me she could
have saved herself a lot of misery if she had written a
straight up letter explaining who she was, why she was
taking the action that she had to and copying Dartmouth and
Kentucky and Dr. Doe in on the whole thing, and it would
have caused some hurt feelings, but I'm not sure we'd be

1    where we are today.

2              MR. WATTS:  Well, we would be here today if she

3    had sent anything to Kentucky regardless of when she

4    disclosed to Dartmouth.  Dartmouth would have pretty clearly

5    lowered the boom on her anyway because they were the ones

6    that -- Dr. Freeman was irate.  He felt that the institution

7    was embarrassed because Kentucky learned about this

8    situation that Dartmouth already knew about.  Dartmouth was

9    well aware of Dr. Doe's shortcomings, but they graduated her

10   nevertheless.

11             So they were embarrassed that they had done such a

12   thing and it was going to ruin their reputation.  And that's

13   what Dr. Freeman, using some profanity, said to Dr. Knapik,

14   you created a hell of a storm for us or words worse than

15   that, but --

16             THE COURT:  And then I guess the point I wanted to

17   nail down was this letter of concern a quality assurance

18   document within the meaning of the New Hampshire statute or

19   not?

20             MR. WATTS:  Well, Dr. Knapik is not a lawyer.

21   She's not -- she had not read the statutes.  She --

22             THE COURT:  She did not get training there on

23   privilege and privacy?

24             MR. WATTS:  No.  I specifically asked Dr. Freeman

25   for the training for ethics and in that whole area.  And he

 1   said, no, no such training.

 2           And so they don't know about it.  And so that's

 3   presumably why those documents are all stamped quality

 4   assurance because it alerts non-lawyers to the fact that

 5   this is a secret document that can't be transmitted

 6   anywhere.  But even if she did know the overriding precept

 7   here is what the AMA standard is.  And that is she has to

 8   disclose a fellow physician who has been dishonest.  And

 9   that was her motivation.

10           And all this talk about the book being stolen and

11   the statement made that she called Dr. Doe --

12           THE COURT:  I shut off your colleague on the same.

13   I don't care about the tittle-tattle between these people.

14           MR. WATTS:  Thank you.

15           THE COURT:  They have a long, unhappy history and

16   presumably its come to an end.

17           MR. WATTS:  Okay.  So the important point then is

18   to focus on the fact that she didn't have a duty to exhaust

19   remedies.  The arbitrary and capricious is a much broader

20   standard of reasonableness.  And that the defense's case has

21   been bouncing around.  Every time we raise a specific

22   defense or an argument they change their story particularly

23   on the academic dismissal matter.

24           And so when the Court evaluates this, not as an

25   appellate, but evaluating the summary judgment motion, with

1    the burden on their side, presumably the Court will be

2    looking at these as they really are not as they are

3    portrayed.

4              THE COURT:  So your dream result would be here a

5    jury trial at which the jury would determine a more fully

6    developed version of the arbitrary or capricious or

7    unreasonable standard and apply that to Darmouth's action?

8              MR. WATTS:  Yes.  And also a number of the

9    statements that were made, for instance, by Dr. Finlayson,

10   which are essentially either leading or were asked as

11   leading questions or were expert opinions or something, will

12   probably be excluded.  And we certainly will move to exclude

13   them.

14             THE COURT:  Oh, yeah.  We don't have to get into

15   the details.  But that's fundamentally where you are.  And

16   does it make a difference whether these people were acting

17   in tort or acting in contract?

18             It's always inconvenient when people don't tell us

19   which area of law they are moving in.

20             MR. WATTS:  Well, our claims, our three claims

21   encompass all three of, those two theories that you -- and I

22   can go through it if you'd like.  The --

23             THE COURT:  I just wondered what the practical

24   consequences are.  It is like the scope of damages or what

25   difference does it make?

1           MR. WATTS:  It does go to damages, yes, I think.

2    And it gives the jury an opportunity to evaluate what the

3    contractual relationship was between the parties here and

4    how the AMA Guidelines and the professional guidelines

5    impact.  And then, lastly, with the covenant, Dartmouth's

6    conduct, Dartmouth's conduct in not investigating the matter

7    fully and in firing her before she has an opportunity to

8    make any sort of a protest and ignoring Dr. Knapik's stelar

9    record in the organization, etcetera, etcetera.

10          So I think the final point is that they have made

11   the point or tried to make the point that we didn't plead a

12   due process claim.  We're not here to plead or ask the Court

13   to evaluate constitutional due process.

14          What we are here to ask, and it's in our pleadings

15   and our complaint, and even under, even if it didn't say,

16   arbitrary and capricious on that other point, or if it

17   didn't say procedural due process, we're working in a notice

18   pleading state here, you know.

19          And so if the facts that are portrayed in the

20   complaint add up to failure of due process it's a due

21   process claim.  And we have made the point very clearly in

22   the pleadings that they gave her no due process.  They fired

23   her without any of their own procedures being followed.

24          THE COURT:  Right.  But you are not making a due

25   process claim?  You are making a private claim, either in

```
1    contract or in tort?

2            MR. WATTS:  Correct.

3            THE COURT:  And there's a third theory, you'll

4    remind me?

5            MR. WATTS:  I'm sorry?

6            THE COURT:  There's a third theory, a third legal

7    theory?

8            MR. WATTS:  Well, the third theory is the covenant

9    which is a tort based, not a contract.

10           THE COURT:  Okay.  Okay.  But no claim that they

11   are a state act or --

12           MR. WATTS:  No.  No.  No.  Even though there was

13   some reference in the pleadings on the other side that said

14   private hospitals are not held to the same standard.  That

15   has been de-botched by New Hampshire case law and other

16   states too where private hospitals are supported by public

17   funds, etcetera, that they have to live by the same

18   standards as public hospitals.

19           We're not saying it is a state actor.  And I think

20   the case law specifically says it's not a state actor, but

21   it is held to a certain standard.

22           The other point was that the defense is claiming

23   that the Court should defer to the institution as an

24   academic institution.  We've already addressed the point

25   that it was not an academic decision, as they admitted.  But
```

1    also in the Bricker case, which is one that they cited, and

2    the whole line of cases that came after that, the courts

3    have said that there is no deference if there's a hint or

4    suspicion of foul play of any kind or procedural

5    irregularities, that sort of thing, taking advantage of the

6    situation.

7            And we, I think, portrayed that that has been the

8    case here.  So the idea of deference to the institution is

9    not in the mix here at all.

10           THE COURT:  All right.  And then before I lose

11   you, are you on the side of this being academic or

12   disciplinary?

13           MR. WATTS:  Well, that's a good question.  It was

14   not academic.  The institution says it wasn't academic.  So

15   we have to abide by that.

16           THE COURT:  That's your view?  Do you see it as a

17   disciplinary action?

18           MR. WATTS:  Yeah, it appears to be a disciplinary

19   action.  Yes.

20           THE COURT:  And does it make a difference?  I

21   mean, I sort of see them as a continuum, right?  I mean on

22   the academic side on the left the extreme case would be some

23   poor soul that just couldn't master the material.  And the

24   disciplinary side on the right would be somebody that

25   commits a felony outside of a hospital.  And then there are

```
 1    all kinds of behaviors in between that have academic and
 2    disciplinary mixed in such as plagiarism or cheating of
 3    different sorts.
 4              MR. WATTS:  Ethical issues.
 5              THE COURT:  What's that?
 6              MR. WATTS:  Ethical issues.
 7              THE COURT:  Ethical issues, yeah.  That have both
 8    qualities.  But I guess my real question to you is does it
 9    matter for this case which of those poles we locate the
10    hospital's action under?
11              MR. WATTS:  It only matters if the Court is
12    inclined to defer to the institution's decision making.
13              THE COURT:  Right.  And then less deference for
14    the disciplinary?
15              MR. WATTS:  Yes.  Yes.
16              THE COURT:  Because it looks more like the
17    expulsion of a student from high school or something like
18    that?
19              MR. WATTS:  Correct.
20              THE COURT:  All right.  That's helpful.  Thanks.
21              MR. WATTS:  Thank you.
22              MR. PANDOLPH:  Briefly, may I?
23              THE COURT:  Please.
24              MR. PANDOLPH:  In terms of the latter point,
25    again, the only issue between, in the case law between
```

1   disciplinary and academic dismissals is the amount of due

2   process.  It has nothing to do with the substantive review

3   of a decision.

4           To say there's no deference, but then to argue on

5   the other hand the arbitrary and capricious and

6   reasonableness, which is the same thing by the way, applies

7   doesn't make any sense.

8           THE COURT:  So on the disciplinary side you what,

9   get more notice?  The pure disciplinary case, which is

10  someone who is getting kicked out because of domestic abuse

11  outside of the hospital?

12          MR. PANDOLPH:  Step back again.  This is

13  constitutional law.  But, yes, some courts have said you

14  can't even review an academic decision.  But in terms of

15  discipline the Supreme Court has said, well, at least you

16  should tell them notice of what they did and give them an

17  opportunity to tell their side of the story.  Not an

18  evidentiary hearing.

19          THE COURT:  Probably let them bring a lawyer into

20  the room too.

21          MR. PANDOLPH:  No, that's not -- I don't think the

22  Supreme Court's decisions says that at all.  The cases we

23  cited nobody says that a lawyer has to be present during

24  that, during that, during those meetings.

25          And the second point is, you know, you call it due

1    process in terms of a constitutional sense, but I'm talking

2    about even procedural due process claim, even if it's based

3    on contract you can review the complaint.  There's no,

4    there's no allegation that she didn't receive due process, a

5    procedural due process.  All the allegations are about is

6    that she was dismissed and substantively that was an

7    incorrect or unjust decision.

8            THE COURT:  Substantively unfair.

9            MR. PANDOLPH:  Right.

10           THE COURT:  I think the two of you, it took a

11   little doing, but I think the two of you agree on that.

12           MR. PANDOLPH:  The other thing is, I'll briefly go

13   over these points, we did plead as an affirmative defense in

14   our response to the amended complaint.

15           THE COURT:  Oh, exhaustion thing?

16           MR. PANDOLPH:  Failure to exhaust.  Okay.  That's

17   there.  You can see that.

18           THE COURT:  It was probably right after Latchis

19   and before --

20           MR. PANDOLPH:  I think we said it a couple of

21   ways.

22           THE COURT:  Right.

23           MR. PANDOLPH:  Dr. Kispert didn't say that the

24   decision was irrevocable.  That's not in evidence.  You'll

25   have the stuff in front of you.  That's just a misstatement.

1          THE COURT:  What did he say?

2          MR. PANDOLPH:  He didn't -- there's no evidence

3    that he said anything.  They haven't -- this is the letter.

4    The letter tells her she's dismissed from the program and

5    that you have a grievance procedure and process.

6          That's the same thing they did in the other case

7    that counsel represented another medical resident.  She got

8    the same kind of letter that said she was dismissed from the

9    program, went through the grievance hearing.  That's nothing

10   unique about --

11         THE COURT:  I may be losing, I thought I had the

12   facts down, but I obviously don't.  I thought there was a

13   discussion between Dr. Knapik and Dr. Kispert.

14         MR. PANDOLPH:  Kispert.  There's no -- we looked.

15   There's nothing in his deposition about that.

16         THE COURT:  It's my mistake.  I thought she had

17   spoken to somebody after she got word that she was going to

18   not graduate.

19         MR. PANDOLPH:  Oh, for sure she did.  She spoke to

20   somebody on the 1st, the day that they went out to her

21   house.

22         THE COURT:  Right.

23         MR. PANDOLPH:  She, you know, this is -- she

24   didn't get a chance, she never got to explain.  She sent an

25   e-mail and she explained how she got the letter.  She

1  claims, oh, wait, she never claimed that Dr. Doe gave her
2  the letter.  She said it was e-mailed to her.  You can
3  check, it's right in the docket.  She said it was e-mailed
4  to me by Dr. Doe.  And we have that issue.
5          Then she had a meeting with representatives of the
6  residency program.  They told her, geese, we're not much
7  concerned about how you got the letter but what you did with
8  it.  As you note, frankly, she did worse than possible with
9  the letter.
10         And then -- so that's -- she did come in for a
11 meeting.  And she had a meeting with representatives of the
12 residency program.  She explained her side of the story.
13 But let's step back.  She admitted doing it.  This is not a
14 place where you have to investigate she denies doing it.
15 She admitted what she did and what -- she admitted the facts
16 that formed the basis of a decision to dismiss her from the
17 program.
18         And the question is, is that a reasonable decision
19 by the residency program.  Is that not an exercise of
20 professional judgment that's entitled to deference by this
21 Court and not for a jury to second guess a residency
22 program's determination about academic standards, including
23 professionalism and ethical standards that need to be
24 applied to residents that they train.
25         They made a decision that that conduct, they no

 1   longer wanted to associate with that kind of a person

 2   because they didn't think that conduct professional conduct

 3   and conduct becoming of a physician.  Simply.  That's it.

 4           Now, in terms of futility, back to the exhaustion

 5   question, whatever, you know, possibly could a resident have

 6   been confused by this letter that's saying, well, maybe I

 7   don't have the right to appeal, maybe it's irrevocable.

 8   Possibly.

 9           This resident was not so confused.  That is an

10   after the fact argument that's inconsistent with her

11   deposition testimony where she said, she was not going to go

12   for a hearing.  I knew I had the right to it, I'm not going

13   to do it.  Or whether it's because she didn't lack counsel

14   or whether because -- it's not futile because you think, and

15   the New Hampshire Courts, we've cited cases, it's not futile

16   merely because you think I don't think the outcome is going

17   to change.

18           Now, I don't know how you can say that when you

19   don't, the committee hasn't even been formed.  And the

20   committee is to include people that you didn't work with.

21   It's to include other residents.  How you can sit there and

22   say, I don't think it's going to change its mind, if I have

23   an evidentiary hearing and present whatever I present,

24   that's not futility.  That's not futility.

25           THE COURT:  I mean, I wondered myself if she had

1    thrown herself on the carpet and begged for mercy whether

2    the outcome would have been different.  We'll never know.

3            MR. PANDOLPH:  Well, that was another factor.  She

4    showed no remorse.  You see that in the letter.  They said,

5    she never said, you know, well, let's step back.  By her own

6    admission in 2011 she knows from Dr. Doe's mother that

7    Dr. Finlayson said, you're wrong, this was not probation,

8    you don't have to disclose it to the fellowship program.

9    You are wrong.

10           A year later she decides, without doing anything

11   else, that, oh, I disagree with that, and I'm going to send

12   the letter and not discuss it with anyone from the residency

13   program.

14           And, by the way, it was not anonymous.  Okay.  It

15   was sent in a Dartmouth Hitchcock envelope with Dartmouth

16   Hitchcock postage.  It was meant to be -- it was designed to

17   be like it came from the program.  Okay.

18           And she says, well, she's supposed to report to

19   the board that was lied to.  Well, that -- if it involves a

20   medical license application that has nothing to do with the

21   fellowship program.  What's the fellowship program supposed

22   to say?  Gee, I got this letter in the mail, that must mean

23   that somebody is trying to report that Dr. Doe lied on her

24   application for a medical license.  I mean, come on, it

25   strains credibility in that regard.

1          So she didn't do anything.  She knew.  And, as I

2    said before, the actions were unprofessional.  And a

3    reasonable residency program could have made that

4    determination.

5          THE COURT:  I'll have to give it some thought.  I

6    appreciate it.  Which depositions, you know, you guys have

7    been good about sending in only the pieces of the

8    depositions, which was helpful in the first round.  But then

9    you sort of wonder what happened before and what happened

10   after.

11         Can I get the transcripts of the, I don't need all

12   the depositions that you've taken in the case, but those

13   that have been submitted in part?  It's a lot easier to read

14   the run up and read the thing in context.

15         MR. PANDOLPH:  How do you prefer to -- you can

16   have them four on a page, you prefer the whole one single

17   page?  How do you prefer?

18         THE COURT:  A scrunch is fine.

19         MR. PANDOLPH:  Sure.  We'll take responsibility

20   for that.

21         THE COURT:  Yeah.  Is that all right with the

22   plaintiff's side?  I don't know if you had attached copies

23   of portions or not.

24         MR. WATTS:  I'm sorry, I missed that.

25         THE COURT:  Would you mind submitting the full

1     transcript for the depositions that are attached in part?

2     It's just hard to kind of read six pages and then it all

3     cuts off.

4              MR. WATTS:  That's fine.  I would ask if, if we

5     shouldn't redact them?

6              THE COURT:  What's that?

7              MR. WATTS:  We should redact them for Dr. Doe's,

8     where Dr. Doe's name is mentioned?

9              THE COURT:  Oh, is it going to be voluminous?

10    File them under seal.  I can return them.

11             MR. WATTS:  The first few depositions --

12             THE COURT:  It's not that hard?

13             MR. WATTS:  No, we've already --

14             THE COURT:  Well, let's redact them.  That will

15    make --

16             MR. PANDOLPH:  We can do that.

17             THE COURT:  Mr. Ellis is nodding and make him

18    pleased.  And that's only fair, yeah.  Good.  All right.

19    Good.  Thank you both.  I appreciate it.

20             (The Court recessed at 2:42 p.m.

21

22

23

24

25

1                    C E R T I F I C A T E

2

3            I, Anne Marie Henry, Official Court Reporter for

4    the United States District Court, for the District of

5    Vermont, do hereby certify that the foregoing pages are a

6    true and accurate transcription of my shorthand notes taken

7    in the aforementioned matter to the best of my skill and

8    ability.

9

10   _____

11                   Anne Marie Henry, RPR
                     Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25